MARK K. SCHONFELD (MS-2798)
REGIONAL DIRECTOR
JACK KAUFMAN (JK-3050)
PREETHI KRISHNAMURTHY (PK-2809)
Attorneys for Plaintiff
SECURITIES AND EXCHANGE COMMISSION
Northeast Regional Office
3 World Financial Center
New York, NY  10281
(212) 336-1100

**RECEIVED**
**JAN 29 2007**
**U.S.D.C. S.D. N.Y.**
**CASHIERS**

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

| | | |
|---|---|---|
| **SECURITIES AND EXCHANGE COMMISSION,** | : | |
| | : | |
| **Plaintiff,** | : | |
| | : | |
| -against- | : | **06 Civ. 7736 (GEL)** |
| | : | **ECF CASE** |
| **JAMES N. STANARD,** | : | |
| **MARTIN J. MERRITT, and** | : | **FIRST AMENDED** |
| **MICHAEL W. CASH,** | : | **COMPLAINT** |
| | : | |
| | : | |
| **Defendants.** | : | |

---

Plaintiff Securities and Exchange Commission, for its First Amended Complaint against

Defendants James N. Stanard, Martin J. Merritt, and Michael W. Cash (collectively,

"Defendants"), alleges as follows:

## SUMMARY OF ALLEGATIONS

1.      The Commission brings this action, charging the Defendants with fraud in connection with a sham transaction that they concocted to smooth the earnings of RenaissanceRe Holdings Ltd. ("RenRe" or the "Company"), a holding company that provides property catastrophe reinsurance through its subsidiaries.  Stanard is RenRe's former chief executive officer.  Merritt is RenRe's former senior vice president of finance and controller.  Cash is the former senior vice president of specialty reinsurance of RenRe's wholly-owned subsidiary, Renaissance Reinsurance Ltd. ("Renaissance").  Together, they orchestrated a scheme involving a transaction that had no economic substance and no purpose other than to smooth and defer $26.2 million of RenRe's earnings from 2001 to 2002 and 2003.  In effect, the transaction enabled RenRe to create a "cookie jar" into which it put excess revenue from one good year, to be drawn upon in a future period to increase income.

2.      The transaction involved two separate but related contracts.  First, RenRe purported to assign at a discount certain assets ($50 million of recoverables due to RenRe under certain industry loss warranty contracts) to Inter-Ocean Reinsurance Company, Ltd. in exchange for $30 million in cash, for a net transfer to Inter-Ocean of $20 million.  RenRe recorded income of $30 million upon executing the assignment agreement.  The remaining $20 million of its $50 million assignment became part of a "bank" that RenRe planned to use in later periods to bolster income.

3.      Second, RenRe entered into a purported reinsurance agreement with Inter-Ocean that was just a vehicle to refund to RenRe the $20 million transferred under the assignment agreement plus the purported insurance premium paid under the reinsurance agreement.  The

reinsurance agreement purported to cover losses in excess of certain specified amounts, conditioned upon the occurrence of a particular kind of loss event. For this purported reinsurance coverage, RenRe paid Inter-Ocean a $7.3 million premium.

4.      This reinsurance agreement was a complete sham. Not only was RenRe certain to meet the conditions for coverage; it also would receive back all of the money paid to Inter-Ocean under the two agreements plus investment income earned on the money in the interim, less certain transactional fees and costs. In other words, the two parties consented to a round trip of cash. RenRe's claim under the reinsurance agreement would be paid with its own money. Inter-Ocean agreed to hold the reinsurance premium and the net amount of recoverables transferred under the assignment agreement (less $1.1 million in fees and costs) in trust for RenRe until RenRe made a claim, and RenRe's recovery was limited to the amount held in the trust. Thus, the assignment agreement was not a true assignment but at best a temporary deposit, and the reinsurance agreement transferred no risk to Inter-Ocean because RenRe paid Inter-Ocean the entire amount it could recover under the reinsurance agreement.

5.      The true purpose of the deal, as Stanard, Merritt and Cash understood and intended, was to defer recognizing and publicly reporting approximately $26 million in income until RenRe made a claim under the reinsurance agreement. Through this fraudulent device, RenRe materially understated income in 2001 and materially overstated income in 2002, when it made a claim under the reinsurance agreement and received as apparent reinsurance proceeds the funds it had paid to Inter-Ocean and that Inter-Ocean held in the trust for RenRe's benefit. In the third quarter of 2002, for example, RenRe overstated net income by nearly 38% as a result of the sham transaction.

3

6.     In addition, Merritt and Cash designed the transaction with the intent of fooling RenRe's outside auditors into believing that it was a legitimate assignment and reinsurance agreement, even though both knew that the transaction was a sham.  Furthermore, to mislead RenRe's auditors about the transaction, Merritt misrepresented and omitted key facts to the auditors, including the deal's lack of risk transfer and its income smoothing purpose.  Stanard and Cash were aware that Merritt concealed key facts from RenRe's auditors.

7.     On March 31, 2005, RenRe filed its Form 10-K for the year ended December 31, 2004, which contained restated financial statements for the years ended December 31, 2001, 2002, and 2003.  The restatement accounted for the transaction as if it had never occurred – in other words, like the sham transaction that it was.  However, the Form 10-K's description of the reasons for the restatement and the nature of the Inter-Ocean transaction was misleading.

## VIOLATIONS

8.     By virtue of the foregoing conduct:

a.     Stanard, Merritt and Cash, directly or indirectly, singly or in concert, have engaged in acts, practices and courses of business that constitute violations of Section 17(a) of the Securities Act of 1933 (the "Securities Act") [15 U.S.C. § 77q(a)], Sections 10(b) and 13(b)(5) of the Securities Exchange Act of 1934 (the "Exchange Act") [15 U.S.C. §§ 78j(b) and 78m(b)(5)] and Rules 10b-5(a), (b) and (c) and 13b2-1 [17 C.F.R. §§ 240.10b-5(a), (b) and (c) and 240.13b2-1].

b.  Stanard and Merritt, directly or indirectly, singly or in concert, have engaged in acts, practices and courses of business that constitute violations of Rule 13b2-2 of the Exchange Act [15 U.S.C. § 240.13b2-2].

c.  Stanard, directly or indirectly, singly or in concert, has engaged in acts, practices and courses of business that constitute violations of Rule 13a-14 of the Exchange Act [17 C.F.R. § 240.13a-14].

d.  By virtue of the conduct described herein, Stanard, Merritt and Cash are also each liable, pursuant to Section 20(e) of the Exchange Act, as an aider and abettor of RenRe's violations of Sections 10(b), 13(a) and 13(b)(2) of the Exchange Act [15 U.S.C. § 78j(b), 78m(a) and 78m(b)(2)] and Rules 10b-5(a), (b) and (c), 12b-20, 13a-1 and 13a-13 [17 C.F.R. §§ 240.10b-5(a), (b) and (c), 240.12b-20, 240.13a-1 and 240.13a-13].

