UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

SECURITIES AND EXCHANGE COMMISSION,

                      Plaintiff,

          -against-

JAMES N. STANARD, MARTIN J. MERRITT
and MICHAEL W. CASH,

                 Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

No.  06 Civ. 7736 (GEL)

## JAMES N. STANARD'S ANSWER TO FIRST AMENDED COMPLAINT

Defendant James N. Stanard respectfully submits this answer to the First Amended Complaint brought against him by plaintiff Securities and Exchange Commission.

### I.  Introduction

The improper accounting for the Inter-Ocean transaction that led to this SEC enforcement action against Mr. Stanard was uncovered and self-reported publicly and to the SEC only through the persistent and voluntary efforts of Mr. Stanard when he was the Chairman and Chief Executive Officer ("CEO") of RenaissanceRe Holdings Ltd. ("RenRe" or the "Company").  In 2004, when RenRe was under no regulatory scrutiny, Mr. Stanard initiated and supported a comprehensive internal review of RenRe's transactions and business practices in reaction to media reports concerning government investigations of other companies in the reinsurance industry relating not to finite reinsurance but rather to broker contingent commission arrangements.  This review was led by the respected law firm of Boies Schiller & Flexner LLP ("Boies Schiller").  After scouring thousands of deals and more than 250,000 e-mails, Boies Schiller concluded that only one transaction required further examination – a 2001 finite

reinsurance deal between Renaissance Reinsurance Ltd. ("Renaissance"), a wholly owned subsidiary of RenRe, and Inter-Ocean Reinsurance Company ("Inter-Ocean").   Until this investigation, Mr. Stanard had understood that the Inter-Ocean deal contained sufficient risk transfer for reinsurance accounting and that, in fact, RenRe's outside auditor, Ernst & Young, had reviewed the transaction's terms and approved its accounting treatment.   When it was determined in 2005 that the Inter-Ocean deal had not contained sufficient risk to merit reinsurance accounting, Mr. Stanard advocated a full restatement, even though RenRe's outside auditor and others within the Company had questioned whether the uncovered accounting error was material.

This single transaction had the effect of understating – not overstating – RenRe's earnings in 2001, the year the Inter-Ocean transaction was executed and a period in which RenRe's net income was soaring toward unprecedented highs.   Revenues largely were recognized when Renaissance became entitled to a reinsurance recovery the following year – a year in which RenRe's net income was even higher than it had been the year before.   The result of the February 2005 restatement accordingly was to shift the timing of when roughly $26 million was recognized during a historical three-year period in which RenRe's net income was roughly *one billion, one hundred and sixty-six million* dollars.   The restatement had no recognizable impact on RenRe's stock price, and the contemporaneous comments of market analysts confirmed that the Inter-Ocean transaction was immaterial to the marketplace.

The restatement correctly noted that the outside directors on RenRe's board, working with Boies Schiller, concluded that the single accounting error was the result of "mistakes and lack of due care," not fraud or misconduct.  Mr. Stanard then fully cooperated with the resulting government investigation, voluntarily meeting with government officials and answering all

questions even after he was identified as a target of their investigation and, as a result, was forced out of the company he founded.

The SEC enforcement action seeks to twist this voluntary restatement of a single transaction into a badge of fraud.  As is well established in the Second Circuit, however, the mere fact that a transaction was not accounted for properly is not enough to prove fraud. Lacking facts sufficient to show fraud by Mr. Stanard, the SEC does little more than point to the structure of the transaction itself, proclaim it a sham, and conclude that Mr. Stanard "must have known" it was a sham because he knew about the transaction generally and he had, in an earlier email not addressing this particular transaction, expressed a desire to defer income by purchasing finite reinsurance.  This is not enough.

The transaction at issue in the first amended complaint was comprised of two related contracts between Renaissance and Inter-Ocean.  The first contract was an assignment agreement whereby Renaissance sold to Inter-Ocean the right to collect up to $50 million in reinsurance recoverables in exchange for $30 million.  Under the second contract, Renaissance purchased reinsurance from Inter-Ocean, allowing it to recover up to $45 million in the event of future catastrophic reinsurance losses.

Mr. Stanard at the time was only generally familiar with the details of the transaction, which was developed and negotiated by others.  He understands, however, that the $20 million potential profit to Inter-Ocean on the assignment agreement was designed and intended to partially fund the cost of the reinsurance agreement.  The reinsurance deal was structured as a finite risk contract, so named because such contracts typically transfer a very small amount of risk to the reinsurer (here, Inter-Ocean).  A primary purpose of such contracts – obvious on their face and from the very nature of finite reinsurance – is that they allow the purchaser (here, Renaissance) to effectively manage its risk volatility by permitting it to set aside, or "put away,"

funds in an extremely *low risk* (but not *no risk*), GAAP-compliant transaction.  Such funds then likely will be available at a later date as income (from a reinsurance recovery) to help offset losses from catastrophic reinsurance claims Renaissance incurs.[1]  Finite coverage is much cheaper than traditional reinsurance precisely because, by its very nature and design, it has a low risk threshold to the insurer, is largely self-funded by the insured, and therefore commands a much smaller margin paid to the insurer by the insured.

Although Boies Schiller later concluded that the Inter-Ocean transaction as finally executed contained insufficient risk to be treated as reinsurance – and hence the voluntary restatement when the issue was uncovered in 2005 – Mr. Stanard did not know this at the time of the transaction.  To the contrary, he understood that the transaction had been reviewed and approved by RenRe's outside auditors as having sufficient risk.  To qualify for reinsurance accounting under Financial Accounting Statement 113 ("FAS 113"), a transaction must transfer "significant risk" to the reinsurer.  Yet "significant risk" is not defined within FAS 113, which has been widely criticized as being unclear and imprecise and currently is under review by the Financial Accounting Standards Board.  What is clear is that only a very small amount of risk must be transferred.  The general rule of thumb adopted within the industry is that a transaction passes FAS 113 so long as it contains a ten percent chance of a ten percent loss ***to the reinsurer*** (here, Inter-Ocean) – effectively a ***one percent risk of loss***.  Due to the ambiguity inherent in

---

[1]  Renaissance is a catastrophic reinsurer, which means that it provides insurance to other insurers for catastrophic events such as hurricanes, tornados, and earthquakes.  When Renaissance suffers losses, given the nature of its catastrophic insurance, they often are high-dollar losses.  Premiums, by contrast, are collected on a steadier, more predictable basis.  A critical aspect of managing Renaissance's business thus is protecting itself against the unpredictability and volatility of losses through careful financial management and planning for inevitable but unknowable future losses.  Reinsurers often protect themselves through purchasing recognized insurance products such as finite reinsurance and Industry Loss Warranty contracts.

FAS 113, Mr. Stanard (a non-accountant) believed that assessing the sufficiency of accounting risk was a task best left to the accounting professionals.

Putting aside the SEC's conclusory fraud accusations, nothing suggests that, at the time of the Inter-Ocean transaction, Mr. Stanard had any unique awareness of the particular details of this one deal among thousands – much less that he understood the interaction or evolution of its terms. Mr. Stanard did not craft the structure or terms of the deal. He was aware of the general structure of the deal, but not its specific features. He understood that it contained only a small amount of risk, but enough to comply with the applicable accounting rules. Mr. Stanard indisputably thought that the deal had been reviewed and approved by Ernst & Young, who indeed had reviewed and approved an earlier version of the deal. This is all that one would expect of the Chairman and CEO of a rapidly growing company.