## JURISDICTION AND VENUE

9.  The Commission brings this action pursuant to the authority conferred upon it by Section 20(b) of the Securities Act [15 U.S.C. § 77t(b)] and Section 21(d)(1) of the Exchange Act [15 U.S.C. § 78u(d)(1)] seeking to restrain and permanently enjoin Stanard, Merritt and Cash from engaging in the acts, practices and courses of business alleged herein. The Commission also seeks a final judgment:

a.  ordering Stanard, Merritt and Cash to disgorge any ill-gotten gains and to pay prejudgment interest thereon;

5

b.     ordering Stanard, Merritt and Cash to pay civil money penalties pursuant

to Section 20(c) of the Securities Act [15 U.S.C. § 77t(c)] and Section

21(d)(3)(A) of the Exchange Act [15 U.S.C. § 78u(d)(3)(A)]; and

c.     permanently barring Stanard, Merritt and Cash from acting as an officer or

director of any issuer that has a class of securities registered pursuant to

Section 12 of the Exchange Act [15 U.S.C. § 78l] or that is required to file

reports pursuant to Section 15(d) of the Exchange Act [15 U.S.C.

§ 78o(d)].

10.     This Court has jurisdiction over this action pursuant to Section 22(a) of the

Securities Act [15 U.S.C. § 77v(a)] and Sections 21(e) and 27 of the Exchange Act [15 U.S.C.

§§ 78u(e) and 78aa].

11.     Stanard, Merritt and Cash, directly or indirectly, singly or in concert, have made

use of the means and instrumentalities of interstate commerce, or of the mails, in connection with

the transactions, acts, practices and courses of business alleged herein.  Certain of these

transactions, acts, practices and courses of business occurred in the Southern District of New

York, including, among other things, the wire transfer of at least $50 million in connection with

the sham transaction through a bank located in the Southern District of New York.

**THE DEFENDANTS**

12.     **Stanard**, age 58, resides in Baltimore, Maryland and Bermuda.  Stanard was the

chairman and chief executive officer of RenRe and Renaissance from the time of RenRe's

formation in June 1993 until approximately November 1, 2005.  Prior to founding RenRe,

Stanard was an executive vice president at a reinsurer affiliated with a minority investor involved

6

in the formation of RenRe.  Stanard entered the reinsurance industry in 1971, holding actuarial,
underwriting, and management positions in the insurance and reinsurance industry.

13.     **Merritt**, age 43, resides in Bermuda.  He was the controller of both RenRe and
Renaissance from at least 2000 through March 2005.  He was then employed by RenRe as the
senior vice president of finance until approximately November 1, 2005.  He also was a vice
president in 2000 and 2001 and a senior vice president from 2002 through March 2005 of
Renaissance, and a vice president from 2000 through 2002 and a senior vice president from 2003
through March 2005 of RenRe.  Merritt was a certified public accountant licensed in
Massachusetts, but his license lapsed in approximately 1996.

14.     **Cash**, age 39, resides in Bermuda.  Cash joined Renaissance in 2000 as vice
president – specialty reinsurance.  Cash came to Renaissance with over 11 years of experience in
the reinsurance industry, including experience with finite reinsurance.  From 2002 until July
2005, he was senior vice president – specialty reinsurance of Renaissance.  According to a press
release issued by RenRe, Cash resigned on or about July 11, 2005, after he declined to accept a
Commission subpoena for his testimony.

## OTHER RELEVANT ENTITIES

15.     **RenRe** is a Bermuda corporation with its principal corporate office in Bermuda.
Formed in 1993, it is a holding company that, through its subsidiaries, provides property
catastrophe reinsurance, along with selected other insurance and reinsurance.  RenRe's securities
are registered pursuant to Section 12(b) of the Exchange Act and are listed on the New York
Stock Exchange.  Renaissance is one of RenRe's principal insurance subsidiaries.

16.    **Inter-Ocean** is, or was from at least 2000 through 2003, a Bermuda corporation with its principal corporate offices in Bermuda.  Inter-Ocean is, or was from at least 2000 through 2003, a wholly-owned subsidiary of Inter-Ocean Holdings, Inc., which was formed in 1990 as a joint venture of ten reinsurers.  In 1999, RenRe acquired a 10% interest in Inter-Ocean effective at the end of that year.  The other shareholders of Inter-Ocean Holdings are, or were from at least 2000 through 2003, also insurance and reinsurance companies, including American Reinsurance Company ("AmRe").

## FACTS

17.    Stanard, Merritt and Cash deliberately designed the Inter-Ocean transaction as a fraudulent device to store excess earnings so that RenRe could draw on them if the Company incurred large insurance losses in the future.  This scheme was intended to have a material impact during a future period when RenRe needed an earnings boost.

18.    On February 22, 2005, RenRe issued a press release announcing that it would restate its financial results for its fiscal years ended December 31, 2001, December 31, 2002, and December 31, 2003.  The press release disclosed that the effect of the relevant portion of the restatement was to increase net income by $26.4 million in 2001, decrease net income by $25.0 million in 2002, and decrease net income by $1.4 million in 2003.

19.    On March 31, 2005, RenRe filed its Form 10-K for the year ended December 31, 2004, which contained restated financial statements for 2001, 2002, and 2003.  The restatement treated the transaction as if it had never occurred.  Stanard signed and certified the Form 10-K.

### A.    Background:  RenRe's Earnings and Reinsurance Situation

20.    At the time of the Inter-Ocean deal, RenRe's main business was property

catastrophe reinsurance – i.e., providing reinsurance to insurers that might suffer losses due to

catastrophes like hurricanes, tornados, and earthquakes.  To manage its risk, RenRe obtained

reinsurance from other reinsurers to protect itself if it had to pay out claims for large losses.  In at

least 1998 and 1999, RenRe entered into industry loss warranty contracts ("ILWs") – a type of

reinsurance – with other insurers and reinsurers as counterparties.  These contracts entitled

RenRe to recover from the ILW counterparties for insurance claims paid by RenRe to its

insureds if certain industry-wide insurance losses exceeded contractually designated levels.  For

example, RenRe could recover under one of the ILW contracts if industry-wide earthquake

losses in the United States for a one-year period beginning in March 1999 exceeded $15 billion.

21.    It became clear in 2000 or early 2001 that the ILW counterparties had not

understood the risks underlying these contracts as well as RenRe had and that the ILW

counterparties had therefore under-priced the contracts, to RenRe's benefit.  The price RenRe

would have to pay to enter into future ILWs thus rose significantly, making these contracts less

attractive economically.  As a result, RenRe's highest officials began thinking about ways to

protect future earnings in case RenRe had to pay claims for major losses that it could not

adequately reinsure.

22.    At the same time, RenRe was flush with earnings.  In November 2000, two senior

executives of RenRe recognized that 2000 would be a financially strong year for the Company.

In e-mail correspondence, they discussed a project called the "4th quarter challenge" and "project

Christmas present" and considered structuring a transaction that would help some other company

meet earnings expectations for the fourth quarter of 2000 while possibly helping RenRe defer earnings.

23.     When Cash joined Renaissance in November 2000 as a vice president responsible for underwriting reinsurance, he began working on "project Christmas present" almost immediately.  By the end of 2000, however, no deal had been consummated and RenRe's earnings per share in 2000 were 31% higher than in the previous year.  "Project Christmas present" was a precursor to the Inter-Ocean transaction.

24.     In early 2001, it appeared that RenRe would again have high earnings for the first quarter.  At some point during the first quarter, the Company learned that it was likely to obtain substantial payments under its 1999 ILWs largely due to industry-wide losses sustained from a severe European windstorm and an Asian typhoon.  On January 12, 2001, RenRe began sending preliminary notices to its reinsurers stating that it was likely to claim recoveries under the ILWs.  The recoveries became quantifiable in March 2001 when an industry report, contractually used to determine recoveries under the ILWs, tabulated industry-wide loss figures for 1999.  The Company knew that it was entitled to approximately $55 million under the 1999 ILWs and understood that it would recover approximately $50 million of that amount.