The SEC pins its fraud claims on the notion that Mr. Stanard allegedly wanted to "defer approximately $26 million of income to *protect itself from future insurance losses*." Am. Compl. ¶ 26 (emphasis supplied). The SEC somehow sees this as a nefarious purpose and thus concludes that Mr. Stanard intended to deceive shareholders. In the complicated and inherently volatile world of reinsurance, however, this is exactly how a conservative CEO should manage his company for the *benefit* of shareholders. This also is precisely what Mr. Stanard understood finite reinsurance allowed – in a manner fully compliant with the accounting rules. Although finite risk reinsurance has come under intense scrutiny after 2001, its very purpose is to allow an insurer to mitigate its inevitable future losses by purchasing low risk coverage intended to smooth out some of that inherent volatility. When you buy additional reinsurance, the associated expense inevitably reduces current income, i.e., it *defers* income until a reinsurance claim can be made, if one can be made. Finite reinsurance by definition transfers a very limited amount of risk to the reinsurer in exchange for a smaller profit margin, making it much cheaper to purchase

than traditional reinsurance.  So long as the contract contains the modicum of risk needed to pass applicable accounting standards, it is entirely appropriate.

Thus, to allege that Mr. Stanard's "true purpose … was to defer recognizing and publicly reporting approximately $26 million in income until RenRe made a claim under the reinsurance agreement" (*see* Am. Compl. ¶ 5) is meaningless to the SEC's fraud allegation.  Lacking anything to suggest Mr. Stanard intended to enter into a riskless transaction or one that purposefully evaded the accounting rules, the SEC simply points back to the fact that the executed deal failed the accounting tests because it lacked sufficient risk transfer.  Were this bootstrap approach enough to prove fraud, any improperly accounted for transaction could be fraudulent, even if the purpose would be perfectly legitimate had the accounting been correct.

The SEC's claims against Mr. Stanard fall far short of the Second Circuit's requirements for securities fraud.  Among other things, they lack two necessary ingredients – materiality and scienter.  Accordingly, these claims ultimately must fail.

## II.      Mr. Stanard's Responses to the SEC's Allegations

### Summary of Allegations

1.      Mr. Stanard admits that the SEC has charged the defendants with fraud in connection with a contract entered into by Renaissance, which is a wholly owned subsidiary of RenRe, a holding company that provides property catastrophe reinsurance through its subsidiaries; Mr. Stanard denies that the SEC's claims have merit.  Mr. Stanard admits the second, third, and fourth sentences of paragraph 1, which identify positions held by the defendants at RenRe or Renaissance.  The remaining allegations in paragraph 1 are denied.  Mr. Stanard affirmatively states that terms such as "cookie jar," "bank," "round trip," and "smoothing" or "deferring" earnings, which are sprinkled throughout the SEC's first amended complaint, are empty characterizations that add nothing to the substance of the SEC's factual

allegations.  Finite reinsurance by its very nature is intended to help a reinsurer operate its business wisely and in the best interests of shareholders by providing a legitimate and recognized means of deferring income recognition and smoothing financial volatility.  Less pejoratively than the SEC puts it, finite reinsurance allows a reinsurer to legitimately create a "rainy day" fund, the effect of which is to "put away" income so that it is available when needed to offset catastrophic future losses and to provide some measure of financial stability by softening the income-statement impact of such catastrophic losses.  Indeed, at some level, this is a primary purpose of *all* insurance.  The SEC's rhetoric aside, the fault in the Inter-Ocean transaction was not an intention or "purpose" to defer income; it was that the transaction was not found to contain the requisite risk to qualify for reinsurance accounting.

2.      Mr. Stanard admits that Renaissance entered into two related contracts with Inter-Ocean.  The terms of these two contracts are set forth in the written contracts.  To the extent the allegations in paragraph 2 are inconsistent with or characterize the terms of the written contracts, they are denied.   Under an assignment agreement, Renaissance sold to Inter-Ocean for $30 million the right to collect up to $50 million worth of recoverables under certain industry loss warranty ("ILW") contracts.  Mr. Stanard understands and thus admits that, in connection with this contract, RenRe recorded $30 million of income in the first quarter of 2001.  Mr. Stanard understands that the $20 million in potential profit to Inter-Ocean on this transaction was not intended as a "bank" for Renaissance, as the SEC alleges, but rather as a means to partially fund the related finite reinsurance agreement.  The remaining allegations in paragraph 2 are denied.

3.      Mr. Stanard admits that Renaissance entered into a reinsurance agreement with Inter-Ocean.  The terms of this reinsurance agreement are set forth in the written contract.  To the extent the allegations in paragraph 3 are inconsistent with or characterize the written contract, they are denied.  This agreement was designed to function in combination with the assignment

agreement described in paragraph 2, above, so that if Renaissance were able to place a claim for the full limit under the reinsurance agreement, it likely would recoup most of its losses under the assignment agreement. The transaction eventually was commuted to be a one-year agreement for $30 million of maximum limit, and Renaissance paid only a single $7.3 million premium. The remaining allegations in paragraph 3 are denied.

4.      Mr. Stanard denies that he understood or intended that Renaissance was certain to meet all conditions for coverage or that Renaissance was certain to receive back a specified recovery. He denies that he understood or intended the reinsurance agreement to be a "sham" or "round trip of cash." Mr. Stanard admits that he believed Renaissance was likely to meet the conditions for coverage under the finite reinsurance contract and likely would be able to make a claim that would allow Renaissance to recoup most of its losses under the assignment agreement. Mr. Stanard affirmatively states that he believed and understood that a small, but real, risk existed that Renaissance would not be able to make a claim under the reinsurance contract or avoid a loss beyond transactional fees and costs. Mr. Stanard understands, based on the Company's 2005 investigation, that the amount in the trust approximately equaled the premium payments made by Renaissance under the reinsurance agreement plus the $20 million difference (minus a margin) between what Renaissance ultimately received and paid out under the assignment agreement. Mr. Stanard admits that the amount that Inter-Ocean earned in the linked assignment agreement was intended and used to partially fund the reinsurance agreement and to pay a margin to Inter-Ocean and/or AmRe, although Mr. Stanard was not involved in these transaction details at the time. He affirmatively states that he understood and intended that this reinsurance agreement would be in compliance with Generally Accepted Accounting Principles ("GAAP") and would be reviewed and approved by RenRe's outside auditor, Ernst & Young. The remaining allegations in paragraph 4 are denied.

5.     Mr. Stanard denies that he had, or was aware of, any fraudulent intent in connection with Renaissance entering the Inter-Ocean transaction.  He admits that Renaissance intended to defer approximately $26 million in a GAAP-compliant transaction until Renaissance was able to make a claim under the reinsurance agreement.  Mr. Stanard admits that, as a result of the conclusion that this transaction did not contain sufficient risk to be GAAP-compliant, RenRe understated income in 2001, when Renaissance entered into the transaction, and overstated income in 2002 and 2003, when Renaissance made and collected on a claim under the reinsurance agreement.  Mr. Stanard denies, however, that RenRe overstated net income in the third quarter of 2002 by nearly 38% as a result of the transaction.  He affirmatively states that, in 2002, the transaction resulted in a 6.8% overstatement of net income and that, for the 2001 – 2003 period as a whole, there was no overstatement or understatement of income.  The remaining allegations in paragraph 5 are denied.

6.     Mr. Stanard is without knowledge or information sufficient to form a belief as to the truth of the allegations contained in the first and second sentences of paragraph 6, and he therefore denies them.  Mr. Stanard denies that he was aware of Mr. Merritt concealing key facts from RenRe's auditors.