25.     Under generally accepted accounting principles ("GAAP"), RenRe should have recognized the ILW recoverables as income in the first quarter of 2001, when the Company became aware that it was entitled to an amount that was probable and reasonably estimable.  To the extent that a small portion of the actual recovery was doubtful because of credit risk (i.e., the risk of nonpayment by the counterparties under the ILWs), RenRe should have recorded an appropriate allowance, supported by a valuation analysis.  No such valuation analysis was

performed, but the likelihood of collection was high because the Company had already received $23 million of the recoverables by March 31, 2001.  By April 23, 2001, before RenRe had closed its first quarter books, the Company had received $42.1 million of the recoverables, or about 76% of the expected total.  Thus, in the first quarter of 2001 the Company knew that the recoverables would have a substantial positive impact on its earnings.

26.     RenRe did not recognize $50 million of income from the ILWs in the first quarter of 2001.  Instead, the Company sought to defer approximately $26 million of income to protect itself from future insurance losses, particularly because the Company expected not to have the benefit of adequate ILWs in the future.

27.     Stanard, the then-CEO, initiated this project and was involved from the beginning.  In January 2001, he sent an e-mail entitled "leveling contract."  In this e-mail, he asked Merritt and a senior officer of Renaissance to try to "structur[e] a ceded contract that allows us to 'put away' $25 million."  This e-mail, which Stanard sent to Cash and others, was the impetus for the Inter-Ocean transaction.

28.     Cash promptly began to develop proposals "to smooth [] earnings," according to an email he sent, and he kept Stanard and Merritt updated on his progress.

29.     Eventually, Cash and Merritt negotiated a deal with Inter-Ocean and AmRe, which managed Inter-Ocean through a subsidiary.  Merritt, Cash and another RenRe official initially met with three employees of Inter-Ocean, who also had ties to AmRe, in mid-March 2001.  They discussed the proposed structure for the transaction.

11

30.     Merritt and Cash also informed AmRe that RenRe's purpose for proposing the transaction was to defer earnings.  According to an internal AmRe email, RenRe asked AmRe not to "widely broadcast" its proposal "given the nature of the transaction."

31.     Cash played a significant role in drafting both the assignment agreement and the reinsurance agreement.  Cash ultimately signed the reinsurance agreement with Inter-Ocean on RenRe's behalf, while Merritt signed the assignment agreement.

32.     Cash initially wanted to have different counterparties on each agreement.  RenRe originally proposed entering into the assignment agreement with Inter-Ocean and the reinsurance agreement with AmRe, in part because Cash initially wanted to mislead RenRe's auditors into thinking that the agreements were unrelated.  Ultimately, RenRe entered into both parts of the transaction with Inter-Ocean, which then ceded its obligations under the reinsurance portion of the transaction to AmRe through a separate retrocession agreement.  A retrocession agreement is one in which a reinsurer cedes its obligations under an insurance policy or agreement to another reinsurer.

33.     Stanard was kept apprised of the progress of the negotiations.  The Inter-Ocean transaction, including its purpose of deferring earnings and its basic structure, was discussed at several senior staff meetings attended by Stanard, Merritt, Cash, and others.

**B.      The Inter-Ocean Transaction**

34.     Although it was not obvious from the documentation itself, the assignment and the reinsurance agreement operated in tandem, as Stanard, Cash, Merritt and Inter-Ocean understood and intended.  In the assignment agreement, RenRe purported to transfer $50 million of the recoverables under the ILWs to Inter-Ocean in exchange for a payment of $30 million,

while the purported reinsurance agreement provided a mechanism for RenRe to recover from Inter-Ocean at a later date the remaining $20 million (plus $7.3 million it paid Inter-Ocean as a supposed premium, less certain fees and costs).  The two agreements in reality provided no economic benefit to either party other than a substantial fee – not expressly reflected in the contracts – that RenRe paid Inter-Ocean for its role in the transaction.

### 1.    The Assignment Agreement

35.    On April 23, 2001, RenRe entered into an assignment agreement with Inter-Ocean.  Under its terms, RenRe appeared to assign $50 million of the recoverables under the 1999 ILWs to Inter-Ocean in return for a payment of $30 million.  Thus, the consideration paid by Inter-Ocean appeared to be discounted to reflect nonpayment risk.  As a result of the transaction, RenRe recorded smaller earnings than it should have, thereby reducing RenRe's net income by $20 million.

36.    The assignment agreement was a sham, as Stanard, Merritt and Cash understood and intended.  The apparent discount for nonpayment simply cloaked what was actually a transfer of $20 million in earnings from RenRe to Inter-Ocean.  According to an internal AmRe email dated April 4, 2001, RenRe had assured AmRe that "[t]he 50 M[illion] recoverable … will essentially be guaranteed" and that the recoverables would "be collected and paid to [Inter-Ocean] by 7/31/2001."  Indeed, by April 23, 2001, the date the assignment agreement was executed, RenRe had already received $42.1 million of the recoverables it was supposedly assigning to Inter-Ocean for $30 million.

37.    Inter-Ocean assumed no non-payment risk because the assignment agreement expressly permitted RenRe or Inter-Ocean to terminate the agreement at any time prior to

August 1, 2001. Thus, if RenRe did not collect the entire $50 million of the recoverables by July 31, 2001, Inter-Ocean could terminate the agreement, which would otherwise terminate in accordance with its terms on July 31, 2003.

38.     Although RenRe ultimately collected all $50 million of the assigned recoverables and the assignment agreement was not terminated, the termination provision demonstrates the assignment's lack of economic substance. The assignment agreement's only purpose was to transfer $20 million of earnings from RenRe to Inter-Ocean with no corresponding transfer of nonpayment risk to Inter-Ocean before August 1, 2001.

39.     RenRe collected all $50 million of the assigned recoverables by July 5, 2001. On July 31, 2001, RenRe transferred $50 million to Inter-Ocean by wire through a bank located in the Southern District of New York.

**2.     The Reinsurance Agreement**

40.     On July 31, 2001, RenRe entered into a purported reinsurance agreement with Inter-Ocean with a coverage period that began seven months earlier, on January 1, 2001. This agreement also was a sham, as Stanard, Merritt and Cash understood and intended. There was no risk to either RenRe or Inter-Ocean in the transaction because: (a) RenRe's full recovery was assured, as the coverage triggers in the agreement were illusory and under RenRe's control; and (b) Inter-Ocean assumed no risk under the agreement because the amount of any recovery was limited to whatever amount Inter-Ocean held in a trust for RenRe's benefit – a trust that was funded with RenRe's money.

a.     *There was no risk to RenRe because the coverage triggers were illusory.*

41.     The reinsurance agreement appears to provide coverage up to a limit of

$45 million for certain of RenRe's losses if two requirements – or triggers – were met.  First, the

reinsurance agreement specified certain retention limits.  RenRe could make a claim under the

reinsurance agreement if it suffered losses – sums paid by RenRe or reserved by RenRe to be

paid to companies it reinsured, among other things – greater than $250 million during the three-

year term of the agreement or $60 million in any quarter during the term of the agreement.

Second, the reinsurance agreement required the occurrence of an industry-wide "1 in 10 loss

event," as defined solely by RenRe based on a proprietary risk modeling system, during the term

of the agreement.