7.     Mr. Stanard admits the allegations in the first sentence of paragraph 7.  The remaining allegations in paragraph 7 are denied.

**Violations**

8.     Paragraph 8 is a conclusion of law to which no response is required.  To the extent a response is required, however, the allegations in paragraph 8 are denied.

**Jurisdiction and Venue**

9.     Mr. Stanard admits that the SEC purports to bring claims against him, as described in paragraph 9.  Mr. Stanard denies that the claims against him have merit.

10.     Admitted.

11.     Mr. Stanard is without knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 11 concerning Messrs. Cash and Merritt, and he therefore denies them.   Mr. Stanard understands that company records show, and he thus admits, that a wire transfer relating to the Inter-Ocean transaction was processed through a bank located in the Southern District of New York.  He denies that this wire transfer was a material step in the Inter-Ocean transaction sufficient to make venue proper in the Southern District of New  York. He similarly denies that venue is proper in this district.   No material acts occurred in the Southern District of New York.  RenRe does not file any reports with the New York office of the Securities and Exchange Commission.

12.     Mr. Stanard admits that he is a resident of Bermuda.  He denies that he is a resident of Baltimore, Maryland.  He was 58 years old at the time the first amended complaint was filed.  Mr. Stanard admits that he was the Chairman and Chief Executive Officer of RenRe from the time of RenRe's formation in June 1993 until approximately November 1, 2005.  Mr. Stanard admits that he was the Chairman and Chief Executive Officer of Renaissance in 1996, the first year for which RenRe filed public reports.  He further admits that he was the Chairman, but not the Chief Executive Officer, of Renaissance in 1997.  He denies holding any positions within Renaissance subsequent to that point.  Mr. Stanard does not recall whether he held any other specific positions with Renaissance prior to 1996 and therefore denies the remainder of the allegations in the second sentence of paragraph 12.  Mr. Stanard affirmatively states that, from 1983 to 1991, he served as a Senior Vice President and later Executive Vice President of F&G Re, Inc., a reinsurance subsidiary of U.S. Fidelity & Guaranty ("USF&G").  In 1991, he left F&G Re, Inc. and joined USF&G.  In 1993, Mr. Stanard founded RenRe, in which USF&G was

an original minority investor.  Mr. Stanard admits that he entered the reinsurance industry in 1971 and has held actuarial, underwriting, and management positions over the years.

13.     Mr. Stanard is without knowledge or information sufficient to form a belief as to the truth of the allegations contained in the first and fifth sentences of paragraph 13, and he therefore denies them.  Mr. Stanard admits that Mr. Merritt was the Controller of RenRe from at least 2000 through March 2005.  Mr. Stanard further admits that Mr. Merritt was a Vice President of RenRe from 2000 until 2002, when he became a Senior Vice President of RenRe. Mr. Merritt remained a Senior Vice President until he left RenRe in November 2005.  Mr. Stanard denies that Mr. Merritt was an officer of Renaissance.

14.     Mr. Stanard is without knowledge or information sufficient to form a belief as to the truth of the allegations contained in the first sentence of paragraph 14, and he therefore denies them.  Mr. Stanard admits that Mr. Cash joined Renaissance on or about November 2000 as a Vice President.  Mr. Stanard admits that Mr. Cash had prior experience in the reinsurance industry, but Mr. Stanard is without knowledge or information sufficient to admit the extent of Mr. Cash's prior experience, and he therefore denies the remaining allegations in the second sentence of paragraph 14.  Mr. Stanard admits that Mr. Cash served as Senior Vice President, Specialty Reinsurance from 2002 until approximately July 11, 2005.  Mr. Stanard admits that Mr. Cash resigned on or about July 11, 2005 and that the Company issued a press release announcing the resignation.

**Other Relevant Entities**

15.     Admitted.

16.     Mr. Stanard admits that Inter-Ocean is, or was from at least 2000 through 2003, a Bermuda corporation.  He is without knowledge or information sufficient to form a belief as to whether Inter-Ocean's principal corporate offices are in Bermuda, and he therefore denies that

allegation.  Mr. Stanard further is without knowledge or information sufficient to form a belief as to the truth of the allegations in the second sentence of paragraph 16, and he therefore denies them.  Mr. Stanard admits the third sentence of paragraph 16.  Mr. Stanard admits that, from 2000 through 2003, the other shareholders of Inter-Ocean Holdings were various insurance and reinsurance companies.  He is without knowledge or information sufficient to form a belief as to the current shareholders of Inter-Ocean and therefore denies the remainder of the fourth sentence of paragraph 16.

**Facts**

17.    Mr. Stanard denies that he designed the Inter-Ocean transaction, that he was involved in or familiar with the specific details of the transaction, or that he understood or intended the transaction to be a fraudulent device.  He admits that he understood and intended the transaction to serve as a legitimate means to defer income through the use of a GAAP-compliant and auditor-approved transaction "so that RenRe could draw on [available reinsurance] if the Company incurred large insurance losses in the future."  Mr. Stanard affirmatively states that this is consistent with the recognized, intended, and appropriate use of finite reinsurance.  Mr. Stanard denies the allegations in the second sentence of paragraph 17. He affirmatively states that 2002, the year in which Renaissance made a claim on the reinsurance contract, was an even better year for RenRe than was 2001 and that the transaction did not have the effect of providing RenRe with a "material impact during a future period when RenRe needed an earnings boost;" the transaction, however, did help address large insurance losses incurred by Renaissance.

18.    Mr. Stanard admits that RenRe issued a press release on February 22, 2005.  The press release is a written document.  To the extent the allegations in paragraph 18 are inconsistent with or characterize the written document, they are denied.

19.     Mr. Stanard admits that RenRe filed its Form 10-K for the year ended December 31, 2004 on or about March 31, 2005 and that he signed and certified the filing.  The Form 10-K is a written document.  To the extent the allegations in paragraph 19 are inconsistent with or characterize the written document, they are denied.  Mr. Stanard does not understand the characterization in the second sentence of paragraph 19 that "[t]he restatement treated the transaction as if it had never occurred," and this allegation therefore is denied.  He affirmatively states that he and the Company learned in 2005 that the transaction lacked the necessary risk transfer to be treated as reinsurance and accordingly restated the transaction voluntarily.

## A.     Background:  RenRe's Earnings and Reinsurance Situation

20.     Admitted.  Mr. Stanard affirmatively states that he and RenRe always were interested in ways to manage RenRe's risks and reinsurance portfolio effectively.  RenRe was a substantial purchaser of traditional reinsurance in the industry; purchasing Industry Loss Warranty ("ILW") contracts was just one aspect of an overall strategy to better manage RenRe's risks and reinsurance portfolio effectively.

21.     Mr. Stanard admits that, during early 2001, the Company thought it was likely to recover under various ILW contracts it had purchased in 1999, which included the ILWs ultimately involved in the Inter-Ocean transaction.  Given the unprecedented number of large catastrophes during 1999, which resulted in RenRe obtaining substantial recoveries in connection with its 1999 ILW contracts, the price of ILW contracts was likely to increase significantly in the future.  Mr. Stanard admits that he and RenRe always were interested in new and creative ways to protect the Company in the face of the inevitable occurrence of future losses, an approach that he believed to be in the shareholder's best interests.  Mr. Stanard denies the remaining allegations in paragraph 21.