42.     In reality, Cash designed both of these triggers to make the agreement look like

standard risk-transferring reinsurance even though Cash, Stanard, and Merritt all knew that

RenRe would meet these requirements and receive a full recovery under the contract.

43.     First, RenRe controlled its own ability to meet the retention limits.  Cash set the

limits based on information Merritt and others provided about the Company's past losses and

premiums so that they would be met but would still appear large to the Company's auditors.  To

assure that the Company would hit the triggers, RenRe defined covered "losses" very broadly

and did not restrict the definition to losses actually paid by RenRe.  Thus, the retention limits

were completely within RenRe's control.

44.     Second, RenRe controlled whether the "1 in 10 loss event" trigger was met

because, according to the agreement's express terms, the "1 in 10 loss event" was to be "defined

solely" by RenRe.  A "1 in 10 loss event" was simply any loss whose likelihood of occurrence

RenRe determined was once every ten years.  By manipulating geographic parameters, RenRe could construe virtually any major loss event during the agreement's term as a "1 in 10 loss event."  For example, a hurricane in the United States resulting in a large insurance loss might have an occurrence likelihood of one in five years, but if RenRe simply reduced the geographic area to the southeastern United States, the occurrence likelihood of the same hurricane could be one chance in ten years.

45.    Moreover, Inter-Ocean would not have access to RenRe's proprietary system to dispute any such characterization.  Thus, just like the retention limits, the "1 in 10 loss event" trigger was contrived and completely within RenRe's control.  The reinsurance agreement removed all doubt that RenRe would be able to meet both triggers and make a claim under the contract.

46.    In exchange for this fictitious reinsurance coverage, the agreement required RenRe to pay Inter-Ocean a premium of $7.3 million annually for the three-year term of the agreement.  On July 31, 2001, RenRe paid the first annual premium.

**b.    There was no risk to Inter-Ocean because coverage was limited to the amount in a trust funded by RenRe.**

47.    The reinsurance agreement required Inter-Ocean to place $18.9 million, as well as RenRe's premium payments, into a trust.  Inter-Ocean, however, did not fund the initial $18.9 million with its own money.  Instead, the $18.9 million represented all but $1.1 million of the net $20 million of ILW recoverables that RenRe purportedly transferred to Inter-Ocean under the assignment agreement.  The $1.1 million remainder constituted RenRe's payment to Inter-Ocean for fees and transaction costs.

16

48.     On its face, the reinsurance agreement provided coverage of $45 million. However, the real coverage limit was the amount in the trust.  The agreement provided that the contractual coverage limit would be adjusted by a "limit adjustment factor."  This factor would always reduce the coverage to the amount in the trust, comprising RenRe's premiums plus the $18.9 million deposit, all funded by RenRe through the assignment agreement even though the agreement provided that Inter-Ocean was to fund the initial $18.9 million deposit to the trust.

49.     The parties later amended the reinsurance agreement in January 2003 to reduce the coverage limit to $30 million.  The 2003 amendment also reduced the premium due to one annual payment of $7.3 million.  Although in a true reinsurance agreement such a substantial premium reduction might have been rather unusual, here it made no economic difference. Because the agreement required Inter-Ocean to place RenRe's premium payments into the trust for RenRe's benefit, the premium change simply reduced the amount of RenRe's money held in the trust.  Because RenRe paid only the first annual premium of $7.3 million, the total in the trust, exclusive of investment income, was about $26.2 million.

50.     Because the trust was funded with RenRe's premium payment of $7.3 million, plus all but $1.1 million of the $20 million RenRe transferred to Inter-Ocean through the assignment agreement, Inter-Ocean assumed no risk under the purported reinsurance agreement. The written agreements made this clear, and the parties confirmed orally that this was their intent.

51.     In April 2001, Stanard and the chief executive officer of AmRe, which managed Inter-Ocean at the time, participated in a conference call.  Stanard fully understood the design of the transaction and wanted to make it clear to his counterpart at AmRe that RenRe would get its

money back under the reinsurance agreement.  During the conference call, Stanard walked AmRe's CEO through the assignment and reinsurance agreements, explained that the triggers in the reinsurance agreement would be met by RenRe, and made clear that RenRe would make a claim for a full recovery under the reinsurance agreement.  Both sides intended the transaction to look like a real assignment and reinsurance agreement but with no actual risk transfer.

52.     In short, the purported reinsurance agreement was a sham and the Defendants all knew or recklessly disregarded that it was a sham.  Inter-Ocean assumed no reinsurance risk because RenRe could not receive more from Inter-Ocean under the reinsurance agreement than it had already paid Inter-Ocean in premiums or by the transfer of the ILW recoverables under the assignment agreement.  RenRe assumed no risk, because the reinsurance agreement provided an assured mechanism for it to recover the money it had transferred to Inter-Ocean.  The reinsurance agreement merely provided a means for RenRe fraudulently to defer recognizing $26 million until such time as RenRe made a claim under the reinsurance agreement.

**3.     RenRe's Claim Under the Reinsurance Agreement**

53.     RenRe decided to make a claim under the reinsurance agreement in the third quarter of 2002.  In the wake of the publicity surrounding Enron Corporation's accounting scandal, RenRe decided to close out the Inter-Ocean transaction.

54.     On September 25, 2002, RenRe made a claim to Inter-Ocean for the entire amount then in the trust: approximately $26 million.  That sum consisted of the $18.9 million Inter-Ocean originally placed in the trust and the sole $7.3 million premium RenRe had paid Inter-Ocean, plus investment returns on those sums.  To make its $26 million claim, Cash sent a four-sentence letter to Inter-Ocean, asking for the full amount in the trust.  Consistent with the

parties' understanding that the transaction was a sham, Cash provided no explanation in his letter as to how RenRe had met the purported requirements – or triggers – for making a claim under the reinsurance agreement.

55.     Following this notice, RenRe received $16.6 million of its claim from the trust in November and December 2002, $9.7 million in January 2003, and approximately $91,000 in October 2003.  It recorded these amounts as income over the course of several quarters beginning in the third quarter of 2002, as described in more detail below.

## C.     Accounting for the Transaction

56.     The entire Inter-Ocean transaction was a sham and should not have been accounted for at all.  Under GAAP, RenRe should have recognized the ILW recoverables as income in the first quarter of 2001, when the Company became aware of its entitlement to them and the amount was probable and reasonably estimable.  Instead, the Company sought to reduce the impact from the ILW recoverables on its earnings by assigning them to Inter-Ocean.  But the assignment agreement was not bona fide and should not have been given accounting effect.

57.     Even if RenRe wished to account for the transaction, it should have treated the assignment and premium as a loan to or deposit with Inter-Ocean of approximately $26 million, with $1.1 million of expenses for transaction fees and costs, and a later recovery of the principal and investment returns.  RenRe did not account for the transaction in this manner, because proper accounting treatment would not have permitted RenRe to defer $26 million of income.

58.     Stanard, Merritt and Cash knew that the accounting for the transaction was improper and did not comply with GAAP.

59.     Both Stanard and Cash had a sufficient understanding of reinsurance accounting to know that RenRe's transaction with Inter-Ocean could not be accounted for under GAAP as a legitimate assignment and reinsurance transaction, as RenRe accounted for it.

60.     RenRe's outside lawyer on the transaction, who advised RenRe on the form of the contracts, questioned the accounting on the transaction in an e-mail to Merritt and Cash.  Merritt and Cash intentionally did not bring the lawyer's concern to the attention of RenRe's outside auditors.