22.     Mr. Stanard admits that 2000 was a profitable year for RenRe.  Mr. Stanard further admits that, in November 2000, certain Renaissance executives engaged in e-mail correspondence referring to a "4th quarter challenge" and "project Christmas present."  Mr. Stanard does not recall seeing these e-mails at the time.  He is not aware of where these terms originated but does not believe that they were originated by anyone at RenRe or Renaissance. These e-mails are written documents.  To the extent the allegations in paragraph 22 are inconsistent with or characterize the written documents, they are denied.  Mr. Stanard affirmatively states that any transaction explored by Renaissance executives, if consummated, would be expected to comply with GAAP.

23.     Mr. Stanard admits that Mr. Cash joined Renaissance in November 2000 as a vice president.  He denies any implication that Mr. Cash, who at that time was not considered a member of senior management, had overall responsibility for underwriting reinsurance at Renaissance.  Mr. Stanard is without knowledge or information sufficient to form a belief as to what Mr. Cash was working on immediately after he joined Renaissance and Mr. Stanard therefore denies the allegations in the first sentence of paragraph 23.  To the extent the allegations refer to e-mail correspondence regarding "project Christmas present," those e-mails are written documents.  To the extent the allegations in paragraph 23 are inconsistent with or characterize those written documents, they are denied.  Mr. Stanard admits that no transaction considered in connection with any e-mail referencing a "project Christmas present" ever was consummated.  He denies the remaining allegations in paragraph 23.

24.     Mr. Stanard admits that, in early 2001, RenRe was in a strong financial position and felt that it could afford to purchase additional reinsurance.  He denies any particular focus on quarterly earnings generally, or first quarter 2001 earnings, and affirmatively states that he cautioned shareholders against the fluctuation inherent in quarterly results for catastrophic

reinsurance companies and for RenRe.  Mr. Stanard understands that company records show, and he thus admits, that Renaissance sent preliminary loss notices to its reinsurers on or about January 12, 2001, as was required by the ILW contracts.  The purpose of the provisional loss notices was to notify the Company's reinsurers of a potential recovery under the 1999 ILW treaties.  Mr. Stanard further states that the ILWs, including those underlying the Inter-Ocean contract, had contractual triggers that had to be met before Renaissance was eligible to collect on them.  One such trigger was the occurrence of a particular type of catastrophic event that caused industry-wide losses beyond a certain threshold level, as measured by some independent body.  The ILWs underlying the Inter-Ocean contract required those loss levels to be verified through the publication of the Sigma Report, issued by Swiss Reinsurance Company.  Mr. Stanard understands that company records show, and he thus admits, that Renaissance became entitled to collect upon the ILWs underlying the Inter-Ocean transaction on March 15, 2001, with the publication of the 2001 Sigma report.  He denies that Renaissance at that time was certain to collect $50 million, given the possibility for Sigma to revise its numbers and the uncertainties regarding collection, including possible reinsurer insolvency.  The timing of collections also could be uncertain.  Mr. Stanard understands that company records show, and he thus admits, that after the publication of the 2001 Sigma Report, Renaissance sent actual loss notices to its reinsurers, notifying them that the contractual trigger had been met.  Mr. Stanard's knowledge of these facts concerning ILWs is based upon the Company's 2005 investigation.  He does not recall how much, if any, of this information he knew during 2001.

25.      Paragraph 25 contains legal conclusions to which no response is required.  To the extent a response is required, however, these allegations are denied.  Mr. Stanard understands that company records show, and he thus admits, that Renaissance had received approximately $23 million by March 31, 2001 and approximately $42.1 million by April 23, 2001 relating to

the recoverables covered by the assignment agreement.  Mr. Stanard affirmatively states that he is not an accountant and was not directly involved in decisions in 2001 or 2005 concerning how to account properly for the ILW recoverables underlying the Inter-Ocean transaction.  Mr. Stanard denies the remaining allegations in paragraph 25.

26.     Mr. Stanard understands that company records show, and he thus admits, that RenRe did not recognize $50 million of income from the specified ILWs in the first quarter of 2001.  He understands that RenRe recognized $30 million of income in the first quarter associated with the sale of the ILWs through the assignment agreement.  Mr. Stanard denies the allegations in the second sentence of paragraph 26 to the extent they suggest that it is improper for a reinsurance company to use available resources to purchase additional reinsurance "to protect itself from future insurance losses" or to replace the benefits associated with ILW contracts that no longer were available at favorable pricing.  He affirmatively states that, by entering into the Inter-Ocean transaction, Renaissance hoped to defer income by purchasing additional reinsurance through a GAAP-compliant finite risk reinsurance transaction with the intent that the reinsurance would be available to protect Renaissance when it later experienced insurance losses.  He denies the remaining allegations in paragraph 26.

27.     Mr. Stanard denies the allegations in the first sentence of paragraph 27.  He admits the allegations in the second sentence of paragraph 27.  The January 10, 2001 email referenced is a written document.  To the extent the allegations in paragraph 27 are inconsistent with or characterize the written document, they are denied.  Mr. Stanard affirmatively states that he does not recall sending the January 10, 2001 e-mail.  Although this e-mail may have encouraged others at Renaissance who later developed the Inter-Ocean transaction, Mr. Stanard is aware of no direct link between his e-mail and the Inter-Ocean transaction itself.  Mr. Stanard further states that he would not have had any specific contractual structure in mind when he sent

16

his January 10, 2001 e-mail, and he would have assumed that any finite reinsurance contract Renaissance entered into would be GAAP-compliant and fully reviewed and approved by the Company's outside auditors.  Mr. Stanard denies the remaining allegations in paragraph 27.

28.     Mr. Stanard is without knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 28 concerning Mr. Cash, and he therefore denies them. The allegations in paragraph 28 concerning Mr. Stanard, however, are by their nature so vague and ambiguous that he cannot form a response to them.  Moreover, any e-mail sent by Mr. Cash would be a written document.  To the extent the allegations in paragraph 28 are inconsistent with or characterize the written document, they are denied.

29.     Mr. Stanard admits that Renaissance personnel other than Mr. Stanard negotiated the Inter-Ocean transaction.  Mr. Stanard is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 29, and he therefore denies them. Mr. Stanard denies any implication in paragraph 29 that he met with three Inter-Ocean employees in mid-March 2001.

30.     Mr. Stanard is without knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 30, and he therefore denies them.  In any event, any such email is a written document.  To the extent the allegations in paragraph 30 are inconsistent with or characterize the written document, they are denied.

31.     Mr. Stanard is without knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 31, and he therefore denies them.

32.     Mr. Stanard is without knowledge or information sufficient to form a belief as to the truth of the allegations in the first sentence of paragraph 32, and he therefore denies them. Mr. Stanard denies the allegations in the second sentence of paragraph 32.  Mr. Stanard admits the allegations in the third and fourth sentences of paragraph 32.

17

33.     Mr. Stanard admits that he was aware at a general level of negotiations between Renaissance and Inter-Ocean.  Although Mr. Stanard does not recall any such discussion, he believes it is possible that the status of the Inter-Ocean transaction could have been discussed at senior staff meetings.  He denies the remaining allegations in paragraph 33.

### B.     The Inter-Ocean Transaction

34.     Mr. Stanard admits that the assignment and reinsurance agreements with Inter-Ocean were intended and understood to be related; he denies that this relationship "was not obvious from the documentation itself," as paragraph 34 suggests.   To the contrary, the agreements were negotiated together, they were presented together to RenRe's outside auditors, and they in fact were related.  The reinsurance agreement and assignment agreement are written documents.  To the extent the allegations in paragraph 34 are inconsistent with or characterize the written documents, they are denied.  Mr. Stanard denies that the two agreements were not intended to provide any economic benefit to either party; the Inter-Ocean transaction as a whole was intended by Stanard to be a GAAP-compliant finite risk reinsurance agreement that could reduce volatility in Renaissance's loss portfolio and soften the income-statement impact of future catastrophic losses.