61.     Merritt, as RenRe's then-controller, was responsible for recording the improper accounting entries.

### 1.     First and Second Quarters of 2001

62.     RenRe should have recorded the expected $50 million in recoverables as income in the first quarter of 2001 because it used an accrual method of accounting.  It could have booked an allowance (or reserve) for whatever small portion of the total $55 million of recoverables to which it was entitled that it legitimately decided it would not collect.  However, any such allowance necessarily would have taken into account the $42 million RenRe had received by the time it entered into the assignment agreement.  RenRe booked neither the $50 million of income nor any related allowance in the first quarter of 2001.

63.     Instead, RenRe entered into the assignment agreement transferring to Inter-Ocean $50 million of the recoverables in exchange for $30 million.  Although this assignment agreement was not executed until April 23, 2001, after the close of the first quarter, RenRe accounted for the assignment by posting a credit of $30 million to income in the first quarter of 2001, reflecting only the amount Inter-Ocean paid for the recoverables.  This resulted in the

Company's deferral of $20 million of income from the recoverables.  Moreover, as the

recoverables were received in 2001, RenRe did not report them as income, but recorded them in,

among other things, a temporary holding account.  Thus RenRe sidestepped its own accounting

policies and GAAP in an effort to defer income.

      **2.**        **<u>Third and Fourth Quarters of 2001</u>**

      64.      On July 31, 2001, during the third quarter, RenRe paid Inter-Ocean a $7.3 million

"premium" pursuant to the reinsurance agreement.  RenRe accounted for the payment as a

premium expense, apportioned over the third and fourth quarters of 2001.  This treatment of the

purported premium did not comply with GAAP.  In particular, GAAP permits a reinsured to treat

a premium payment to a reinsurer as an expense only if the reinsurance contract includes a

genuine transfer of risk from the reinsured to the reinsurer.  In the absence of genuine risk, the

reinsured must treat the premium payment as a deposit – in essence, a loan to the reinsurer to be

repaid at a later date through the riskless reinsurance recovery.

      65.      As explained above, RenRe transferred no risk at all to Inter-Ocean because it

fully expected – and agreed with Inter-Ocean – that it would receive a complete recovery of the

amounts it had paid Inter-Ocean.  RenRe nevertheless treated the $7.3 million "premium"

payment to Inter-Ocean as an expense, instead of a deposit.

      66.      In addition, the excess $20 million in recoverables that RenRe assigned to Inter-

Ocean under the assignment agreement was ultimately placed in the trust account for RenRe's

benefit (minus the fees and costs paid to Inter-Ocean).  Thus, the $20 million was also a deposit

of cash with Inter-Ocean in the third quarter of 2001.

3.     **Third Quarter of 2002 and First and Fourth Quarters of 2003**

67.     On September 25, 2002, RenRe made a claim under the reinsurance agreement for the full amount in the trust.  RenRe then received from Inter-Ocean approximately $16.6 million in the fourth quarter of 2002, $9.7 million in the first quarter of 2003, and $91,000 in the fourth quarter of 2003.  To account for these recoveries, RenRe originally recorded $25 million of income in the third quarter of 2002, to reflect its accrual of at least that amount based on its third quarter claim to Inter-Ocean for the trust's contents.  It recorded an additional $1.3 million of income in the first quarter of 2003, to reflect receipt of $1.3 million more than the $25 million it accrued in the third quarter of 2002.  Finally, in the fourth quarter of 2003, it recorded $91,000 of income to reflect receipt of $91,000 more than it had previously accrued.

68.     The company treated these recoveries as reinsurance recoveries, even though the reinsurance agreement did not transfer any risk to Inter-Ocean.  This treatment enabled RenRe to record the recoveries as income in 2002, rather than as the return of a deposit given to Inter-Ocean in 2001 under the assignment and risk-free reinsurance agreements.  RenRe's treatment of the recoveries under the reinsurance agreement did not comply with GAAP.  The end result was the improper deferral of more than $26 million of income from 2001 to 2002 and 2003.

4.     **The Restatement**

69.     On March 31, 2005, RenRe restated its financial results for 2001, 2002, and 2003 in its Form 10-K for the year ended December 31, 2004.  The restatement reversed both components of the transaction, as if the transaction had not occurred at all.  The net effect was to increase the Company's net income by $26.4 million in 2001 and decrease its net income by $25 million in 2002 and $1.4 million in 2003.  Because the transaction cost the Company $863,000 in

transaction fees and costs to Inter-Ocean ($1.1 million in fees and costs offset by investment returns on the trust principal), RenRe restated that amount as an operating expense in the third quarter of 2001.

**D.**      **The Concealment of Key Facts from RenRe's Auditors**

70.      From the beginning, Merritt and Cash designed the transaction with the intent of fooling RenRe's outside auditors into believing that it was a legitimate assignment and reinsurance agreement, even though both knew that the transaction was a sham.  In addition, to ensure that the auditors were fooled, Merritt concealed key facts from RenRe's auditors.  Stanard and Cash were aware that Merritt concealed key facts from RenRe's auditors.

71.      Cash's intent to fool the auditors was evident from the early stages of designing the transaction.  In one of Cash's first proposals for a structure "to smooth [] earnings," in a January 2001 memorandum, Cash proposed "back to back reinsurance contracts, one losing money, the other making money."  (In fact, this structure was functionally similar to the final transaction, although the final transaction used an assignment agreement that lost money and a reinsurance agreement that made money.)  Cash suggested a complicated structure for the "back to back reinsurance contracts" he proposed to "assist in muddying the water" for accounting purposes.

72.      In a March 2001 email to an insurance broker involving a similar two-contract structure in which the first contract lost money and the second contract made money, Cash again made it clear that he intended to fool the auditors.  Cash noted that RenRe's intent was to find a coverage amount in the first contract that would make it clear to all parties to the transaction, but not RenRe's auditors, that RenRe would suffer a loss on the first contract.  Cash wrote: "The

basic point is to find some exposure which everyone knows will have a loss, but which will not be so absurd as to trigger auditor questions."

73.     In the same email, Cash also told the insurance broker that he wanted an understanding with any potential counterparty that RenRe would obtain a recovery under the second contract, or "hit the contract," without documenting that understanding in the files. Cash wrote: "Obviuosly [sic], we would all need to understand that we are going to hit the contract (though you won't want to document that in the buyer's files[)]." Again, Cash sought to structure a transaction in which the written documentation would conceal the true nature of the transaction from the auditors.

74.     In a subsequent March 2001 memo Cash sent Merritt for yet another proposal to "stor[e] profit, and/or protect[] downside," Cash described an example of a contract feature that would pass auditor "sniff tests" by appearing to convey risk. Cash wrote:

> A simple example of how to pass sniff tests is to simply have a very standard reinsurance contract which doesn't look like there is anything out of the ordinary, but to have loose language around what the covered business can be (auditors will often not focus on whether a contract has well defined descriptions of what other business might be included as covered business).

75.     Cash used some of these same techniques, designed to fool RenRe's auditors, in structuring the final transaction with Inter-Ocean. As described above in paragraphs 41 through 45, Cash carefully designed the two triggers in the reinsurance agreement to make the agreement appear to transfer risk without actually transferring risk.