### 1.     The Assignment Agreement

35.     Mr. Stanard admits that, on April 23, 2001, Renaissance signed an assignment agreement with Inter-Ocean.  The assignment agreement is a written document.  To the extent the allegations in paragraph 35 are inconsistent with or characterize the written document, they are denied.  The assignment agreement was related to the reinsurance agreement.  Although Mr. Stanard was not involved in designing the specific terms of the agreements, he understands that the $20 million difference between the $30 million received from Inter-Ocean and the right to

collect up to $50 million of the 1999 ILW recoverables was intended to reflect uncertainty in the timing and receipt of payment and to serve as a method of partially funding the related reinsurance agreement.  Mr. Stanard denies the remaining allegations in paragraph 35.

36.     Mr. Stanard denies the allegations in the first and second sentences of paragraph 36.  Mr. Stanard is without knowledge or information sufficient to form a belief as to the truth of the allegations contained in the third sentence of paragraph 36, and he therefore denies them.  In any event, any such April 4, 2001 email is a written document.  To the extent the allegations in paragraph 36 are inconsistent with or characterize the written document, they are denied.  Mr. Stanard understands that company records show, and he thus admits, that by April 23, 2001 Renaissance had received $42.1 million of the $56 million in ILW recoverables covered by the assignment agreement.  Mr. Stanard denies the remaining allegations in paragraph 36.

37.     Mr. Stanard admits that Renaissance and Inter-Ocean ultimately executed the assignment agreement, which is a written document.  To the extent the allegations in paragraph 37 are inconsistent with or characterize the written document, they are denied.

38.     Mr. Stanard admits that Renaissance ultimately collected $50 million of the assigned recoverables and that the assignment agreement was not terminated by either party.  He denies that the termination provision demonstrates that the assignment agreement lacked economic substance.  Mr. Stanard admits that it is his understanding that the assignment agreement was designed and intended as a way to partially fund the related reinsurance agreement with Inter-Ocean.  He denies the remaining allegations in paragraph 38.

39.     Mr. Stanard understands that company records show, and he thus admits, the allegations in paragraph 39 as to Renaissance rather than RenRe, and he thus admits them as to Renaissance.  Mr. Stanard denies that the processing of a wire payment by a bank located in the Southern District of New York was a material step in the Inter-Ocean transaction.

## 2.       The Reinsurance Agreement

40.       Mr. Stanard admits that, on July 31, 2001, Renaissance signed a reinsurance agreement with Inter-Ocean having a coverage period beginning on January 1, 2001.   He affirmatively states that it is a common practice in the reinsurance industry for contracts to include a coverage period that begins on a date prior to when the contract is executed.   Mr. Stanard denies the remaining allegations in paragraph 40.

### a.       There was no risk to RenRe because the coverage triggers were illusory

41.       Mr. Stanard denies the allegations in the self-serving and conclusory characterization in the sub-heading immediately preceding paragraph 41 of the first amended complaint.   The reinsurance agreement is a written document.   To the extent the allegations in paragraph 41 are inconsistent with or characterize the written document, they are denied.   Mr. Stanard denies that the coverage triggers were illusory.   He affirmatively states that it is his understanding that the triggers were valid and were satisfied before Renaissance made a claim. Mr. Stanard further affirmatively states that it is his understanding that the coverage triggers were presented to RenRe's outside auditor when the auditor reviewed the transaction for risk transfer, and that the auditor did not find them to be illusory or ask that they be changed or clarified.   Mr. Stanard's understanding of these facts is based on the Company's 2005 investigation.

42.       Denied.   Mr. Stanard affirmatively states that he understood that there was intended to be only a small risk that Renaissance would not be able to recover under the Inter-Ocean transaction, but he did not understand or intend that there would be no risk that Renaissance would not be able to make a full recovery.   Mr. Stanard further understood that

RenRe's outside auditor had reviewed the agreements and determined that sufficient risk existed to justify reinsurance accounting.

43.     Denied.  Mr. Stanard affirmatively states that he is aware of no evidence that the retention limits were manipulated.  He further states that the retention limits were set forth in the written agreements, which were reviewed by the Company's outside auditor.

44.     Denied.  Mr. Stanard admits that a "1 in 10 loss event" was defined solely by Renaissance in accordance with its Risk Exposure Management System ("REMS"), as was specified in the contract, but he denies that Renaissance controlled whether the trigger would be met.  Mr. Stanard affirmatively states that REMS was a well-defined, overall risk management system that Renaissance relied upon routinely in its underwriting and pricing decisions to assess loss probabilities at numerous levels.  He understands that the "1 in 10 loss event" provision was disclosed to the Company's outside auditor.  Mr. Stanard is not aware of the REMS system being manipulated in connection with the Inter-Ocean transaction.  He affirmatively states that, to his knowledge, the REMS system was not infinitely scaleable and that Renaissance could not construct a "1 in 10 loss event" that would validly satisfy the contract terms any time it wanted.

45.     Mr. Stanard affirmatively states that REMS is a proprietary system developed by Renaissance over many years for use in connection with its underwriting and pricing decisions.  Given its proprietary nature, Renaissance generally did not make this system available to its competitors.  Mr. Stanard denies awareness that REMS was manipulated in connection with the "1 in 10 loss event."  Mr. Stanard understand that, under the reinsurance agreement, Renaissance was required to grant Inter-Ocean the right to inspect at all reasonable times the books, records, and papers of Renaissance pertaining to the reinsurance provided and any claims made in connection with that agreement.  Mr. Stanard denies the remaining allegations in paragraph 45.

46. Mr. Stanard denies the characterization in the first sentence of paragraph 46 regarding "fictitious reinsurance coverage." The reinsurance agreement is a written document. To the extent the allegations in paragraph 46 are inconsistent with or characterize the written document, they are denied. Mr. Stanard admits that a premium payment of $7.3 million was made on July 31, 2001.

                    **b.**       **There was no risk to Inter-Ocean because coverage was limited to the amount in a trust funded by RenRe**

47. Mr. Stanard denies the allegations in the self-serving and conclusory characterization in the sub-heading immediately preceding paragraph 47 of the first amended complaint. The reinsurance agreement is a written document. To the extent the allegations in paragraph 47 are inconsistent with or characterize the written document, they are denied. Mr. Stanard admits that the amount that Inter-Ocean earned in the linked assignment agreement was intended and used to partially fund the reinsurance agreement and to pay a margin to Inter-Ocean and/or AmRe, although Mr. Stanard was not involved in these transaction details at the time.

48. The reinsurance agreement is a written document. To the extent the allegations in paragraph 48 are inconsistent with or characterize the written document, they are denied. Mr. Stanard affirmatively states that he understands that there were multiple drafts of the reinsurance agreement and that the limit adjustment factor changed in later drafts; Mr. Stanard was not aware of the specifics of the limit adjustment factor or how it operated at the time of the Inter-Ocean transaction. Mr. Stanard further affirmatively states that he intended and understood in 2001 that the Inter-Ocean transaction would have sufficient risk to qualify for reinsurance accounting.

49. The 2003 amendment to the reinsurance agreement is a written document. To the extent the allegations in paragraph 49 are inconsistent with or characterize the written document, they are denied. Mr. Stanard admits the allegations in the first and second sentences of

paragraph 49.  Mr. Stanard admits the allegations in the final sentence of paragraph 49.  Mr. Stanard denies the remaining allegations in paragraph 49.