76.     Cash and Merritt were also concerned that RenRe's auditors would discover that the transaction could not be properly accounted for as reinsurance, as RenRe ultimately accounted for it, if the counterparty to the transaction used the same audit firm that RenRe used.

Cash and Merritt were concerned that if the counterparty correctly accounted for the transaction

(which Inter-Ocean ultimately did), a single audit firm working for both parties would likely

compare the accounting treatment used by both sides, examine the transaction more carefully,

and discover RenRe's improper accounting treatment.  Consequently, Cash and Merritt discussed

the need to find a counterparty that did not use RenRe's audit firm.  In fact, Inter-Ocean did not

use RenRe's audit firm, which was a key reason Cash and Merritt selected Inter-Ocean as the

counterparty for the transaction.

    77.    Even beyond the deceptive structure of the transaction itself, Merritt

misrepresented to, and concealed from, RenRe's auditors certain facts to further ensure that the

transaction would achieve the desired, fraudulent accounting effect.  Furthermore, Stanard and

Merritt made misrepresentations in management representation letters to RenRe's auditors in

connection with the audit of RenRe's year-end 2001 and 2002 financial statements.

    78.    In early April 2001, Merritt spoke to RenRe's outside audit partner about the

transaction.  Merritt failed to disclose to the audit partner certain relevant facts concerning the

transaction, including, among other things, that the purpose of the transaction was to smooth

income, that the transaction conveyed no risk to Inter-Ocean, and that Inter-Ocean and AmRe

were aware of that fact.  Nor did he reveal these facts when he informed the audit partner of

RenRe's approximately $25 million recovery under the reinsurance agreement during the outside

auditor's third-quarter 2002 review of RenRe's financial statements or its 2002 year-end audit.

He also failed to inform the audit partner during the third-quarter 2002 review or 2002 year-end

audit that the $25 million recovery under the reinsurance agreement was related to another

contract with Inter-Ocean, the assignment agreement.  Merritt knew, or was reckless in not

knowing, that his representations and omissions to the audit partner were false and/or misleading.

79.     Stanard knew that key facts about the transaction had been concealed from the auditors. Stanard was informed that the transaction had been discussed with RenRe's auditors and that the transaction's purpose of deferring earnings and the fact that the "1 in 10 loss event" trigger on the reinsurance agreement was certain to be met had not been disclosed to the auditors. Stanard was therefore aware that the truth about the transaction had been hidden from the auditors.

80.     Cash also knew that Merritt concealed key facts about the transaction from the auditors. Cash and Merritt had one or more discussions about how to obtain the auditors' approval for the transaction when both Cash and Merritt understood that the transaction was a sham. Cash knew that the auditors had not been told that the transaction failed to convey any risk. Indeed, as described above, he structured the transaction so that it would appear to the auditors to convey risk when in fact it did not. He also knew that the auditors had not been told that the true purpose of the transaction was to smooth earnings.

81.     Stanard and Merritt later made further misrepresentations to the auditors in management representation letters they signed concerning the year-end 2001 and 2002 audits. In these letters, they falsely represented that each of RenRe's ceded reinsurance contracts met the reinsurance accounting requirements of Statement of Financial Accounting Standards No. 113 ("SFAS 113") to be accounted for as reinsurance, when in fact, as discussed above, Merritt and Stanard knew or recklessly disregarded that the reinsurance agreement with Inter-Ocean

conveyed no risk and therefore did not meet SFAS 113's requirements for reinsurance accounting.

82.     Stanard's and Merritt's misrepresentations and omissions to the auditors were intentional or reckless.  Indeed, Cash attempted from the beginning to structure a transaction that would pass auditor scrutiny regardless of its lack of economic substance.  Stanard, Merritt and Cash knew that RenRe's auditors would not approve the accounting for the transaction unless it was made to look like a genuine assignment and reinsurance agreement.

**E.     The Misrepresentations in RenRe's Financial Statements**

83.     RenRe's annual and quarterly filings with the Commission on Forms 10-K and 10-Q for 2001 and 2002 misstated the Company's net income.  Furthermore, the Company incorporated these misstatements by reference into three registration statements and two prospectus supplements, pursuant to which it offered approximately $577 million of securities.

84.     On April 2, 2002, RenRe filed its Form 10-K for the year ended December 31, 2001.  As a result of the accounting improprieties detailed above, the Form 10-K understated the Company's net income for the period by $26.4 million, or 14.7%.  Stanard signed the Form 10-K.

85.     On March 31, 2003, RenRe filed its Form 10-K for the year ended December 31, 2002.  The Form 10-K overstated the Company's net income for the period by $25.0 million, or 7.04%.  Stanard signed and certified the Form 10-K.

86.     In addition, each of the interim reports the Company filed on Form 10-Q for the first and third quarters of 2001 and the third quarter of 2002 misstated the Company's net income for each of those periods.  RenRe's Form 10-Q for the first quarter of 2001 understated net

income by $20 million, or 30.8%, and its Form 10-Q for the third quarter of 2001 understated net income by $4.6 million, or 13.3%. Its Form 10-Q for the third quarter of 2002, which Stanard signed and certified, overstated net income by $25.0 million, or 37.7%.

87.     Furthermore, RenRe filed two S-3 shelf registration statements that incorporated these financial misstatements by reference. The first, filed on October 1, 2001, incorporated the Company's false financial statements in its quarterly report for the first quarter of 2001. Stanard signed this registration statement. The second, filed on February 25, 2002, incorporated by reference the false financial statements in its quarterly reports for the first and third quarters of 2001. Stanard signed this registration statement, as well. The second registration statement was amended several times, and each amendment incorporated the Company's false Form 10-K for 2001. In addition, RenRe filed prospectus supplements on January 30, 2003 and February 3, 2003, both of which incorporated by reference the Company's false Form 10-K for 2001 and the Company's false 10-Q for the third quarter of 2002.

88.     In connection with these registration statements and the prospectus supplement, RenRe raised approximately $577 million from the sale of securities. After the S-3 shelf registration was filed on October 1, 2001, RenRe raised $232 million from the issuance of 2.5 million common shares on October 15, 2001, and $145 million from the issuance of 6 million preferred shares in November 2001. RenRe also raised $100 million from the sale of certain notes in January 2003 and $100 million from the sale of preference shares in February 2003.

89.     In addition, RenRe filed a Form S-8 on June 19, 2002 that incorporated by reference RenRe's false Form 10-K for 2001. In connection with the Form S-8, RenRe offered

over $108 million pursuant to its Amended and Restated 2001 Stock Incentive Plan and Non-Employee Director Stock Plan.

90.     Stanard, Merritt and Cash knew and intended that their actions in connection with the Inter-Ocean transaction would result in false statements by RenRe to investors in its publicly-filed financial statements in the United States.  That was their very purpose for orchestrating and implementing the transaction.

**F.     The Misleading Restatement**

91.     In early 2005, as discussed above, RenRe restated its financial results for 2001, 2002, and 2003 based in part on the Inter-Ocean transaction.  Its restatement, however, was not candid about the reasons for the restatement and the nature of the Inter-Ocean transaction.

92.     On February 22, 2005, RenRe issued a press release announcing that it was restating its financial statements for the years ended December 31, 2001, 2002, and 2003.  It stated that the restatement resulted in part from "errors" due to "the timing of the recognition of reinsurance recoverables" – referring to the treatment of RenRe's transaction with Inter-Ocean.