50.     The reinsurance agreement is a written document.  To the extent the allegations in paragraph 50 are inconsistent with or characterize the written document, they are denied.  Mr. Stanard denies the existence of any oral agreement or understanding that contradicted, changed, or invalidated the terms of the Inter-Ocean transaction, which terms were set forth in the written agreements executed by the parties.  Mr. Stanard affirmatively states that he intended and understood in 2001 that the Inter-Ocean transaction would have sufficient risk to qualify for reinsurance accounting.

51.     Mr. Stanard admits the allegations in the first sentence of paragraph 51.  Mr. Stanard denies the remaining allegations in paragraph 51.  Mr. Stanard affirmatively states that nothing said in the telephone call referenced in paragraph 51 contradicted, changed, or invalidated the terms of the Inter-Ocean transaction, which terms were set forth in the written agreements executed by the parties.  To the contrary, the telephone call was a discussion, at a high level of generality, about the parties' expectations *under* the terms of the written agreements and about the parties' concerns over the small risk that their expectations would not be realized *under* the terms of the written agreements, as Mr. Stanard understood them at the time.  This flatly contradicts and is inconsistent with the unsupportable allegation that Mr. Stanard, at the time of the call, understood or intended that the transaction would have "no actual risk transfer."

52.     Mr. Stanard denies the allegations in the first, third, and fourth sentences of paragraph 52.  Mr. Stanard affirmatively states that he understood and intended in 2001 that the Inter-Ocean transaction would have sufficient risk to qualify for reinsurance accounting.  Mr. Stanard admits that, as a culmination of the comprehensive internal review conducted during 2005 into RenRe's transactions and business transactions, Boies Schiller concluded that the

Inter-Ocean transaction lacked sufficient risk to Inter-Ocean to justify reinsurance accounting. Mr. Stanard affirmatively states that, when he first learned of this, he directed RenRe to issue a financial restatement correcting the accounting.   The reinsurance agreement is a written document.   To the extent the allegations in paragraph 52 are inconsistent with or characterize the written document, they are denied.

### 3.      RenRe's Claim Under the Reinsurance Agreement

53.      Mr. Stanard admits that Renaissance made a claim under the reinsurance agreement in the third quarter of 2002, which he understands was the first time that the company was eligible to make a claim under the contract.   Mr. Stanard denies any suggestion that Renaissance made a claim under the Inter-Ocean transaction as a result of publicity surrounding the accounting scandals at Enron Corporation.   He admits that, after it made a claim under the Inter-Ocean transaction, the Company at some point decided not to expand the transaction or do other finite reinsurance deals with Inter-Ocean.   He admits that the Enron accounting scandals caused many companies, including RenRe, to take more conservative accounting positions and that this may have been a factor in the Company's decision not to expand the Inter-Ocean transaction or do other finite transactions with Inter-Ocean.   He denies any inference in the second sentence of paragraph 53 that the Company was aware at the time that the accounting for the Inter-Ocean transaction was improper.

54.      Mr. Stanard admits that, on or about September 25, 2002 and pursuant to the written terms of the reinsurance agreement, Renaissance submitted a written reinsurance claim. Mr. Stanard admits that the claim letter was signed by Mr. Cash on behalf of Renaissance.   The reinsurance agreement and claim letter are written documents.   To the extent the allegations in paragraph 54 are inconsistent with or characterize the written documents, they are denied.   Mr.

Stanard denies that the Inter-Ocean transaction was intended to be a sham or that the length or nature of the claim letter suggests in any way that the claim was not valid.

55.     Mr. Stanard understands that company records show, and he thus admits, the allegations in the first sentence of paragraph 55 as to Renaissance, rather than RenRe.  He is without knowledge or information sufficient to form a belief as to truth of the allegations in the second sentence of paragraph 55, and he therefore denies them.

### C.     Accounting for the Transaction

56.     Denied.

57.     Denied.  Mr. Stanard affirmatively states that, if the transaction as a whole in fact had contained adequate risk transfer as he understood and intended, his understanding is that RenRe properly could have accounted for the assignment agreement as a sale of assets.  Due to the insufficient risk transfer, which Mr. Stanard first discovered in 2005 as a result of an investigation he ordered, RenRe's restatement deposit-accounted for the Inter-Ocean transaction.

58.     Denied.  Mr. Stanard affirmatively states that he understood that the Inter-Ocean transaction had been reviewed and approved by RenRe's outside auditors and that he understood and intended that the transaction was GAAP-compliant.

59.     Denied.  Mr. Stanard affirmatively states that, at the time of the transaction, he was only generally familiar with the transaction's details and that, as a non-accountant, he believed decisions regarding the proper accounting for the transaction were best left to the accounting professionals.  Mr. Stanard further states that he believed the deal had been reviewed and approved by RenRe's outside auditors.

60.     Mr. Stanard is without knowledge or information sufficient to form a belief as to the truth of the allegations contained paragraph 60, and he therefore denies them.  In any event,

any such email is a written document.   To the extent the allegations in paragraph 60 are inconsistent with or characterize the written document, they are denied.

61.     The allegation that Mr. Merritt "was responsible for recording the improper accounting entries" is vague and ambiguous and therefore is denied.   Mr. Stanard affirmatively states that Mr. Merritt, as RenRe's Controller, would have been involved in accounting decisions on the Inter-Ocean transaction, in consultation with RenRe's outside auditors.

### 1.     First and Second Quarters of 2001

62.     Denied.

63.     Mr. Stanard understands that company records show, and he thus admits, that the assignment agreement was finally executed on April 23, 2001 and that RenRe accounted for $30 million as income in the first quarter of 2001.  Mr. Stanard further admits that additional amounts collected under the assignment agreement were intended to help fund the related reinsurance agreement and were not recorded as income in the first quarter of 2001.  Mr. Stanard denies that this accounting treatment would have been inappropriate, assuming that sufficient risk had been included in the reinsurance agreement, as understood and intended by Mr. Stanard.   The allegations in the fourth and fifth sentences of paragraph 63 are vague, ambiguous, and ill-defined, and they therefore are denied.  Mr. Stanard denies the remaining allegations of paragraph 63.

### 2.     Third and Fourth Quarters of 2001

64.     Mr. Stanard admits that, on July 31, 2001, Renaissance paid Inter-Ocean a $7.3 million premium payment pursuant to the reinsurance agreement.   To the extent that the placement of the word premium in quotation marks suggests that Mr. Stanard knew that the amount could not properly be accounted for as premium expense,  Mr. Stanard denies that

allegation as a self-serving characterization.   Mr. Stanard admits the second sentence of paragraph 64.  He further admits that the accounting treatment was incorrect under GAAP and therefore the $7.3 million payment could not be recorded as a "premium" expense.  He denies that there was no risk of Renaissance not being able to make a reinsurance recovery.   Mr. Stanard affirmatively states that, at the time of the transaction, he understood and intended that the transaction would have sufficient risk transfer to qualify for reinsurance accounting.  When Mr. Stanard first learned in 2005 that there was insufficient risk transfer, as a result of an investigation he ordered, RenRe restated the accounting for the Inter-Ocean transaction.   He denies the remaining allegations in paragraph 64.

65.     Denied.  Mr. Stanard affirmatively states that, at the time of the transaction, he understood and intended that the transaction would have sufficient risk transfer to qualify for reinsurance accounting.  Mr. Stanard fully expected that Renaissance would be able to make a claim under the reinsurance agreement – consistent with the low level of risk inherent in a finite reinsurance agreement such as Mr. Stanard intended here – but he believed a small risk existed that Renaissance might not be able to make a claim.  Mr. Stanard admits that RenRe originally accounted for the $7.3 premium payment as an expense, rather than a deposit; this was changed in the 2005 restatement.