93.     On March 31, 2005, RenRe filed its Form 10-K for the year ended December 31, 2004, which included the restatement.  Stanard signed and certified the Form 10-K.  The Form 10-K continued to refer to the accounting "error[]" as one of "timing of the recognition of Inter-Ocean reinsurance recoverables."  It also noted the Company's conclusion that the Inter-Ocean contracts should have been treated as a single transaction and that the transaction lacked the necessary risk transfer to be accounted for as reinsurance.  These statements were misleading.  First, the Form 10-K stated that the $26.4 million RenRe had received from Inter-Ocean was a "reinsurance recoverable," when in fact the agreement contained no real reinsurance and the

Company's restated financials accounted for the transaction as if it had never occurred.  Second,

the Form 10-K stated that the Company should have accounted for both components of the

transaction as a single unit, when, as discussed, the Company's restatement accounted for the

transaction as if it had never occurred, not as if it was a single transaction.  In short, the entire

transaction was a sham, and the Form 10-K failed to disclose that fact and misrepresented the

reasons for the Company's restatement.

**FIRST CLAIM FOR RELIEF**
**Violations of Section 17(a) of the Securities Act**

94.    Paragraphs 1 through 93 are realleged and incorporated by reference as if set forth

fully herein.

95.    Stanard, Merritt and Cash deliberately orchestrated a sham transaction with Inter-

Ocean as a means to store excess earnings that RenRe could draw upon in the future.  They knew

that the purpose of the transaction was to fraudulently defer recognizing approximately $26

million of income in public filings.

96.    The Defendants, singly or in concert, directly or indirectly, in the offer and sale of

securities, by the use of the means and instruments of transportation and communication in

interstate commerce or by the use of the mails, directly and indirectly, have employed or are

employing devices, schemes and artifices to defraud.

97.    The Defendants, singly or in concert, in the offer and sale of securities, by the use

of the means and instruments of transportation and communication in interstate commerce or by

the use of the mails, directly and indirectly, have obtained or are obtaining money and property

by means of untrue statements of material fact or omissions to state material facts necessary in

order to make the statements made, in light of the circumstances under which they were made,

not misleading, and have engaged or are engaging in transactions, practices or courses of business which have operated or would operate as a fraud and deceit upon investors.

98.     As part of and in furtherance of the violative conduct, the Defendants, directly or indirectly, singly or in concert, in the course of the offerings described herein, have made untrue statements of material fact, or have omitted to state material facts.  Among other things, the materially misleading statements or omissions pertained to (a) a sham transaction entered into with a related party solely to smooth earnings, (b) the improper accounting for the transaction as reinsurance, (c) the concealment of the true nature of the transaction from RenRe's auditors, and (d) financial statements that were materially false and misleading.

99.     The Defendants knew or were reckless in not knowing of the activities described above.

100.     By reason of the foregoing, Stanard, Merritt and Cash have violated, and unless enjoined will again violate, Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)].

**SECOND CLAIM FOR RELIEF**
**Violations of and Aiding and Abetting Violations of Section 10(b) of the**
**Exchange Act and Rule 10b-5(a), (b) and (c)**

101.     Paragraphs 1 through 93 are realleged and incorporated by reference as if set forth fully herein.

102.     Stanard, Merritt and Cash deliberately orchestrated a sham transaction with Inter-Ocean as a means to store excess earnings that RenRe could draw upon in the future.  They knew that the purpose of the transaction was to fraudulently defer recognizing approximately $26 million of income in public filings.

103.    The Defendants, singly or in concert, in connection with the purchase and sale of securities, directly and indirectly, by the use of the means and instrumentalities of interstate commerce or of the mails, have employed or are employing devices, schemes and artifices to defraud; have made or are making untrue statements of material fact and have omitted or are omitting to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and have engaged or are engaging in acts, practices and courses of business which have operated or would operate as a fraud and deceit upon investors.

104.    The Defendants knew or were reckless in not knowing of the activities described above.

105.    RenRe, singly or in concert, in connection with the purchase and sale of securities, directly and indirectly, by the use of the means and instrumentalities of interstate commerce or of the mails, has employed or is employing devices, schemes and artifices to defraud; has made or is making untrue statements of material fact and has omitted or is omitting to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and has engaged or is engaging in acts, practices and courses of business which operated or would operate as a fraud and deceit upon investors, in violation of Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5(a), (b) and (c) [17 C.F.R. § 240.10b-5(a), (b) and (c)].

106.    By reason of the foregoing, Stanard, Merritt and Cash have violated, and unless enjoined will again violate, Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5(a), (b) and (c) promulgated thereunder [17 C.F.R. §240.10b-5(a), (b) and (c)].

107.     In the alternative, by reason of the foregoing, Stanard, Merritt and Cash have aided and abetted RenRe's violations of, and unless enjoined will again aid and abet violations of, Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5(a), (b) and (c) promulgated thereunder [17 C.F.R. §240.10b-5(a), (b) and (c)].

### THIRD CLAIM FOR RELIEF
### Violations of Section 13(b)(5) of the Exchange Act

108.     The Commission realleges and incorporates by reference herein each and every allegation contained in paragraphs 1 through 93.

109.     Stanard, Merritt and Cash, singly or in concert, knowingly circumvented or knowingly failed to implement a system of internal accounting controls and knowingly falsified, directly or indirectly, or caused to be falsified books, records and accounts of RenRe that were subject to Section 13(b)(2)(A) of the Exchange Act [15 U.S.C. § 78m(b)(2)(A)].

110.     By reason of the foregoing, Stanard, Merritt and Cash have violated, and unless enjoined will again violate, Section 13(b)(5) of the Exchange Act [15 U.S.C. § 78m(b)(5)].

### FOURTH CLAIM FOR RELIEF
### Violations of Rule 13b2-1 of the Exchange Act

111.     The Commission realleges and incorporates by reference herein each and every allegation contained in paragraphs 1 through 93.

112.     The Defendants, directly or indirectly, falsified or caused to be falsified the books, records and accounts of RenRe that were subject to Section 13(b)(2)(A) of the Exchange Act, 15 U.S.C. § 78m(b)(2)(A).

113.     By reason of the foregoing, Stanard, Merritt and Cash have violated, and unless enjoined will again violate, Rule 13b2-1 of the Exchange Act [17 C.F.R. § 240.13b2-1].

## FIFTH CLAIM FOR RELIEF
### Violations of Rule 13b2-2 of the Exchange Act

114.    The Commission realleges and incorporates by reference herein each and every allegation contained in paragraphs 1 through 93.

115.    Stanard and Merritt were directors or officers of RenRe at all relevant times.

116.    As described above, Stanard and Merritt, directly or indirectly, singly or in concert, made or caused to be made materially false or misleading statements, or omitted to state or caused another person to omit to state material facts necessary in order to make the statements made, in light of the circumstances under which such statements were made, not misleading to an accountant, in connection with (i) audits, reviews and examinations of the financial statements of RenRe required to be made pursuant to Commission regulations, and (ii) the preparation and filing by RenRe of documents and reports required to be filed with the Commission.

117.    By reason of the foregoing, Stanard and Merritt have violated, and unless enjoined will again violate, Exchange Act Rule 13b2-2 [17 C.F.R. § 240.13b2-2].