66.     Mr. Stanard denies that $20 million in excess recoverables was placed into the trust account.  He admits that the $18.9 million that Inter-Ocean placed into the trust equaled the approximate gain to Inter-Ocean under the assignment agreement, less a margin to Inter-Ocean and/or AmRe.  He further admits that, given that the reinsurance contract as executed lacked sufficient risk transfer, the $20 million that went to Inter-Ocean in the assignment agreement should have been accounted for as a deposit in connection with the reinsurance agreement, as it was in the restatement.

### 3.    Third Quarter of 2002 and First and Fourth Quarters of 2003

67.    Mr. Stanard understands that company records show, and he thus admits, the allegations in the first, second, fourth and fifth sentences of paragraph 67 as to Renaissance, rather than RenRe.  He is without knowledge or information sufficient to form a belief as to the truth of the allegations in the third sentence of paragraph 67, and he therefore denies them.

68.    Mr. Stanard admits that RenRe originally treated the recoveries as reinsurance recoveries.  He further admits that, when it learned in 2005 that the reinsurance agreement did not contain sufficient risk to qualify for reinsurance accounting, RenRe restated its financials to treat the recoveries as a return of a deposit.  Mr. Stanard denies any suggestion or implication in the allegations in paragraph 68 that he intended for the recoveries to be accounted for in a knowingly improper fashion or in contravention of GAAP.  Mr. Stanard admits that the result of the Inter-Ocean transaction was to shift approximately $26 million of income from 2001 to 2002 and 2003; the restatement corrected the accounting.

### 4.    The Restatement

69.    Mr. Stanard admits that, on or about March 31, 2005, RenRe issued a restatement of its financial results in its Form 10-K for the year ending December 31, 2004.  The restatement is a written document.  To the extent the allegations in paragraph 69 are inconsistent with or characterize the written document, they are denied.

### D.    The Concealment of Key Facts from RenRe's Auditors

70.    Mr. Stanard denies the allegations in the self-serving and conclusory characterization in the heading immediately preceding paragraph 70 of the first amended complaint.  Mr. Stanard is without knowledge or information sufficient to form a belief as to the allegations in the first two sentences of paragraph 70.  He denies that he was aware of Mr.

Merritt concealing key facts from the auditors.  Mr. Stanard affirmatively states that he believed the deal had been reviewed and approved by RenRe's outside auditor.

71.     Mr. Stanard is without knowledge or information sufficient to form a belief as to the allegations in the first sentence paragraph 71, and he therefore denies them.  The January 2001 memorandum referenced in paragraph 71 is a written document.  To the extent the allegations in paragraph 71 are inconsistent with or characterize the written document, they are denied.

72.     The March 2001 e-mail referenced in paragraph 72 is a written document.  To the extent the allegations in paragraph 71 are inconsistent with or characterize the written document, they are denied.  Mr. Stanard is without knowledge or information sufficient to form a belief as to the remaining allegations in paragraph 72, and he therefore denies them.

73.     The March 2001 e-mail referenced in paragraph 73 is a written document.  To the extent the allegations in paragraph 73 are inconsistent with or characterize the written document, they are denied.  Mr. Stanard is without knowledge or information sufficient to form a belief as to the remaining allegations in paragraph 73, and he therefore denies them.

74.     The March 2001 memorandum referenced in paragraph 74 is a written document. To the extent the allegations in paragraph 74 are inconsistent with or characterize the written document, they are denied.

75.     Mr. Stanard is without knowledge or information sufficient to form a belief as to the allegations in paragraph 75, and he therefore denies them.  Mr. Stanard affirmatively states that, at the time of the Inter-Ocean transaction, he understood and intended that the transaction would have sufficient risk transfer to qualify for reinsurance accounting.  When Mr. Stanard first discovered the insufficient risk transfer in 2005 as a result of an investigation he ordered, RenRe restated its accounting for the Inter-Ocean transaction.

76.     Mr. Stanard is without knowledge or information sufficient to form a belief as to the allegations in paragraph 76, and he therefore denies them.

77.     Mr. Stanard is without knowledge or information sufficient to form a belief as to the allegations concerning Mr. Merritt in paragraph 77, and he therefore denies them.  He denies the conclusory and self-serving statement in the first sentence of paragraph 77 that suggests that the structure of the Inter-Ocean transaction by itself was deceptive.  The Inter-Ocean transaction was understood and intended by Mr. Stanard to be a legitimate finite risk reinsurance agreement that would satisfy GAAP and help the Company address anticipated future losses and to soften the income-statement impact of such losses.  Mr. Stanard denies any allegation that he knowingly, intentionally, or recklessly made any misrepresentations concerning the Inter-Ocean transaction.  Mr. Stanard affirmatively states that, at the time of the Inter-Ocean transaction, he understood and intended that the transaction would have sufficient risk transfer to qualify for reinsurance accounting.  When Mr. Stanard first discovered the insufficient risk transfer in 2005 as a result of an investigation he ordered, RenRe restated its accounting for the Inter-Ocean transaction.

78.     Mr. Stanard is without knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 78, and he therefore denies them.

79.     Denied.  Mr. Stanard affirmatively states that the "purpose" of this (or any) finite reinsurance agreement to assist in effectively managing the reinsurer's business for the benefit of the company and its shareholders by, in part, effectively "deferring earnings" through the purchase of additional reinsurance would be obvious to anyone experienced in reinsurance, including an auditor in the reinsurance field.  Mr. Stanard further states that the nature and terms of the "1 in 10 loss event" as it related to the reinsurance agreement were fully disclosed in the reinsurance agreement provided to RenRe's outside auditor for review and approval.  Mr.

Stanard denies that he understood or intended that the agreement contained a "1 in 10 loss event" trigger that "was certain to be met."

80.     Mr. Stanard is without knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 80, and he therefore denies them.

81.     Mr. Stanard denies any allegation that he knowingly, intentionally, or recklessly made any misrepresentations concerning the Inter-Ocean transaction.     Management representation letters are written documents.  To the extent the allegations in paragraph 81 are inconsistent with or characterize the written documents, they are denied.  Mr. Stanard is without knowledge or information sufficient to form a belief as to the truth of the allegations concerning Mr. Merritt contained in paragraph 81, and he therefore denies them.

82.     Mr. Stanard denies any allegation that he knowingly, intentionally, or recklessly made any misrepresentations concerning the Inter-Ocean transaction.  Mr. Stanard denies the allegations in the last sentence of paragraph 82 as they relate to Mr. Stanard.  Mr. Stanard is without knowledge or information sufficient to form a belief as to the truth of the allegations concerning Mr. Merritt and Mr. Cash contained in paragraph 82, and he therefore denies them.

### E.     The Misrepresentations in RenRe's Financial Statements

83.     Admitted.  Mr. Stanard denies any suggestion or implication in the allegations in paragraph 83 that any misstatements in the Company's financial statements were knowing, intentional, or reckless on his part.  Any inaccuracies were corrected by the Company in its restatement after it learned in 2005 that the reinsurance agreement did not contain sufficient risk to qualify for reinsurance accounting.

84.     Mr. Stanard denies the allegations in the first and second sentence of paragraph 84.  He affirmatively states that RenRe filed its Form 10-K for the year ended December 31, 2002 on April 1, 2002.  Mr. Stanard admits the third sentence of paragraph 84.  Mr. Stanard

expressly denies any allegation that he knowingly, intentionally, or recklessly participated in or intended any "accounting improprieties."