## SIXTH CLAIM FOR RELIEF
### Aiding and Abetting Violations of Section 13(a)
### of the Exchange Act and Rules 12b-20, 13a-1 and 13a-13

118.    Paragraphs 1 through 93 are realleged and incorporated by reference as if set forth fully herein.

119.    RenRe failed to file with the Commission such financial reports as the Commission has prescribed, and RenRe failed to include, in addition to the information expressly required to be stated in such reports, such further material information as was necessary to make the statements made therein, in light of the circumstances in which they were

34

made, not misleading, in violation of Section 13(a) of the Exchange Act [15 U.S.C. § 78m(a)] and Rules 12b-20, 13a-1 and 13a-13 [17 C.F.R. §§ 240.12b-20, 240.13a-1 and 240.13a-13].

120.   Stanard, Merritt, and Cash deliberately orchestrated a sham transaction with Inter-Ocean as a means to store excess earnings that RenRe could draw upon in the future, thereby distorting RenRe's financial reports.

121.   By reason of the foregoing, Stanard, Merritt and Cash aided and abetted RenRe's violations of Section 13(a) of the Exchange Act [15 U.S.C. § 78m(a)] and Rules 12b-20, 13a-1 and 13a-13 [17 C.F.R. §§ 240.12b-20, 240.13a-1 and 240.13a-13].

## SEVENTH CLAIM FOR RELIEF
### Aiding and Abetting Violations
### of Section 13(b)(2) of the Exchange Act

122.   Paragraphs 1 through 93 are realleged and incorporated by reference as if set forth fully herein.

123.   RenRe failed to:

   a.   make and keep books, records, and accounts, which, in reasonable detail, accurately and fairly reflected the transactions and dispositions of its assets; and

   b.   devise and maintain a system of internal accounting controls sufficient to provide reasonable assurances that:

   i.   transactions were executed in accordance with management's general or specific authorization;

   ii.   transactions were recorded as necessary to permit preparation of financial statements in conformity with generally accepted

accounting principles or any other criteria applicable to such

statements, and to maintain accountability for assets;

iii.    access to assets was permitted only in accordance with

management's general or specific authorization;

iv.    and the recorded accountability for assets was compared with the

existing assets at reasonable intervals and appropriate action was

taken with respect to any differences, in violation of Section

13(b)(2) of the Exchange Act [15 U.S.C. § 78m(b)(2)].

124.    Stanard, Merritt and Cash deliberately orchestrated a sham transaction with Inter-Ocean as a means to store excess earnings that RenRe could draw upon in the future, thereby distorting RenRe's financial reports.

125.    By reason of the foregoing, Stanard, Merritt and Cash have aided and abetted RenRe's violations of Section 13(b)(2) of the Exchange Act  [15 U.S.C. § 78m(b)(2)].

## EIGHTH CLAIM FOR RELIEF
### Violations of Rule 13a-14

126.    Paragraphs 1 through 93 are realleged and incorporated by reference as if set forth fully herein.

127.    As described above, RenRe failed to file with the Commission such financial reports as the Commission has prescribed, and RenRe failed to include, in addition to the information expressly required to be stated in such reports, such further material information as was necessary to make the statements made therein, in light of the circumstances in which they were made, not misleading.

36

128.    Stanard was RenRe's principal executive at the time of the filing of each of RenRe's reports with the Commission.

129.    Stanard certified the foregoing filings, each of which was materially false and misleading.

130.    Stanard knew or reasonably should have known, or was reckless in not knowing, of the activities described above.

131.    By reason of the foregoing, Stanard has violated, and unless enjoined will again violate, Rule 13a-14 [17 C.F.R. § 240.13a-14].

## PRAYER FOR RELIEF

**WHEREFORE**, the Commission respectfully requests a Final Judgment:

## I.

Permanently enjoining Stanard, Merritt and Cash, their agents, servants, employees and attorneys and all persons in active concert or participation with them who receive actual notice of the injunction by personal service or otherwise, and each of them from future violations of Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)], Sections 10(b) and 13(b)(5) of the Exchange Act [15 U.S.C. §§ 78j(b) and 78m(5)] and Rules 10b-5(a), (b) and (c) and 13b2-1 [17 C.F.R. § 240.10b-5(a), (b) and (c) and 240.13b2-1], and from aiding or abetting future violations of Sections 10(b), 13(a) and 13(b)(2) of the Exchange Act [15 U.S.C. § 78j(b), 78m(a) and 78m(b)(2)] and Rules 10b-5(a), (b) and (c), 12b-20, 13a-1 and 13a-13 [17 C.F.R. §§ 240.10b-5(a), (b) and (c), 240.12b-20, 240.13a-1 and 240.13a-13].

## II.

Permanently enjoining Stanard and Merritt, their agents, servants, employees and attorneys and all persons in active concert or participation with them who receive actual notice of the injunction by personal service or otherwise, and each of them from future violations of Rule 13b2-2 of the Exchange Act [17 C.F.R. § 240.13b2-2].

## III.

Permanently enjoining Stanard, his agents, servants, employees and attorneys and all persons in active concert or participation with him who receive actual notice of the injunction by personal service or otherwise, and each of them from future violations of Rule 13a-14 of the Exchange Act [17 C.F.R. § 240.13a-14].

## IV.

Ordering Stanard, Merritt and Cash to disgorge any ill-gotten gains from the conduct alleged herein and to pay prejudgment interest thereon.

## V.

Ordering Stanard, Merritt and Cash to pay civil money penalties, pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] and Section 21(d)(3)(A) of the Exchange Act [15 U.S.C. § 78u(d)(3)(A)].

## VI.

Permanently barring Stanard, Merritt and Cash, pursuant to Section 20(e) of the Securities Act [15 U.S.C. § 77t(e)] and Section 21(d)(2) of the Exchange Act [15 U.S.C. § 78u(d)(2)], from serving as an officer or director of any issuer that has a class of securities

registered under Section 12 of the Exchange Act [15 U.S.C. § 78l] or that is required to file

reports pursuant to Section 15(d) of the Exchange Act [15 U.S.C. § 78o(d)].

## VII.

Granting such other and further relief as to this Court seems just and proper.

Dated:  New York, New York
         January 29, 2007

Mark K. Schonfeld (MS-2798),
Regional Director
Jack Kaufman (JK-3050)
Preethi Krishnamurthy (PK-2809)
Attorneys for Plaintiff
SECURITIES AND EXCHANGE
COMMISSION
3 World Financial Center
New York, NY  10281-1022
(212) 336-1100

Of Counsel:

Andrew M. Calamari
Robert J. Keyes
Ken C. Joseph
Laura V. Yeu

39

## CERTIFICATE OF SERVICE

I hereby certify that I served the foregoing First Amended Complaint by mailing a copy of same via overnight delivery service prepaid on this 29th day of January 2007 to:

James D. Mathias, Esq.
DLA Piper Rudnick Gray Cary US LLP
6225 Smith Avenue
Baltimore, MD  21209
Counsel for Defendant James N. Stanard

Robert Plotkin, Esq.
McGuire Woods LLP
Washington Square
1050 Connecticut Avenue N.W., Suite 1200
Counsel for Defendant Martin J. Merritt

Martin L. Perschetz, Esq.
Schulte Roth & Zabel LLP
919 Third Avenue
New York, NY 10022
Counsel for Defendant Michael W. Cash

PREETHI KRISHNAMURTHY (PK-2809)
Attorney for Plaintiff
Securities and Exchange Commission
Northeast Regional Office
3 World Financial Center
New York, NY  10281-1022
Ph:  (212) 336-0116
Fax: (212) 336-1317
Email: krishnamurthyp@sec.gov