85.     Mr. Stanard admits the allegations in the first and third sentences of paragraph 85. He denies the allegations in the second sentence of paragraph 85.

86.     Mr. Stanard admits the allegations in the first sentence of paragraph 86.   He denies the remaining allegations in paragraph 86.

87.     Mr. Stanard denies the second sentence of paragraph 87 and affirmatively states that RenRe filed a S-3 shelf registration statement incorporating the Company's Form 10-Q for the first quarter of 2001 on September 28, 2001.  The remaining allegations in paragraph 87 are admitted, except that Mr. Stanard denies any implication that any misstatements in the Company's financial statements were knowing, intentional, or reckless on his part.

88.     Mr. Stanard is without knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 88, and he therefore denies them.

89.     Admitted.

90.     Denied, as it relates to Mr. Stanard.

    **F.     The Misleading Restatement**

91.     Mr. Stanard denies the allegations in the self-serving and conclusory characterization in the heading immediately preceding paragraph 91 of the first amended complaint.  Mr. Stanard admits the allegation in the first sentence of paragraph 91 that RenRe restated its financial results based, in part, on the Inter-Ocean transaction.  He denies the remaining allegations in paragraph 91.

92.     Mr. Stanard admits that RenRe issued a press release on or about February 22, 2005.  The press release is a written document.  To the extent the allegations in paragraph 92 are inconsistent with or characterize the written document, they are denied.

93.     Mr. Stanard admits the allegations in the first and second sentences of paragraph 93. Mr. Stanard denies that the restatement was misleading or was intended to be misleading. Mr. Stanard further denies that he understood or intended the Inter-Ocean transaction to be a "sham." The restatement is a written document. To the extent the allegations in paragraph 93 are inconsistent with or characterize the written document, they are denied.

## FIRST CLAIM FOR RELIEF

### Violations of Section 17(a) of the Securities Act

94.     Mr. Stanard realleges and incorporates his answers to the preceding paragraphs.

95.     Denied, as it relates to Mr. Stanard.

96.     Denied, as it relates to Mr. Stanard.

97.     Denied, as it relates to Mr. Stanard.

98.     Denied, as it relates to Mr. Stanard.

99.     Denied, as it relates to Mr. Stanard.

100.    Denied, as it relates to Mr. Stanard.

## SECOND CLAIM FOR RELIEF

### Violations of and Aiding and Abetting Violations of Section 10(b) of the Exchange Act and Rule 10b-5(a), (b), and (c)

101.    Mr. Stanard realleges and incorporates his answers to the preceding paragraphs.

102.    Denied, as it relates to Mr. Stanard.

103.    Denied, as it relates to Mr. Stanard.

104.    Denied, as it relates to Mr. Stanard.

105.    Denied, as it relates to Mr. Stanard.

106.    Denied, as it relates to Mr. Stanard.

107.    Denied, as it relates to Mr. Stanard.

## THIRD CLAIM FOR RELIEF

### Violations of Section 13(b)(5) of the Exchange Act

108.   Mr. Stanard realleges and incorporates his answers to the preceding paragraphs.

109.   Denied, as it relates to Mr. Stanard.

110.   Denied, as it relates to Mr. Stanard.

## FOURTH CLAIM FOR RELIEF

### Violations of Rule 13b2-1 of the Exchange Act

111.   Mr. Stanard realleges and incorporates his answers to the preceding paragraphs.

112.   Denied, as it relates to Mr. Stanard.

113.   Denied, as it relates to Mr. Stanard.

## FIFTH CLAIM FOR RELIEF

### Violations of Rule 13b2-2 of the Exchange Act

114.   Mr. Stanard realleges and incorporates his answers to the preceding paragraphs.

115.   Admitted.

116.   Denied, as it relates to Mr. Stanard.

117.   Denied, as it relates to Mr. Stanard.

## SIXTH CLAIM FOR RELIEF

### Aiding and Abetting Violations of Section 13(a)
### of the Exchange Act and Rules 12b-20, 13a-1, and 13a-13

118.   Mr. Stanard realleges and incorporates his answers to the preceding paragraphs.

119.   Denied, as it relates to Mr. Stanard.

120.   Denied, as it relates to Mr. Stanard.

121.   Denied, as it relates to Mr. Stanard.

## SEVENTH CLAIM FOR RELIEF

### Aiding and Abetting Violations
### of Section 13(b)(2) of the Exchange Act

122.    Mr. Stanard realleges and incorporates his answers to the preceding paragraphs.

123.    Paragraph 123 is a conclusion of law, for which no response is required by Mr. Stanard.  The allegations in paragraph 123 therefore are denied.

124.    Denied, as it relates to Mr. Stanard.

125.    Denied, as it relates to Mr. Stanard.

## EIGHTH CLAIM FOR RELIEF

### Violations of Rule 13a-14

126.    Mr. Stanard realleges and incorporates his answers to the preceding paragraphs.

127.    Paragraph 127 is a conclusion of law, for which no response is required by Mr. Stanard.  The allegations in paragraph 127 therefore are denied.

128.    Mr. Stanard admits that he was RenRe's CEO when each of the RenRe reports referenced in the first amended complaint were filed with the SEC.

129.    Mr. Stanard admits that he certified the foregoing filings.  He admits further that the accounting for the Inter-Ocean transaction, to the extent it was incorporated into filings prior to RenRe's restatement, was incorrect.  Mr. Stanard denies that the restatement was incorrect or was intended to be incorrect or misleading.  The remainder of the allegations in paragraph 129 are denied.

130.    Denied.

131.    Denied.

## PRAYER FOR RELIEF

Mr. Stanard denies that the SEC is entitled to any judgment in its favor or any of the requested relief.

### III.  AFFIRMATIVE DEFENSES

#### First Affirmative Defense

Plaintiff fails to state a claim upon which relief can be granted.

#### Second Affirmative Defense

Mr. Stanard generally denies liability.

#### Third Affirmative Defense

Plaintiff's claims are barred by the applicable statute of limitations and by laches.

WHEREFORE, Mr. Stanard respectfully requests that a judgment be entered in his favor and that he be awarded his costs and attorneys' fees and any other relief that this Court deems just and proper.

Dated:    New York, New York                DLA PIPER US LLP
          May 31, 2007


                                            By:   ____/s/ James D. Mathias_____
                                                     James D. Mathias*

                                            John J. Clarke, Jr. (JC 3449)
Of Counsel:                                 1251 Avenue of the Americas
                                            New York, New York 10020-1104
Paul R. Grand (PG 9144)                     (212) 335-4500
Morvillo, Abramowitz, Grand, Iason,
Anello & Bohrer, P.C.                       James D. Mathias*
565 Fifth Avenue                            Hugh J. Marbury*
New York, New York 10017                    Melissa Rubin Roth (MR 7269)
(212) 856-9600                              Megan H. Baer*
                                            6225 Smith Avenue
                                            Baltimore, Maryland 21209-3600
                                            (410) 580-3000

(*Admitted *pro hac vice*)
                                            Attorneys for Defendant James N. Stanard

CERTIFICATE OF SERVICE

I certify that I am a member of the Bar of this Court and that on May 31 2007, I caused a copy of the foregoing James N. Stanard's Answer to the First Amended Complaint to be filed with the Court using the ECF electronic filing system, which will provide automatic electronic notice of such filing to all counsel who have appeared in this action.


_____/s/  John J. Clarke, Jr._____
John J. Clarke, Jr. (JC 3449)