UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------------x
                                 :

SECURITIES AND EXCHANGE COMMISSION,  :
                                 :

                 Plaintiff,    :      06 Civ. 7736  (GEL)
                                 :

          -v.-           :    **OPINION AND ORDER**
                                 :

JAMES N. STANARD, MARTIN J. MERRITT,  :    **FINDINGS OF FACT**
and MICHAEL W. CASH,              :        **AND**
                                 :    **CONCLUSIONS OF LAW**

                Defendants.   :
                                 :
---------------------------------------------------------------x

Jack Kaufman and Preethi Krishnamurthy,
Securities and Exchange Commission, New York, NY,
<u>for plaintiff Securities and Exchange Commission</u>.

James D. Mathias, Stacie E. Tobin, Melissa Rubin Roth,
Megan H. Baer, DLA Piper LLP, Baltimore, MD,
Paul R. Grand, Morvillo, Abramowitz, Grand, Iason,
Anello & Bohrer, P.C., New York, NY, and John J.
Clarke, Jr., DLA Piper LLP, New York, NY,
<u>for defendant James N. Stanard</u>.


GERARD E. LYNCH, <u>District Judge</u>:

      The Securities and Exchange Commission (the "SEC") brings this action against James

N. Stanard, asserting claims for securities fraud under section 17(a) of the Securities Act of 1933

and Section 10(b) of the Securities Exchange Act of 1934 and Rule 10b-5; aiding and abetting

securities fraud under Section 10(b) and Rule 10b-5; books and records violations under Section

13(b)(5) of the Exchange Act and Rule 13b2-1; aiding and abetting violations of Sections 13(a)

and 13(b)(2) of the Exchange Act and Rules 12b-20, 13a-1 and 13a-13; making false or

misleading statements to auditors under Rule 13b2-2; and providing false officer certifications in

violation of Rule 13a-14.  The case was tried before the Court without a jury from September 8

to September 22, 2008.  This Opinion sets forth the Court's Findings of Fact and Conclusions of

Law pursuant to Federal Rule of Civil Procedure 52(a).  To the extent any Finding of Fact

reflects a legal conclusion, it shall be to that extent deemed a Conclusion of Law, and vice versa.

## FINDINGS OF FACT

I.      **Background**

     A.      <u>RenRe</u>

    1. RenaissanceRe Holdings, Ltd. ("RenRe") is a Bermuda corporation with its principal

corporate office in Bermuda.  RenRe specializes in writing property catastrophe reinsurance.

(Ex. 126 at 3.)[1]   RenRe was founded as a private company in 1993 by James N. Stanard.  The

company went public in 1995.  (Ex. 253 at 7; Stipulations 2-3; Ex. 231.)  By 2000, RenRe was

one of the world's largest writers of excess of loss catastrophe reinsurance.  (Ex. 159 at 4.)

     B.      <u>James Stanard</u>

    2. James N. Stanard is the founder of RenRe.  He served as the company's chief

executive officer and chairman of its board of directors from the company's formation in 1993

until early  2005.  (Ex. 253 at 6.)

    3. Stanard is an actuary by training.  He became certified in 1977 as a Fellow in the

Casualty Actuarial Society, the highest designation that a member can obtain.  He earned a Ph.D.

in Finance from New York University in 1986.  Stanard held a variety of positions in the

insurance and reinsurance industries between his graduation from college in 1971 and 1993,

---

[1] "Ex." refers to the parties' jointly numbered trial exhibits.  "Stipulations" refers to the
SEC's and Stanard's stipulations at pages 7-8 of the parties' proposed Joint Pre-Trial Order in
this case submitted on August 22, 2008.  "Tr." refers to the trial transcript.  "[Name] Tr." refers
to the transcript of the deposition of the person named.  "[Name] Trial Aff." and "[Name] Decl."
refer to the affidavit or delcaration in lieu of direct testimony of the person named.

when he left a senior executive position with USF&G Corporation to found RenRe.  (Tr. 473-80, 792.)

4.  As RenRe's CEO, Stanard was known for his financial conservatism and his focus on maintaining a strong balance sheet.  (Ex. 159 at 12-13, 14-15.)  By 2001, Stanard was one of the most successful business leaders in the reinsurance industry and had built RenRe into one of the world's leading reinsurance companies.  (Ex. 253 at 3, 5-7.)  Stanard's total compensation package for 2001 was over $3.6 million, and for 2002 was over $5 million.  (Ex. 39 at 3.)  As of July 2005, Stanard and his immediate family owned RenRe stock valued at over $199 million. (Tr. 486; Ex. 123.)

      C.    <u>Martin Merritt</u>

5.  Martin Merritt worked at RenRe from 1996 through 2005.  Merritt joined RenRe in 1996 after holding junior positions at two large accounting firms and a two-year stint as controller and treasurer of a small reinsurance company.  He started at RenRe as assistant vice president and controller, then was promoted to controller of RenRe's holding company.  (Tr. 9.) As controller, Merritt was RenRe's chief accounting officer and was responsible for reviewing all accounting matters concerning RenRe's books and records.  (Tr. 9-10.)

6.  When Merritt first joined RenRe, the company was outsourcing its accounting work to Johnson & Higgins, with Merritt managing the work performed externally.  (Tr. 234-35.) Eventually, he brought the accounting work in-house.  (<u>Id</u>.)

7.  Merritt reported to John Lummis, the company's non-accountant chief financial officer, and was the principal contact with Ernst & Young, RenRe's external auditing firm.  (Tr. 16-18, 234.)

8.  Merritt was named as a defendant in this action.  During the litigation, he entered into a settlement with the SEC under which he agreed to be permanently enjoined from future violations of the securities laws, and to pay a civil penalty of $50,000.  The Merritt was also barred from serving as an officer or director of a public company in the United States, was permitted by the settlement to appeal this bar.  (Ex. 69; Final Consent Judgment against Martin J. Merritt.)  Merritt testified for the SEC at trial.

D.     Michael Cash

9.  Michael Cash was hired by RenRe in November 2000 to explore new market opportunities, particularly those in finite reinsurance – an area involving highly-structured contracts with significantly less risk transfer than traditional reinsurance.  (Riker Trial Aff. ¶ 6; Tr. 481.)

10.  William Riker, who was RenRe's president and chief operating officer at the time, was primarily responsible for hiring Cash, but Stanard interviewed Cash and personally approved and supported his hiring.  (Riker Trial Aff. ¶ 6; Tr. 497; Nichols Tr. 69-70.)  Before joining RenRe, Cash worked for Centre Reinsurance Company and Stockton Reinsurance Company, and had a background in finite reinsurance.  (Riker Trial Aff. ¶ 6.)  According to Jay Nichols, RenRe's controller before Merritt assumed the job, Stanard believed that RenRe needed to add finite reinsurance to its "toolbox" and that Cash was someone who could help the company do that.  (Nichols Tr. 70.)  Stanard eventually placed Cash in charge of all specialty insurance.  (Tr. 497-99; Nichols Tr. 68-69, 72.)

11.  Cash was named as a defendant in this action.  During the litigation, he entered into a settlement with the SEC under which he agreed to be barred from serving as an officer or

4

director of a public company in the United States for five years; be permanently enjoined from future violations of the securities laws; and pay a civil penalty of $130,000. (Tr. 974-75.) Cash appeared for a deposition in this action after agreeing in principle to his settlement with the SEC but he refused to testify, invoking his Fifth Amendment privilege against self-incrimination. (See generally Cash Tr.)

## II.    Reinsurance Accounting

12.  Reinsurance transactions can be accounted for either as reinsurance or as deposits. When a transaction qualifies for reinsurance accounting, a number of economic benefits can accrue to the ceding insurer, including the ability to reduce the volatility of the company's financial results and to increase its underwriting capacity. See National Ass'n of Insurance Commissioners, *Accounting and Disclosure for Property and Casualty Reinsurance Contracts*, *available at* http://www.naic.org/documents/topics_finite_re_12-pcrsg4B.doc (last visited Jan. 20, 2008). Earnings are affected because the premium paid is treated as an expense, reducing earnings during the relevant period, while any recovery on the reinsurance policy will be treated as income in a future year.

13.  When a transaction does not qualify for reinsurance accounting, the premium paid is recorded as a deposit on the ceding company's balance sheet and the ceding company sees no benefit to its underwriting income or leverage ratios. See Guy Carpenter, *Specialty Practice Briefing: United States Accounting and Regulatory Update*, *available at* http://www.guycarp.com/portal/extranet/pdf/GCBriefings/US%20Accounting&Regulatory%20Update%20081505.pdf (last visited Jan. 20, 2008). Economically, such a transaction transfers insufficient risk to be

5

treated as any different from a deposit in a bank account or other investment of earnings.[2]

14.  Accordingly, accounting for a transaction as reinsurance that should not be so accounted for because no risk is actually transferred, and the reinsured company will be able to make a claim with certainty and with no risk of loss to the reinsuring company permits the insured to "smooth" earnings by reducing its apparent profit in exceptionally good years in which earnings targets have been exceeded, and "parking" funds with a reinsurer to be reclaimed, and increase apparent profits, in a future year in which earnings targets have not been reached.

A.    Financial Accounting Standard 113

15.  Financial Accounting Standard 113 ("FAS 113"), which was promulgated in 1992, determines whether a transaction qualifies for reinsurance accounting.  (Bridges Aff. ¶ 63.)  For a transaction to so qualify, it must be "reasonably possible that the reinsurer may realize a significant loss from the transaction."  FAS 113 ¶ 9(b).

16.  Although neither "reasonably possible" nor "significant" are defined in FAS 113, industry practice holds as a rule of thumb that a transaction can be properly accounted for as reinsurance under FAS 113 if the reinsurer incurs at least a ten percent chance of sustaining a ten percent or greater present value loss.  (Tr. 24.)  If a transaction does not meet these requirements, it must instead be accounted for as a deposit.  (Tr. 25.)

---

[2] "The treatment of reinsurance transactions as deposits does not mean that economic risk has not been transferred.  It just means that the nature and the amount of the risk transferred do not sufficiently conform to the accounting literature definition of risk transfer to be afforded reinsurance accounting treatment."  National Ass'n of Insurance Commissioners, *Accounting and Disclosure for Property and Casualty Reinsurance Contracts*, *available at* http://www.naic.org/documents/topics_finite_re_12-pcrsg4B.doc (last visited Jan. 20, 2008).

17.  The plain language of FAS 113 is quite clear that relative risk to the reinsurer is the ultimate test for determining whether a particular reinsurance contract qualifies for reinsurance accounting under FAS 113.  (Tr. 411-12; Bridges Aff. ¶¶ 65, 67; Johnson Decl. ¶¶ 2-3; Ex. 211 at 8.)

18.  Auditors, however, typically also take into account the relative risk to the company purchasing the reinsurance.  Auditors examine the relative risk to both parties to understand whether, and to what extent, the reinsured party actually has transferred risk to the reinsurer. (Johnson Decl. ¶¶ 2-3; Ex. 211 at 16-18; Tr. 412-14.)

19.  The FAS 113 accounting guidelines reflect a policy of Generally Accepted Accounting Principles ("GAAP") that a reinsurance company may not create a "catastrophe reserve" – i.e., it may not expense against earnings its anticipated reinsurance losses until a particular catastrophic loss event (such as a hurricane) actually has occurred.  (Tr. 421-22, 637-41.)  At least one effect of this rule is to prevent reinsurance companies from distorting their profits by artificially smoothing earnings.

20.  Some insurance executives believe that this policy itself distorts the true economic condition of reinsurance companies, by concealing the fact that present profits do not reflect already-anticipated future casualty losses.  Whether or not the GAAP approach is the right policy, it is the rule.  Consumers of financial statements who think that GAAP principles are not the best way to assess the true financial health of insurance or reinsurance companies can apply their own standards for reassessing such companies' financial statements, but they are entitled to do so knowing that the financial statements have been prepared according to the consistent principles embodied in GAAP.  (See Tr. 639-41, 933-34.)

**III.**   **The Inter-Ocean Transaction**

A.     The Two Inter-Ocean Contracts

21.  In 2001, RenRe and a company called Inter-Ocean Ltd. ("Inter-Ocean") entered into

a single transaction comprising two separate but related contracts.  Inter-Ocean is a wholly-

owned subsidiary of Inter-Ocean Holdings Inc., a joint venture formed by ten reinsurers.  (Ex.

37 at 1; Ex. 211 at 4.)  In 2001, RenRe owned an approximately ten percent joint venture interest

in Inter-Ocean Holdings Inc.  (Ex. 211 at 4.)

22.  The first contract in the transaction was an Assignment Agreement (the "Assignment

Agreement").  Under the Assignment Agreement, which the parties entered into on April 23,

2001, Inter-Ocean purchased $50 million of reinsurance recoverables from RenRe for $30

million in cash.  (See Ex. 1.)  RenRe participated in various contracts known as industry loss

warranty contracts ("ILWs") and the recoverables arose from these ILWs.[3]  (Ex. 211 at 10.)

23.  The second contract was an Aggregate Excess of Loss Reinsurance Agreement (the

"Reinsurance Agreement").  Under this contract, which the parties entered into on July 31, 2001,

Inter-Ocean sold RenRe up to $45 million of reinsurance over a three-year period for premiums

of $7.3 million per year.  (See Ex. 2.)

24.  The Reinsurance Agreement provided that RenRe would be indemnified for net

incurred losses arising over a three-year period beginning January 1, 2001.  (Ex. 37 at 3.)  To

trigger coverage, RenRe needed to sustain either a $250 million cumulative loss over a three-

---

[3] Insurance recoveries for ILWs are determined using reports, such as the Sigma report, on industry-wide loss events.  The Sigma publications are released periodically by Swiss Re's Economic Research & Consulting Team, and provide analyses on economic trends and strategic issues in international insurance markets.  (Ex. 211 at 10.)

year period or a $60 million calendar quarter loss.  (Id.)  In addition, a one-in-ten loss event –

that is, a catastrophe likely to occur less than once every ten years in a given geographic region –

must have occurred.  The one-in-ten event was to be defined solely by RenRe in accordance with

its Renaissance Exposure Management System ("REMS"), a computer software system RenRe

designed to enable the company to consistently assess risk regarding potential insurance

contracts.  (Id.)

25.   A trust was established to secure Inter-Ocean's obligation to pay the limit.  This trust

was funded by $18.9 million from Inter-Ocean (equal to its profit on the Assignment Agreement,

minus an agreed-upon margin), as well as premiums paid over time by RenRe.  (Id.)

26.   The Reinsurance Agreement's Limit of $45 million (which was later revised to $30

million) was subject to adjustment by calculating a Limit Adjustment Factor on each date that

recovery was due.  (Ex. 2 at RENRE 00019; Ex. 211 at 11.)  The Limit Adjustment Factor

equaled (a) the sum of (1) the balance in the trust account, and (2) the total amount of all future

premiums payable by RenRe divided by (b) $45 million.  (Ex. 211 at 11.)

B.     The Treatment of the Inter-Ocean Transaction under FAS 113

27.   Although the two agreements were always part of a single, linked transaction, RenRe

accounted for the two agreements separately, treating the Assignment Agreement as a sale of

assets, and the Reinsurance Agreement as reinsurance under FAS 113.  (Ex. 37 at 4.)  However,

when the two contracts were considered together, the entire transaction should actually have

been accounted for as a deposit, since the sale of recoverables was designed to transfer to Inter-

Ocean a sum of money which was in effect an additional premium, and the ultimate effect of the

transactions was that insufficient risk transferred to Inter-Ocean, which was virtually guaranteed

to have to return all – but no more than all – of the total premiums paid (minus a "margin" or fee for engaging in the transaction) to RenRe in due course.  (Ex. 126 at 5.)

28.   As a direct result of RenRe's having accounted for the Inter-Ocean Transaction improperly as reinsurance rather than as a mere deposit of RenRe's funds with Inter-Ocean, RenRe's original financial statements in its Forms 10-K and Form 10-Q falsely understated RenRe's total 2001 net income by 14.7%, overstated its total 2002 net income by 7%, and overstated its third quarter 2002 net income by 37.7%.[4]  (Tr. 408-11, 651; Ex. 126 at 55; Ex. 211 at 20-21; Ex. 232 at 1-2, 7, 24-25, 27-28, 31, and 35.)

### 1.   Insufficient Risk to Inter-Ocean

29.   There was absolutely no "reasonable possibility" that Inter-Ocean would realize a "significant loss" – or any loss for that matter – from its transaction with RenRe.  Inter-Ocean was fully protected against risk because the only money that RenRe was ever allowed to recover on the "reinsurance" policy was the money that RenRe paid in the form of premiums, and in the form of the disguised "premium" represented by the difference between what Inter-Ocean paid for RenRe's recoverables and their true value.  (Tr. 593-96, 943, 959.)

30.   The true value of those recoverables was never in doubt.  First, the evidence indicates that RenRe knew from the start that these recoverables were almost certain to be collected.  Merritt testified that he, Cash, Nichols, and Kevin O'Donnell, a RenRe senior officer who was responsible for ceded reinsurance, had a conversation about the fact that "we would collect, [that it] was likely that we would collect on [the recoverables]."  (Tr. 88.)

---

[4] This false statement was eventually corrected by RenRe in the financial restatement that the Company reported in a Form 10-K for the year ending December 31, 2004.  RenRe filed this Form 10-K on March 31, 2005.  (Ex. 126; see Johnson Tr. at 43; Ex. 211 at 6.)

31.  More conclusively, by April 23, 2001, the date the Assignment Agreement was signed, RenRe had already received $42.1 million of the recoverables due.  (Ex. 211 at 12.)  In other words, on the date RenRe entered into the Assignment Agreement to sell Inter-Ocean $50 million worth of its recoverables in exchange for only $30 million, it had *already* received $42.1 million of the recoverables.  (Id.)  Moreover, the Assignment Agreement did not become fully effective until July 31, 2001, as both sides had the right to cancel the deal until that date.  By that date, RenRe had recovered *all* $50 million.  (Tr. 944-45; ex. 4.)  Thus, as of July 31, 2001, RenRe transferred assets that were indisputably worth $50 million to Inter-Ocean for $30 million, in effect simply transferring $20 million to Inter-Ocean.

32.  The Reinsurance Agreement likewise left Inter-Ocean with no risk.  The contract's Limit Adjustment Factor was structured in such a way that it did not pass risk to the reinsurer because it limited the amount of losses ceded to Inter-Ocean to "the sum of (1) the balance in the Trust Account, and (2) the total amount of all future Reinsurance Premium payables by the Reinsured."  (Ex. 211 at 14.)  Inter-Ocean's obligation to pay on the "reinsurance" contract was thus funded entirely from the premiums that were to be paid under the contract, plus the additional $20 million transferred covertly by the purported sale of recoverables.  In effect, there was thus a contractual guarantee that Inter-Ocean was not exposed to any risk at all.

2.    Insufficient Risk to RenRe

33.  The risk to RenRe in the Inter-Ocean transaction was also so minimal as to be nonexistent.  RenRe was certain to make a claim under the Reinsurance Agreement.  There were two necessary triggers for a claim – the one-in-ten loss event, and the loss threshold ($250 million cumulative over three years or $60 million in a calendar quarter) – and both were

virtually locked in.

a.      The One-in-Ten Loss Event

34.   RenRe had control over what constituted a one-in-ten loss event and was able to
manipulate the outcome from its own proprietary REM system to gain the desired result.  Merritt
testified that the one-in-ten event provision was "pretty one-sided . . . because . . . we were the
ones that could control it.  It was based solely on our REM system.  We would solely determine
what a one-in-ten event was."  (Tr. 93.)  Desmond Nash, the senior accountant at Inter-Ocean
who reviewed the deal with Cash and Merritt, testified that he had "never [before] seen anything
like . . . the concept of a one-in-ten loss event and the concept of it being defined by the
reinsured."  (Nash Tr. 47.)  Stanard himself conceded that he had never before seen a one-in-ten
provision in a reinsurance contract.  (Tr. 573-77.)

35.   In preparation for the trial, the SEC asked Ian Branagan, a former RenRe senior vice
president who had helped develop the REM system, to conduct an analysis to determine whether,
according to REMS, any one-in-ten loss events had occurred between 1995 and 2005.
(Branagan Tr. 7-11.)  Branagan's analysis looked at every natural catastrophe and terrorism
event in the Sigma reports (the industry standard source of loss information), and then analyzed
what REMS would estimate to be the probability of the return period of those loss sizes at a
worldwide level for that peril and then at the appropriate sub-region level.  (Branagan Tr. 32.)
The result of Branagan's analysis was that, from 1995 to 2005, at least one one-in-ten loss event
as defined by REMS occurred every year.  (Ex. 137.)[5]

---

[5] The trial exhibits include two other analyses which show one-in-ten loss events
occurring less frequently during the relevant time period than in Branagan's analysis (see Exs.
10, 133), but the Branagan analysis is the only one for which the record includes a detailed

b. <u>The Loss Threshold</u>

36.  The $250 million cumulative or $60 million per quarter loss threshold was also

certain to be met.  Stanard maintains that the fact that seven quarters passed before RenRe was

able to make a claim is evidence that the company was not certain to hit the loss threshold.

However, RenRe had *twelve* quarters in which to make a claim, and the company was able to file

a claim by the seventh of these, despite the fact that 2001 and 2002 were exceptionally good

years with lower-than-average casualty losses industry-wide.  (Tr. 1044-45.)  The Court thus

finds that reasonable insurance executives would have understood at the time the Reinsurance

Agreement was created that RenRe was effectively certain to meet the loss threshold at some

time within the contract period.

37.  In April 2001, Stanard called Ed Noonan, the CEO of AmRe (the company which

stood behind Inter-Ocean in the transaction as its retrocessionaire), to make sure Noonan

understood that Inter-Ocean would end up paying the full claim and would not feel deceived

when it only made its agreed margin or fee on the transaction.  (Tr. 147-48, 678-79, 945; Ex. 218

at 11; Meadows Decl. ¶¶ 4-7, 9.)

38.  Desmond Nash, Inter-Ocean's most senior accountant in 2001, testified that RenRe's

claim notice for payment under the Reinsurance Agreement, which he received in September

2002, stated neither the amount of RenRe's losses nor the payment amount that RenRe was

seeking under the reinsurance agreement.  (Nash Tr. 97-98.)  Of the approximately twenty claim

notices that Nash had previously reviewed at Inter-Ocean, RenRe's was the only one that did not

---

explication of its findings.  In addition, the very variability of the results shows how the REM
system could be manipulated using different assumptions to produce the desired results.  (See
Branagan Tr. 63.)  Accordingly, the Court finds the Branagan analysis most credible.

include such information.  (Id. 94-98.)  Nash did not ask RenRe for such information before

paying it the full amount in the trust because Nash understood that all of the trust account funds

were to be paid back to RenRe and that such routine claims processing information was therefore

irrelevant.  (Id. 98-100, 126-27.)

IV.    **Merritt's and Cash's Roles in the Inter-Ocean Fraud**

39.  It is undisputed, and at any rate it is conclusively demonstrated by the above

analysis, that the accounting treatment of the Inter-Ocean transaction was not correct; indeed, so

much is conceded by RenRe's eventual determination to correct the accounting restate its

earnings for the relevant periods.  Nor is it disputed, and at any rate it is demonstrated by

overwhelming evidence, that Cash and Merritt committed fraud, that they deliberately set out to

create a sham transaction that did not actually transfer any risk and to account for it inaccurately

as a reinsurance transaction, and that they worked intentionally to "fool the auditors."  (Tr. 72.)

A.    Martin Merritt

40.  Merritt testified that he knew at the time the Inter-Ocean transaction was being put

together that the accounting treatment of the deal was not proper under GAAP.  (Tr. 36.)

Merritt had accounting concerns from the moment that he read a January 2001 e-mail from

Stanard – the e-mail that was to precipitate the Inter-Ocean transaction – which suggested

"put[ting] away" $25 million.  (Tr. 47-48; Ex. 13.)  These concerns only grew throughout the

course of his work on the Inter-Ocean contracts.  (Tr. 47-48.)

41.  Merritt understood in 2001 that, in order to realize Stanard's objective of "putting

away" money, Cash was trying to structure a transaction involving back-to-back contracts.  (Tr.

49.)  The "back end" of the contract would be a traditional reinsurance contract, under which

14

RenRe would make a claim to "bring the money back."  (Tr. 49.)  Cash's challenge was to try to figure out the "front end" of the contract – i.e., to figure out a way to get additional money to the reinsurer which could later be pulled back.

42.  Merritt knew that the Inter-Ocean transaction needed to comprise two separate contracts so that the reinsurance contract would appear to an auditor to have risk in it.  (Tr. 49-50.)  Merritt understood that this two-contract structure was just about "swapping cash from one pocket to another" – that is, he knew that RenRe would lose money on the Assignment contract but would gain it all back (minus Inter-Ocean's fee for participating in the transaction) on the Reinsurance Contract – and that there was no legitimate business reason to have more than one contract in the transaction he and Cash were discussing.  (Tr. 57-58, 77.)  Together, Merritt and Cash looked for triggers that were high enough to appear to auditors that there was sufficient risk in the transaction, but not high enough that RenRe might not actually reach them.  (Tr. 91.)

43.  As part of their plan to "fool the auditors" – a phrase which, according to Merritt, Cash used brazenly – Merritt lied to Jonathan Reiss, RenRe's auditor at Ernst & Young, about the purpose of the Recoverables Agreement and the likelihood that RenRe would collect the recoverables.  (Tr. 75, 76, 118, 279.) Despite the unease Merritt claims that he felt about the transaction from the beginning, Merritt went along with the fraud because Cash told him that this was something Stanard wanted and because Merritt therefore saw the Inter-Ocean transaction as chance to "be seen as a key player . . . and to show a different skill set" and to possibly get a promotion or a raise.  (Tr. 49-50, 311, 330-32.)

44.  Having carefully observed Merritt's testimony under vigorous cross-examination, and taking into account his demeanor, as well as the various impeaching evidence, including his

15

settlement agreement with the SEC, the Court finds Merritt's testimony truthful and generally accurate.

      B.    <u>Michael Cash</u>

    45.  Although Cash exercised his Fifth Amendment right and refused to testify, his 2001 e-mails speak for themselves and leave no doubt that he, like Merritt, knew that he was committing fraud.

    46.  On January 29, 2001, for example, Cash wrote an internal memo outlining different ways a contract could be structured to defer income.  (Tr. 56.)  One structure that he proposed was "back to back reinsurance contracts, one losing money, the other making money."  (Ex. 14 at RENRE 000559.)   The memo proceeded to caution that a disadvantage to this approach would be that RenRe would need to figure out a way to "muddy the waters" and that, "[t]o assist in muddying the water, we could write one contract direct, and the other through Chubb Re, though this will result in additional costs."  (Ex. 14 at RENRE 000559.)  Merritt testified that he understood from this memo that Cash was "trying to make it difficult for the auditors to understand the accounting for these [contracts] by putting it in more transactions."  (Tr. 57.)

    47.  On March 6, 2001, Cash sent an e-mail to Merritt and Nichols.  The body of the e-mail contained a request evidencing Cash's state of mind: "Please read (but don't save or print) the attached . . . .  When you're done please delete this."  (Ex. 19 at RENRE 000562.)  The e-mail's attachment, which began with yet another admonition not to save or print it, discussed the structure of the contracts Cash was developing to "smooth" RenRe's income.  (Ex. 19 at RENRE 000563.)  In the memo's first section, Cash explained that RenRe could buy a

> multi year cumulative loss cover from the Protected Cell which
> will act as the mechanism for enabling RenRe to recoup the profit

> when a big loss occurs.  It will be structured in a way that we can
> always be certain that we will be able to cede sufficient loss to
> recoup the profit.  THIS WILL ENSURE THAT WE ALWAYS
> HAVE A MECHANISM TO RECOUP THE PROFIT.

(Ex. 19 at RENRE 000563.)

48.  Cash then discussed the Reinsurance Agreement:

> Because we will pay a premium . . . we can attach this cover at a
> level that will leave apparent risk to Inter-Ocean.  For example, if
> the Q[uota] S[hare] is expected to produce $40 million of Premium
> to Inter-Ocean and the multi year contract has a premium of $8
> million, then the attachment can appear to be at $48 million . . .
> showing a justification for why we might want to enter into such a
> transaction on a stand alone basis.

(Id.)

49.  On March 12, 2001, Cash sent another e-mail to Merritt and Nichols, this one with

the subject line "needs sanitizing before sending . . ."  In this e-mail, Cash explained that

> [a] simple example of how to pass sniff tests is to simply have a
> very standard reinsurance contract which doesn't look like there is
> anything out of the ordinary, but to have loose language around
> what the covered business can be (auditors will often not focus on
> whether a contract has well defined descriptions of what other
> business might be included as covered business).

(Ex. 20 at RENRE 000218.)

50.  These e-mails unequivocally demonstrate that Cash fully understood that the purpose

of the transaction on which he was working at Stanard's request was to transfer profit to a future

year in which "a big loss occurs"; that the method of doing so was to be a bogus reinsurance

agreement; that in order to accomplish these goals, it would be necessary to deceive the auditors;

and that the illicit nature of his project required caution in eliminating a paper trail (although his

ignorance regarding electronic communications prevented him from achieving the latter goal).

17

V.     **Stanard's Role in the Inter-Ocean Transaction**

51.   The SEC contends that Stanard knew all along that the Inter-Ocean transaction was a sham, or at least that he was reckless in failing to know it.   The SEC also contends that Stanard knew that Merritt concealed key facts about the transaction from the Company's auditor, Ernst & Young, and that Stanard made knowing misrepresentations to Ernst & Young in management representation letters.   (Am. Compl. ¶¶ 5-6, 17, 27, 36, 40, 42, 52, 58-59.)

52.   Stanard denies these allegations.   He claims that, although he was aware generally of the transaction with Inter-Ocean and supported its business concept, he understood that it was carefully structured to transfer sufficient risk to allow the transaction to qualify for reinsurance accounting under FAS 113.   He further claims that he relied on Merritt to ensure that the transaction complied with the applicable accounting requirements, and that he was told at the time that Ernst & Young had signed off on the accounting for the transaction.   (Tr. 444-45, 465-66, 582, 782-83.)

53.   Although there is no direct evidence that Stanard knew that the Inter-Ocean transaction did not comply with GAAP, the preponderance of the circumstantial evidence supports the conclusion that Stanard did know about RenRe's fraudulent accounting.

A.     Stanard Initiated the Inter-Ocean Transaction

54.   On January 10, 2001, Stanard sent to Merritt and to Kevin O'Donnell, a RenRe senior officer who was responsible for ceded reinsurance, an e-mail with the subject line "leveling contract."   He also copied Cash, William Riker, and Dave Eklund, a senior underwriting officer.   The e-mail read:

> Kevin (and Marty)
> we should make another attempt at structuring a ceded contract
> that allows us to "put away" $25 million (maybe each quarter, in
> several different contracts).  We could go to Chubb or
> Underwriters or OPL or Lincoln (or maybe all of them).  I'd like to
> try to get an outline of the terms within a few days so we can know
> what we're likely to do before we report 2000 results.
> Marty,
> Is there a way to defer some of the 4th Q 2000 premium?  Is it too
> late to book it into the above deal?
> Kevin,
> In addition to above, need to get Lincoln going on their finite deal
> - want to get maximum limit and coverage (all peak zones
> worldwide if possible) from that.

(Ex. 13.)

55.  It is undisputed that this e-mail precipitated the Inter-Ocean transaction.  Merritt

testified that the first paragraph of the e-mail raised accounting concerns in his mind when he

received it because the ceded contract that Stanard was asking about "look[ed] like [it was] a

contract to defer income."  (Tr. 47.)  Merritt said that he did not talk to anyone, including

Stanard, about his concerns because he was "hoping maybe it would go away."  (Tr. 47-48.)

Riker, meanwhile, testified that he did not take the e-mail to suggest anything untoward, and that

he would have raised his concerns with Stanard, or with others at the company, if he had.  (Riker

Trial Aff. ¶ 9.)

56.  It does seem unlikely that if Stanard intended – for the first time – to ask Merritt to

engage in an accounting fraud, he would have done so in an e-mail that he sent to four other

RenRe officers, including the company's three most senior underwriting officers, none of whom

has been accused of having engaged in fraud by either the SEC or Merritt.

57.  Even assuming, however, that this e-mail does not in itself demonstrate that Stanard

necessarily intended anything fraudulent at that time, it nevertheless indicates that the purpose of

the transaction was not genuine reinsurance, but rather was to defer the recognition of income to a later year.  The clear import of the e-mail is that Stanard's goal was to get income off the balance sheet in a year that already showed enough profit, while retaining the ability to get the money back in a future year when additional income would be useful to mask less impressive results.

58.  That this e-mail did not contemplate real reinsurance is obvious, and Stanard damaged his credibility by claiming repeatedly at trial that this was intended as a reinsurance transaction, when in fact it was intended only to have an accounting effect, and not to constitute true insurance against risk.  (See Tr. 445, 448, 527.)  Stanard was reluctant to admit at trial that, whether or not "enough" risk was in the deal to satisfy the accounting technicality, the motivating factor was not to transfer actual significant risk for business or economic reasons.

59.  Ultimately, Stanard acknowledged that the true purpose of the transaction was to "smooth" earnings, though he continued to insist that he wanted to accomplish this result by means of a transaction that would transfer the minimum amount of risk necessary to satisfy the accounting standard for reinsurance accounting.  (Tr. 636.)

B.    The Inter-Ocean Transaction Was a "Stanard and Cash Deal"

60.  The preponderance of the trial evidence, including the testimony of Stanard's own witnesses, establishes that Stanard closely supervised Michael Cash in 2001 on several finite reinsurance transactions, including the Inter-Ocean Transaction.  Stanard could not possibly have done so without knowledge of Cash's blatantly fraudulent intent regarding that transaction.

       1.     <u>Stanard and Cash Worked in Close Proximity</u>

61.  Although no smoking-gun e-mail directly indicates that Stanard was aware of the fraudulent nature of Cash's activities in the Inter-Ocean transaction, the absence of any such e-mail is not significant in view of the evidence that Stanard and Cash had the opportunity to engage in extensive oral communications regarding the Inter-Ocean transaction.

62.  In 2001, Stanard and all of the underwriters in the Bermuda office, including Cash, worked and made underwriting decisions in the same room.  (Ex. 235 at 3; Tr. 493.)  Stanard and the underwriters did not have individual offices, but rather sat at open desks within earshot of each other.  (Tr. 492-93; Nichols Tr. 72; Ex. 235 at 3.)  This layout was designed for the very purpose of encouraging informal oral communication among RenRe's underwriters.  (Tr. 492-93; Nichols Tr. at 72; Ex. 235 at 3.)  In 2001, Stanard's own desk faced Cash's, which was approximately ten to fifteen feet from Stanard's.  (Tr. 492-93.)  Merritt's and Nichols's desks, by contrast, were located on a separate floor from the underwriters' floor, heightening the likelihood that Cash would communicate with Merritt and Nichols by e-mail, while communicating orally with Stanard.  (Tr. 20-21; Nichols Tr. 65-66.)  Nichols specifically recalled an exchange between Stanard and Cash at a 2001 senior staff meeting regarding the level of risk to RenRe in the Inter-Ocean Transaction, in which Stanard told Cash that he would speak with Cash later regarding the matter.  (Nichols Tr. 130-31.)

       2.     <u>Stanard Was Particularly Interested in the Inter-Ocean Transaction</u>

63.  As discussed above, Stanard initiated the Inter-Ocean transaction.  (Ex. 13.)  Stanard further suggested potential counterparties for the transaction, including Chubb Re, whose CEO was a "good friend" of Stanard's.  (Ex. 13; Ex. 218 at 6; Tr. 523-26, 534-35.)  Stanard also asked

his staff on January 10 to send him an "an outline of the terms within a few days so we can know

what we're likely to do before we report 2000 results."  (Ex. 13.)

64.  Stanard had a hands-on business style, and was particularly interested in this project.

According to Nichols, "[w]hen [Stanard] gets interested in something, he just doesn't let go.  He

grabs and holds onto it and takes control of it.  So Jim Stanard is a deal guy, he likes focusing on

deals and this was a new area where he could do deals."  (Nichols Tr. 75.)

65.  Stanard knew that other reinsurance companies were illegally using finite

reinsurance transactions to manage their earnings, and that those other reinsurance companies

were getting away with such practices.  (Tr. 468, 471-72, 523-26; Ex. 218 at 14; Meadows Decl.

¶¶ 4-7, 9.)  Stanard hoped to reduce that competitive threat through RenRe's own use of finite

reinsurance products.  (Nichols Tr. 71-72.)

66.  Before Cash was hired, Nichols had worked with Stanard on finite reinsurance

transactions.  (Nichols Tr. 19, 21-25, 33-34, 42-43, 45-46, 49-56.)  Stanard hired Cash to replace

Nichols on finite transactions, at least in part because of Stanard's frustration at Nichols's

inability to create transactions that would satisfy GAAP reinsurance accounting requirements.

(Id. 46, 53-54, 71-72.)  This is precisely the problem that Cash would later illegally "fix" for

Stanard on the Inter-Ocean Transaction.

67.  In 2001, Stanard had extensive personal involvement in, and detailed knowledge of,

virtually every aspect of the Inter-Ocean Transaction itself.  (Ex. 218; Meadows Decl. ¶¶ 4-7, 9;

Tr. 523-26.)  In a January 2005 interview with the law firm of Boies Schiller, which was

conducting an internal investigation of RenRe business practices, Stanard admitted that, in 2001,

he participated in RenRe staff discussions concerning (i) potential counterparties for the

Inter-Ocean Transaction; (ii) appropriate accounting treatment for the transaction; (iii) the need

to obtain reinsurance accounting for the transaction; (iv) the requisite risk transfer for the

transaction to qualify for reinsurance accounting; (v) the amount of recoverables to assign to

Inter-Ocean under the assignment agreement; and (vi) the creation of a trust related to the

transaction and RenRe's control of investments held by the trust.  (Ex. 218 at 3, 6-9; Tr. 523-26,

536-40.)

68.  Stanard also admitted to Boies Schiller that, in 2001, he (i) reviewed potential cash

flows for the Inter-Ocean Transaction; (ii) reviewed the accounting treatment for each piece of

the transaction; (iii) was aware of Inter-Ocean's haggling over its profit margin on the

transaction; (iv) gave the RenRe staff final approval to complete the transaction; and (v)

participated in RenRe's ultimate decisions not to expand the transaction and, in 2002, to make a

claim under the reinsurance agreement.  (Exs. 32; 218 at 3, 7-8, 14;124 at 4; Tr. 523-26, 536,

540-48.)  Stanard even admitted to Boies Schiller that in 2001, he expected his staff to report

back to him concerning the Inter-Ocean Transaction – something that he denied at trial.  (Ex. 218

at 7; Tr. 537.)

69.  Merritt testified that Cash told him as they worked on the Inter-Ocean deal that Cash

was keeping Stanard "in the loop" and that the structure of the deal was "something [Stanard]

was interested in . . . something that [Stanard] wanted."  (Tr. 49-50, 330-32.)[6]

---

[6] Although these statements are hearsay, the remainder of the evidence discussed in this
Opinion supports a finding that Stanard and Cash conspired together to violate the securities
laws, and that Cash's statements to Merritt regarding Stanard's involvement were intended to
further that agreement by bolstering Merritt's commitment to the enterprise.  They thus may be
considered as evidence under Fed. R. Evid. 801(d)(3)(E).

70.  In light of this evidence, Stanard's claim at trial that he merely "parachute[d] in" at certain times to check on Cash but was not part of the "decision process" (Tr. 767) is not credible.

3.  <u>Stanard Supervised Cash</u>

71.  According to Nichols, from 2000 through approximately early 2004, although Cash did not officially report to Stanard, Stanard essentially supervised Cash on all of his finite reinsurance transactions and there was "no question that . . . Mike Cash was under Jim Stanard's thumb."  (Nichols Tr. 72-73, 75-76.)   Nichols also testified that Stanard and Cash shared a "unique bond" at RenRe because they were the company's only two actuaries during the relevant time period, and that the finite reinsurance deals "were pretty much contained in the Mike Cash/Jim Stanard space."  (<u>Id</u>. 70-73, 75-76.)

72.  Stanard's own witnesses effectively admit that Stanard worked closely with Cash specifically on the Inter-Ocean Transaction.  (Tr. 693; Nichols Tr. 75-76, 107-08, 130-31, 177-78.)  John Lummis, RenRe's chief financial officer, testified that Stanard and Cash were the two RenRe underwriters working on the Inter-Ocean Transaction and that the Inter-Ocean Transaction was a "Stanard and Cash deal."  (Tr. 693.)  Nichols similarly testified that Stanard closely supervised Cash on all finite reinsurance deals during this time period and that Stanard worked with Cash on the Inter-Ocean Transaction.  (Nichols Tr. 75-76, 177-78.)  Nichols further testified that he believed it likely that Cash generally updated Stanard regarding the Inter-Ocean Transaction at senior staff meetings because "Mike wouldn't have gotten away without updating Jim."  (<u>Id</u>. 107-08.)  Consistent with this testimony, William Riker, technically Cash's direct supervisor, testified that he did not supervise Cash on the Inter-Ocean transaction, or indeed on

24

any other finite reinsurance transactions, because, unlike Stanard, Riker did not have expertise in finite reinsurance.  (Tr. 740-42; see also id. 501.)

73.  Nichols's testimony is corroborated by the 2001 e-mail traffic between Stanard and Cash.  Those e-mails show that Cash worked on all, or virtually all, of RenRe's potential finite transactions, and that Cash communicated with Stanard regarding every transaction he worked on.  (Exs. 13, 15, 17, 26, 250, 260; Tr. 589-92.)

74.  The testimony of Nichols, Lummis, and Riker is consistent with RenRe's "second pair of eyes" practice, which required that the underwriter on a given deal have a second senior underwriter – one familiar with that type of transaction – review and approve the deal.  (Tr. 22, 494-96; Nichols Tr. 74-75.)  The weight of the trial evidence (including the testimony of Nichols, Lummis, and Riker) leads to the conclusion that no one other than Stanard operated as Cash's "second pair of eyes" on the Inter-Ocean Transaction.

75.  Stanard admitted at trial that he personally instituted the "second pair of eyes" practice; that it was communicated to all RenRe executives; that it was intended to prevent a single RenRe underwriter from acting as a "lone ranger" on a particular deal; and that its use was especially important on transactions, like the Inter-Ocean deal, that were new to RenRe.  (Tr. 494-96.)  Stanard also conceded that, at the time of the Inter-Ocean transaction, Cash did not have underwriting authority and thus would have needed a senior underwriter to review and approve the Inter-Ocean deal.  (Tr. 501; see also Tr. 738-40.)  The "second pair of eyes" practice would have been especially important in the case of Cash, who was a new employee working in an untested and – from an accounting perspective – risky area.  The notion that Stanard, regarded as a controlling chief executive by his fellow senior executives, was not keeping a close eye on

Cash's work on the Inter-Ocean Transaction is contrary to the weight of the evidence.

76.  Furthermore, it is highly unlikely that Cash, in the first few months of his job at RenRe and literally right under Stanard's nose, would engage in a blatant fraud without Stanard's approval or acquiescence.

4.      <u>Cash Did not Hide his Dishonest Practices from Stanard</u>

77.  The e-mails in the record indicate that Cash had no fear of suggesting dishonesty to Stanard.  Although not all of these e-mails relate specifically to the Inter-Ocean deal, they reflect Cash's openness about the fact that some skullduggery was necessary to get the finite reinsurance transactions RenRe was contemplating to pass muster with the auditors.

78.  In a February 7, 2001, e-mail to Stanard and others, for example, Cash discusses a potential finite transaction that includes a reinsurance contract where "everyone knows that we're going to hit this cover," and where Cash's principal concern is making "sure this isn't going to collapse the accounting."  (Ex. 15.)

79.  In a June 24-26, 2001, e-mail exchange between Cash and Stanard, the two men discuss in great detail a potential finite reinsurance transaction between RenRe and a company called Met P&C.  On June 25 e-mail, Stanard asked Cash, "Is there an understanding with executives at Met that we're supposed to get all our money back?"  (Ex. 250 at RENRE 000984.) That no innocent explanation exists for Stanard's query is clear from its context.  Point 5 of Cash's prior e-mail, to which Stanard is responding, makes it plain that Merritt was planning to seek "reinsurance accounting (not deposit accounting)" for RenRe in this transaction.  (<u>Id</u>.)

80.  Cash copied Stanard, and only Stanard, on a September 14, 2001, e-mail to Chubb Re in which Cash explained how he ensured on past contracts that RenRe was "paid back,"

26

through either a "consulting agreement" or "RenRe buying a cheap cat[astrophe] cover that is structured *so that we can always claim* (and structure the limits to make the payback over the desired # of years)."  (Ex. 260; emphasis added.)  The latter contract – the "cheap cat cover that is structured so that we can always claim" – is undoubtedly the Inter-Ocean Transaction since neither Stanard nor Riker could recall any other finite reinsurance transactions that Cash completed in 2001.  (Tr. 591-92, 747-48.)

81.  On November 9, 2001, in a series of e-mails between Stanard and Cash concerning possible expansion of the Inter-Ocean Transaction, and potential similar transactions with other counterparties, Cash advises that RenRe should seek a counterparty that (i) will be "very discrete [*sic*]"; (ii) that is "preferably not publicly traded"; (iii) "[w]ill not have E[rnst]&Y[oung] as auditors"; and (iv) "[w]ill be able to carry funky assets on their balance sheets."  (Ex. 32.)

82.  Cash's criteria are consistent with the interpretation that Cash believed, and communicated to Stanard, that the transactions he was attempting to structure required covert treatment if the desired accounting benefits were to be accomplished.  Stanard claimed that an experienced reinsurance executive would not necessarily infer an accounting fraud from Cash's criteria.  (Tr. 550-53.)[7]   Stanard further claimed that Cash's e-mail did not raise alarm bells for him because Cash was a "brash guy and . . . there was an element of [Cash] being [Cash] when we looked at the language."  (Tr. 550-51.)  While there may be innocent explanations for some

---

[7] Both Lummis and Riker also received Cash's e-mail, and neither testified that Cash's four criteria caused him concern.  See Riker Trial Aff. ¶ 23 ("At no time during those discussions do I recall anyone suggesting anything improper, whether from an accounting perspective or otherwise.").  The obviously self-serving nature of such testimony weakens its credibility.

of Cash's suggestions (such as Stanard's general secretiveness about RenRe transactions, see Tr. 376 (Merritt), 552 (Stanard), 879 (Bridges)), even Stanard's own expert conceded that the third point – that an underwriter was seeking a counterparty that used a different audit firm – would have raised red flags in his mind.  (Tr. 882-83.)  The clear purpose of seeking a counterparty that was not audited by RenRe's own auditor, Ernst & Young, was to permit RenRe to account for the transaction as reinsurance while minimizing the possibility that the auditors would raise questions upon becoming aware that the counterparty would not account for the transaction in the same way.

C.       Stanard's Claim that He Thought the Inter-Ocean Transaction Contained the Requisite Amount of Risk Is Not Credible

83.  Stanard claimed at trial that, although the Inter-Ocean Transaction was "close to the line" for reinsurance accounting purposes, he believed in 2001 that the transaction contained the relatively small risk level necessary to qualify for reinsurance accounting.  (Tr. 445-72.)  The preponderance of the evidence weighs against this claim.

1.       Risk to Inter-Ocean

84.  It is impossible to say conclusively that Stanard understood that there was virtually no risk to Inter-Ocean because there is no direct evidence that Stanard actually saw the final contract – e.g., there is no e-mail to him that attaches it nor does his signature appear on the contract.  It is, however, reasonable to infer that Stanard did see the final contract since (1) Cash did not have underwriting authority; (2) RenRe had the "second set of eyes" principle; and (3) nobody with underwriting authority other than Stanard was involved in this deal.  The fact that Cash signed the contract on behalf of RenRe, (see Ex. 2), is itself some evidence of consciousness that the deal was dubious; no one else's "fingerprints" were put on the document,

even though Cash, who lacked underwriting authority at the time, had no actual authority to bind the company to it.

85.  Moreover, if Stanard – a sophisticated actuary who knew about risk – did see the contract, he cannot have been blind to the obvious facts that (1) the payback was limited to what RenRe put in so there would be no risk to Inter-Ocean, and (2) RenRe was virtually certain to make a claim (something Stanard himself said in the phone call to AmRe's Ed Noonan). Desmond Nash testified that he spent no more than ten minutes determining that Inter-Ocean should account for the transaction as a deposit, rather than as reinsurance, under GAAP.  (Nash Tr. 21-32, 81-85.)  Nash further testified that he understood after reading a draft of the contract and after discussing the contract with Cash that there was no chance that RenRe would not get its money back in the transaction.  (Nash Tr. 42-53.)

86.  Even if Stanard never saw the final contract, he must have known at the time, based simply on his admitted understanding of the operation of the Inter-Ocean Transaction in 2001, that Inter-Ocean would not lose money on the deal.

87.  Stanard understood that the transaction's retention trigger – $250 million of losses during the three-year contract term or $60 million of losses in any one quarter – functioned as a deductible and that RenRe would recover the money it had paid to Inter-Ocean to the extent its losses exceeded those amounts.  (Tr. 580-81.)  Stanard acknowledges that he understood at the time that a "high probability" existed that RenRe would be able to make a sufficiently large claim during the contract period to recover the money it had paid to Inter-Ocean – i.e., that a high probability existed that RenRe's losses would exceed the deductibles by an amount large enough to retrieve all the money that RenRe had paid Inter-Ocean.  (Tr. 580-81.)  Stanard did not

believe at the time that there was some other trigger in the reinsurance contract that kicked in after RenRe had made such a claim, so as to protect Inter-Ocean against loss.  (Tr. 596.)

88.  Thus, it follows logically from Stanard's 2001 understanding of the transaction that a high probability existed that RenRe's losses would exceed the retention level by an amount large enough to result in a loss to Inter-Ocean, unless there was a limit on RenRe's ability to claim that was below the amount that RenRe had paid to Inter-Ocean.  (Tr. 595.)

89.  Without such a claim limit, a high probability existed that Inter-Ocean would lose money on the deal, an absurd result that Stanard knew no party intended.  Such a result would be directly contrary to Stanard's claimed understanding that a "high probability" existed that Inter-Ocean would make a profit on the deal (i.e., would get to keep its margin).  (Tr. 593-94.)

90.  Stanard must therefore have known that RenRe would not and could not claim more than the amount it had paid to Inter-Ocean and, in fact, that it could only claim somewhat less than the amount it had paid in order to provide Inter-Ocean with its negotiated margin.  (Tr. 593-96.)

91.  Cash openly discussed the concept of the claim limit with Stanard.  In an e-mail dated October 30, 2001, Cash reminded Stanard of the concept, stating that the "current IO deal has annual premium of $7.3 million . . . which basically just funds our limit balance."  (Ex. 32 at RENRE 704.)  Stanard admitted at trial that that sentence referred to the limit on RenRe's ability to make a claim under the contract but claimed – implausibly considering his actuarial sophistication and involvement in the transaction – that he did not understand that fact in 2001.  (Tr. 597-600.)

92.   Furthermore, RenRe's amendment to the Inter-Ocean Transaction, which Stanard knew of at the time, also leads to the conclusion that Stanard was aware that there never was any risk to Inter-Ocean.  Towards the end of 2001, due to concerns over the Enron accounting scandal, Stanard and Lummis decided to amend the transaction by reducing the amount of premium RenRe would pay to Inter-Ocean without altering the triggers that allowed RenRe to make a claim.  (Ex. 2 at RENRE 30-33; Tr. 193-95, 632-33.)  Thus, under the amended agreement, Inter-Ocean was to receive less money *for the same amount of risk*, which could only have made sense from Inter-Ocean's perspective if it had no risk to begin with.

2.   Risk to RenRe

93.   Stanard knew in 2001 that Inter-Ocean bore no risk on the transaction for all the reasons described above.  Stanard claimed at trial, however, that he may not have understood in 2001 that the risk for accounting purposes had to be Inter-Ocean's, rather than RenRe's.  (Tr. 560-61.)  First, this claim is inconsistent with Stanard's July 2005 testimony before the SEC in which Stanard stated that he believed risk to both sides of the transaction was relevant to analyzing the accounting issue.  (Tr. 556-59.)  In his July 2005 testimony, Stanard admitted that he understood in 2001 that risk to Inter-Ocean was at least a significant consideration in determining the appropriate accounting treatment for the transaction – an admission he attempted to evade at trial.  (Id.)

94.   Second, other trial evidence establishes that Stanard understood very well how FAS 113 worked and, therefore, that risk to Inter-Ocean was what ultimately mattered.  Stanard admits that in the late 1990s, he personally negotiated at least some finite reinsurance transactions at RenRe.  (Tr. 484.)  Furthermore, prior to Cash's joining RenRe, Nichols had "a

31

lot of conversations" with Stanard concerning accounting issues related to at least one potential

finite transaction.  (Nichols Tr. 45-46, 77-78.)  Himself an accountant and RenRe's prior

controller, Nichols "was under the impression that [Stanard] understood" the risk transfer

accounting issues with respect to that transaction.  (Id. 19, 21-25, 77-78.)  In addition, Stanard's

November 2000 e-mail to Lummis, in which he casually refers to "FASB 113," is further

circumstantial evidence that Stanard was familiar with that accounting provision.  (Ex. 256.)

Indeed, Stanard was sufficiently familiar in November 2000 with FAS 113's impact on

accounting for retroactive reinsurance to have discussed that issue with Lummis.  (Ex. 256; Tr.

554-55.)  Stanard also admitted that he understood in 2001 that reinsurance premium payments

had to be expensed over the entire term of the contract (Tr. 605-06, 776-77), which was also a

requirement of FAS 113 (Tr. 423-28), further evidencing his familiarity with that standard.

95.  But even if Stanard actually believed that the risk at issue for FAS 113 purposes was

RenRe's rather than Inter-Ocean's, the preponderance of the evidence establishes that Stanard

knew the transaction did not satisfy even Stanard's purported understanding of FAS 113 and that

he thus knew the Inter-Ocean Transaction constituted fraud.

96.  Stanard was familiar with the two triggers on the reinsurance contract, which

together defined whatever risk of loss RenRe might have had under the Inter-Ocean Transaction.

Stanard admitted to Boies Schiller that, in 2001, he understood that the loss threshold retention

trigger standing alone did not add sufficient risk to the transaction to qualify for reinsurance

accounting under FAS 113.  (Ex. 218 at 9; Tr. 583-84.)

97.  In addition, Stanard understood that the one-in-ten loss event provision – a provision

he had never seen before in a reinsurance contract – could be manipulated.  (Tr. 573-77.)

Indeed, Stanard made that fact clear to Noonan in their April 2001 telephone conversation when he told Noonan that RenRe was going to make a claim on the reinsurance contract and that Inter-Ocean would get to keep only its margin under the terms of the deal.  (Tr. 147-48; Ex. 218 at 4.)

98.  Finally, any doubt that Stanard understood the illusory nature of the Inter-Ocean Transaction triggers is laid to rest by Cash's and Stanard's multiple 2001 e-mail exchanges concerning this topic.  On September 14, 2001, Cash copied Stanard on an e-mail to Chubb Re, in which Cash explained how he had ensured on past finite reinsurance contracts (which could only refer to the Inter-Ocean Transaction) that RenRe was "paid back," through either a "consulting agreement" or "RenRe buying a cheap cat cover that is structured *so that we can always claim* (and structure the limits to make the payback over the desired # of years)."  (Ex. 260; emphasis added.)

99.  On two other occasions, Stanard and Cash discussed structuring a finite transaction in which RenRe would be certain to get its money back.  On February 7, 2001, Cash pitched a deal to Stanard in which "everyone knows" that RenRe would recover its money by "hit[ting] this cover."  (Ex. 15.)   On June 25, 2001, echoing Stanard's conversation with Noonan, Stanard told Cash to make sure there was "an understanding with executives at Met [P&C] that we're supposed to get all our money back."  (Ex. 250.)

100.  Stanard nonetheless claims that he relied upon Ernst & Young's approval of the Inter-Ocean Transaction.  The preponderance of the trial evidence establishes that Stanard knew that Cash was involved in a fraudulent scheme intended to fool RenRe's auditors.  Thus, Stanard had to know that any sign-off by Ernst & Young was fraudulently obtained (just as auditor

approval would have to have been fraudulently obtained for any of the other finite reinsurance deals that Cash was proposing in 2001).

      D.    The Two-Part Deal Was Inherently Suspect

101. That the Inter-Ocean Transaction was not designed in good faith, and could not have been perceived by a sophisticated insurance executive such as Stanard as having been designed in good faith, is further confirmed by its unusual two-part structure.  Had RenRe's management desired to create a reinsurance contract with adequate risk transfer, and to present that contract to Ernst & Young for a legitimate opinion, there would have been no reason to disguise a significant part of the premium as a bogus sale of receivables.

102.  There was no business reason whatsoever to sell the recoverables for a significant loss; nor, as discussed above, was there any legitimate reason to discount the price of the recoverables, since by the time the Assignment Agreement became effective, it was already clear that the full $50 million of recoverables had indeed been earned.  Thus, it is clear that the Assignment Agreement was orchestrated solely to transfer money to Inter-Ocean.  Nor was there any reason to structure the overall transaction as a sale of recoverables and a reinsurance agreement, rather than as a reinsurance agreement with $20 million of additional premium – except to hide the fact that it was a premium.

103.  It is not surprising that Desmond Nash testified that he had never before encountered a reinsurance transaction linking two deals in this manner, since the sole purpose of the two-contract structure was to conceal from RenRe's auditors the facts that RenRe was fully funding its own "reinsurance" claim and that no risk to Inter-Ocean (or RenRe) therefore existed.

(Nash Tr. 39.)[8]

104.  Stanard's admissions to Boies Schiller confirm his understanding that the two-part

contract was suspect.  Stanard told Boies Schiller that he did not believe in 2001 that it was

necessary to explain to Ernst & Young that the sale of recoverables and the reinsurance

agreement were a package deal, but rather that it was sufficient simply to present the "two pieces

of paper" – that is, the two contracts – to Ernst & Young for their approval:

> I think the spirit of the direction [Merritt] would have had would
> be that the deal is what is written on these two pieces of paper.  It
> is sufficient if you show [Ernst & Young] those pieces of paper,
> that's what they need to know [because] that represents 100% of
> the deal . . . .  I don't know how he communicated it but he
> wouldn't necessarily have had to take both pieces of paper and
> [say] this is a package deal.

(Ex. 218 at 10-11.)

105.  On its face, this statement reflects something considerably less than a

straightforward desire to present a transaction to the outside auditors for the purpose of receiving

honest advice about its proper accounting treatement.  Rather, Stanard appears to have conceived

the presentation to the auditors as a "blow-by" after which it could be claimed that the auditors

---

[8] Nash also testified as to another unusual aspect of the Inter-Ocean deal: although Nash
was technically supposed to oversee the trust, RenRe in fact directed the trust's investments.
(Nash Tr. 75-77; see also Exs. 37 at 4, 130.)  Of the approximately fifteen trusts Nash oversaw
for Inter-Ocean, the RenRe trust was the only one in which the reinsured party directed the trust
investments.  (Id. 79-80.)  If the money paid to Inter-Ocean were a legitimate premium paid to
Inter-Ocean to compensate it for the risk that it was undertaking, there would be no reason to
permit RenRe to manage the money in the fund.  This provision is, however, entirely consistent
with the notion that the transaction was effectively a deposit of RenRe's money with Inter-
Ocean.  Since it was always contemplated that the money would return to RenRe, it made sense
for RenRe to retain control of the funds.  Moreover, Stanard conceded that one purpose of the
transaction was to permit RenRe to invest in hedge funds and other risky investments away from
the company's balance sheet (Tr. 552-53, 600) – hence Cash's concern, shared with Stanard for
finding a counterparty "able to carry funky assets" on its books.  (Ex. 32.)

had been informed of all the facts, when the transaction had been presented in a way that obscured, or at any rate did not openly reveal, its true nature.  Stanard understood that, if Ernst & Young saw that the two contracts were a "package deal," they would quickly realize that the transaction was simply a round-trip of cash and that, therefore, it was a sham transaction whose sole purpose was to smooth or defer earnings.

106.  Ernst & Young's Jonathan Reiss testified that Merritt told him neither that the two contracts constituted a single transaction for risk-transfer purposes, nor that the purpose of the transaction was to smooth earnings or defer income.  If any client had described such a purpose to Reiss, he would have been "alarmed" because such a purpose would have sounded "inherently inappropriate."  (Reiss Tr. 106-07, 476-77.)  Merritt admitted that he intentionally obscured the nature and purpose of the transaction when he presented the Inter-Ocean Transaction to Reiss in April 2001.  (Tr. 117-20, 134-36; Ex. 75.)  Stanard admitted at trial that he had not assumed in 2001 that Merritt had explained the purpose of the transaction to Ernst & Young.  (Tr. 626.)

E.    Stanard's Motive

107.  As RenRe's CEO during the 2000-2002 time period, Stanard was concerned with the appearance of RenRe's quarterly and annual earnings to investors and rating agencies.  Like any CEO, Stanard wanted RenRe's books to show smooth earnings growth over time.  (Tr. 751-52.)

108.  Stanard was frustrated, however, by accounting rules that, to his mind, impeded RenRe from showing in its financial statements what he believed was "a better reflection of the long-run economics of the business" than GAAP permits.  (Id. 752.)  Stanard's frustration arose, at least in part, from the basic GAAP reinsurance accounting principle that a reinsurance

company may not expense against earnings its anticipated reinsurance losses until a particular catastrophic loss event (such as a hurricane) actually has occurred.  (Id. 637-41, 421-22.)  At least one effect of this rule is to prevent reinsurance companies from distorting their profits by artificially smoothing earnings – precisely what Stanard wanted to accomplish in 2001.

109.  To Stanard, however, this GAAP rule did not reflect the economic reality that reinsurance "earnings" in a given year are arguably illusory, because the reinsurance company has already factored into such earnings the likelihood of future losses from catastrophes that have not yet occurred.  (Tr. 637-41.)  Stanard thus wanted to take advantage of any available accounting method to level the "peaks and valleys" of RenRe's earnings, given that a catastrophe reserve could not be established.  (Id.)

110.  Stanard likewise understood that, as a public company, RenRe's quarterly and annual earnings growth and volatility were regularly scrutinized by investors and rating agencies.  (Tr. 449-57, 643-44; Ex. 224.)  Due to GAAP accounting rules, RenRe's public financial disclosures had to reflect RenRe's earnings without taking into account what Stanard – one of the world's leading actuaries – believed were inevitable expected losses.

111.  Furthermore, in 2000-2002, Stanard knew that his competitors were illegally using finite reinsurance transactions to manage their earnings for the reasons set forth above, and that those other reinsurance companies were getting away with such illegal practices.  (Tr. 468, 471-72, 523-26; Ex. 218 at 14; Meadows Decl. ¶¶ 4-7, 9.)  Stanard hoped to reduce that competitive threat through RenRe's own use of finite reinsurance products.  (Nichols Tr. 71-72.)

112.  Stanard claims that there is no reason he would have committed fraud when he could more easily – and legitimately – have accomplished his goal of deferring earnings without

the false accounting on the Inter-Ocean deal.  But despite the hypothetical possibility of building

in "just enough risk," Stanard's goal – to obtain an accounting benefit without actually

undergoing any real risk – was not, in fact, easy to achieve.  Nichols testified that, in 2000, he

had been working on a finite reinsurance transaction for about nine months, and that Stanard

hired Cash "to take stuff away from me because I couldn't get anything done."  (Nichols Tr. 71.)

Nichols explained that "[t]here was a lot of pressure to get [the deal] done but there was just no

way to get the deal [at the same time to] comply with all the accounting rules and [have RenRe]

be comfortable with the risk that was in the deal."  (Id. 46.)  Nichols further testified that Stanard

was trying, through manipulations of terms and conditions, to put less risk in the deal but that

> you can't go that far [in eliminating risk] because they want
> [reinsurance] accounting for it, so if you [eliminate the risk] it's
> going to tilt their accounting and if they want the accounting, it's
> going to tilt the risk.  So there was a balance that I just couldn't see
> how – I wasn't an expert on finite but just from the accounting
> perspective I just couldn't see a solution to it.

(Id. 53-54.)  It is hardly surprising that it would be difficult to structure a transaction that at once

(1) eliminated any risk and (2) could be treated for accounting purposes as a transaction with

genuine risk.

       F.      The Boies Schiller Investigation

     113.  In the fall of 2004, RenRe hired the law firm Boies Schiller & Flexner LLP to

conduct the investigation.  (Ex. 94 at 1.) Stanard testified that he was one of the senior officers

who initiated the idea of an internal investigation of areas that were then the subject of

government investigations of other companies in the insurance industry.  (Tr. 817-18; see

Lummis Trial Aff. ¶ 130; Reiss Tr. 256-57; Ex. 94 at 1.)  He contends that his actions in helping

to uncover the erroneous accounting for the Inter-Ocean transaction are inconsistent with the

inference that he was a knowing participant in an accounting fraud.

114.  Stanard's role in the internal investigation is not in itself exculpatory.  First, the evidence indicates that hiring Boies Schiller was not in fact Stanard's idea.  John Lummis, RenRe's CFO, credibly testified that it was he who initiated the internal investigation and that he and Steve Weinstein, RenRe's in house counsel, were the ones who decided to retain Boies Schiller.  (Lummis Tr. 342-46.)

115.  Lummis remembers running the idea by Stanard, who told them to do "whatever you guys think makes sense."  (Id.)  It is a reasonable inference that Stanard believed that he could not veto the idea of an internal investigation without raising eyebrows, and that the relatively small Inter-Ocean transaction would not become a problem.

G.    The Post-Enron Unwinding of the Inter-Ocean Transaction

116.  In the fall of 2001, after first opting to expand the Inter-Ocean transaction (Ex. 32 at RENRE 000702-04), Lummis and Stanard decided instead that "it wasn't worth it" to continue with the deal.  (Lummis Trial Aff. ¶116.)

117.  Lummis claims that he advised Stanard that they should wind down the transaction because, post-Enron, "[a]ccounting interpretations were likely to become far more conservative, and all structured transactions were likely to be viewed less favorably and with more skepticism than in the past," and also because RenRe had new business opportunities in traditional reinsurance after the events of September 11, 2001, and would be better off focusing its resources on those.  (Lummis Trial Aff. ¶¶ 113-14.)  Merritt, in contrast, claims that he approached Lummis with his concerns about the Inter-Ocean transaction, and suggested that RenRe wind it down.  (Tr. 177.)

118.   Whatever the case, RenRe submitted a notice of claim to Inter-Ocean on September 25, 2002 – as soon as it reasonably could without having to rely unduly upon certain flexibilities built into the triggers but before it had intended to (i.e., in a year when RenRe's earnings were relatively healthy).  (Reiss Tr. 233-35; Exs. 12, 218 at 14.)

119.   RenRe then decided to amend the Reinsurance Agreement with Inter-Ocean to eliminate the premium payments that originally were to be made in 2002 and 2003, the second and third years of the three-year contract.  The parties formalized the amendment in early 2003 as a means to effectively end the contract after RenRe had made the full limit claim; the limit available over the three-year period of the reinsurance agreement was reduced to $30 million to reflect the fact that no additional premium would be paid.  (See Ex. 2 at RENRE 000030.)

120.   Stanard did not direct Merritt or anyone else at RenRe to seek Ernst & Young's advice on whether to close out the transaction (Tr. 634-35), the logical next step if Stanard in fact believed that Ernst & Young had approved the transaction in the first place based on knowledge of all material facts.

121.   Stanard would have it that what changed post-Enron was a perception that RenRe now had to be even more scrupulous than ever, that "if we were willing to do this experiment once and get close to the line . . . in the new world we were not – we didn't want to get close to the line."  (Tr. 633.)

122.   The more natural reading, however, is that Stanard feared that, in a more aggressive regulatory climate, deals that had previously escaped scrutiny would be more likely to be examined by regulators, and that accounting manipulations previously committed with impunity now risked detection and sanctions.  The post-Enron climate dictated that RenRe should refrain

from expanding the Inter-Ocean transaction not because it was legitimate but "aggressive" accounting that might now be questioned, but because increased regulatory scrutiny might now uncover previously-common abuses.  The decision to wind down the transaction prematurely in the "post-Enron environment" thus reflects a knowledge that the transaction would not withstand regulatory scrutiny.

## VI.    Materiality

123.  As a result of its fraudulent accounting for the Inter-Ocean Transaction, RenRe filed public reports with the SEC that understated by 14% its net income for 2001, overstated by 7% its net income for 2002, and overstated by 37.7% its net income for the third quarter of 2002. (Tr. 408-11, 651; Ex. 126 at 55; Ex. 211 at 20-21; Ex. 232 at 1-2, 7, 24-25, 27-28, 31, and 35.)

124.  The public reports containing RenRe's misrepresentations at issue were RenRe's (i) Forms 10-K for 2001 and 2002; (ii) Form 10-Q for the third quarter of 2002; (iii) January 30, 2003, and February 3, 2003 prospectus supplements for its $4 million offering of RenRe stock and $100 million offering of RenRe notes, respectively (which incorporate by reference RenRe's 2001 Form 10-K and its third quarter 2002 Form 10-Q); and (iv) June 19, 2002 Form S-8, through which RenRe offered over $108 million pursuant to its Amended and Restated 2001 Stock Incentive Plan and Non-Employee Director stock plan (and which incorporated by reference RenRe's 2001 Form 10-K).  (Exs. 125, 146, 149, 239, 242, 243.)

125.  Stanard signed RenRe's 2001 Form 10-K; and he signed and certified RenRe's 2002 Form 10-K and third-quarter 2002 Form 10-Q.  (Exs. 125, 146, 149.)

126.  Stanard points to a number of facts suggesting that the impact of these inaccurate statements on investors was limited.  When RenRe voluntarily decided to issue restated

41

financials, the impact of the restatement on shareholders' equity and retained earnings was zero. (Ex. 192 at 2.)

127.   Moreover, the market exhibited little reaction to RenRe's announcement that it would restate its financial results.  RenRe's common stock price increased briefly during intraday trading after the announcement, from $49.06 per share to as high as $49.58, before closing at $48.68.  (Ex. 401.)  RenRe's stock outperformed the market for the day – it fell 0.75% while the Dow Jones Industrial Average fell 1.61%, the S&P 500 declined 1.45%, and the S&P Insurance Index dropped by 1.63%.  (Id.)

128.   Likewise, the market did not react when, on March 31, 2005, RenRe filed its 2004 Form 10-K containing details of the accounting adjustment.  (Ex. 126.)   From its opening price on March 30 until its closing on April 1, RenRe common stock increased from $46.52 to $47.08 per share and reached an intraday high on April 1 of $49 per share.  (Ex. 400.)

129.   As equity analyst Alain Karaoglan testified:  "Neither the income recognized from the Inter-Ocean claim in late 2002, nor the later restatement in early 2005, had any significant or lasting impact on the [Company's stock] trading price."  (Ex. 410; Karaoglan Trial Aff. ¶ 98; see also id. at ¶ 99 and Ex. 411.)

130.   Nonetheless, the preponderance of the evidence indicates that RenRe's false statements were indeed material.  Investors and potential investors in RenRe relied upon a number of factors to determine whether to purchase or sell RenRe stock, including its quarterly and annual earnings.  RenRe's 14% understatement of net income for 2001, coupled with its 7% overstatement for 2002, as well as its 37.7% net income overstatement for the third quarter of 2002, were material false statements in that earnings differences of those magnitudes, as a

general matter, were a significant factor that RenRe's investors and potential investors considered at the time in determining whether to buy or sell RenRe securities.  (Exs. 144-49, 159-72, 174-76, 178-79, 181-83, 186, 224; Tr. 643-44; Lloyd Tr. 6-9, 15-16, 18-25, 27-28, 38-44, 50-51, 57-58, 60-64; Karaoglan Tr. 150-54, 157-59, 165-67, 169-72, 175-78, 181, 185-89.)

131.  RenRe investor Robert Lloyd, a portfolio manager at a large, growth-oriented mutual fund that purchased more than $20 million of RenRe's shares during the relevant period, testified that the particular quarterly and annual earnings misstatements at issue would have been significant to his investment decisions at the time.  (Lloyd Tr. 6-9, 20-25; Ex. 144.)  Lloyd testified that, when considering whether to purchase the stock of a particular company, including RenRe, he focused on "year-over-year earnings growth" and that, as part of that analysis, he reviewed the company's annual and quarterly earnings.  (Lloyd Tr. 15-16, 18-20.)  Among other things, Lloyd reviewed a company's Forms 10-K, Forms 10-Q, and quarterly earnings releases.  (Id. 27-28, 38.)  Lloyd typically focused on the net income and earnings per share information on Forms 10-K and Forms 10-Q.  (Id. 39-44.)

132.  Lloyd testified that a $25 million decrease in RenRe's net income in the third quarter of 2002 would have been significant to his analysis of RenRe stock at the time; that a $25 million decrease in RenRe's net income for the year 2002 would also have been significant to his analysis; and that, even when considered in conjunction with a 14% increase in RenRe's net income for 2001, those amounts would have been significant to him.  (Id. 50-51, 57-58, 60-64.)

133.  According to Lloyd, he would have considered RenRe's changed "growth numbers . . . in the context of what other reinsurance companies were doing at the same time, and also

what other stocks within [his] investable universe are doing at the same time, because it's a choice between buying this company and another company." (Id. 63-64.)

134.   Alain Karaoglan, the industry analyst that Stanard called as a materiality witness, focused on financial measures that are longer-term than the RenRe misstatements at issue in this case.  Yet even Karaoglan acknowledged that many investors consider those quarterly and annual earnings misstatements to be material.

135.   Karaoglan, who covered RenRe's stock during the relevant time period while at Deutsche Bank, testified that he did not focus on "shorter-term indicators such as a reinsurance company's quarterly earnings," but on "stable, long-term indicators" such as book value and return on equity.  (Karaoglan Aff. ¶¶ 8-9, 15.)  Karaoglan conceded, however, that his particular analytical approach was merely one among many (Karaoglan Tr. 160-64); Lloyd's testimony confirms that some reasonable investors placed much greater weight on the company's quarterly earnings.

136.   Karaoglan further acknowledged that RenRe's investors often had a different view than he did as to the value of the company (as reflected in the company's stock price movement); that RenRe's failing to meet a quarterly earnings estimate could cause RenRe's stock price to decline; and that RenRe's quarterly earnings announcements at times prompted investors to call him.  (Karaoglan Tr. 165-67, 169-72.)  Consistent with this investor interest in RenRe's short-term earnings, Karaoglan always tried to issue his analyst reports directly after RenRe announced its quarterly earnings.  (Id. 185-86.)

137.   Indeed, Karaoglan's employer, Deutsche Bank, understood the importance to investors of quarterly earnings and, notwithstanding Karaoglan's focus on long-term data,

required Karaoglan to highlight RenRe's quarterly earnings per share data by placing it at the very top of the very first page of each of his analyst reports.  (Karaoglan Tr. 175-78, 181, 187-89; Exs. 159-172, 174-176, 178-179, 181-183, 186.)

138.  Stanard likewise was well aware that RenRe's quarterly earnings were important to investors.  In press release after press release in 2001, Stanard and RenRe touted the company's quarterly earnings per share to investors.  (Ex. 224.)

139.  For example, in an April 23, 2001, RenRe press release announcing RenRe's financial results for the first quarter of 2001, Stanard himself told investors that "[s]trong performance during January 1 renewals produced excellent top-line growth and enabled us to record a *fourth consecutive quarter of record earnings per share*."  (Id. (emphasis added); Tr. 643-44.)  An October 21, 2002, press release announcing results for the third quarter of 2002 – the quarter in which Stanard and RenRe had overstated the company's earnings by $25 million, or 37.7%, as a result of the Inter-Ocean Transaction – states that "[n]et income available to common shareholders rose to $88.2 million, or $1.26 per common share in the quarter, compared to $29.9 million or $0.49 per common share for the same quarter of 2001."  (Ex. 224.)

140.  Finally, the failure of the market to react to the retrospective correction of RenRe's financial statements in 2005 is of little significance in evaluating the materiality of the false statements when made.  Unlike a restatement that reveals that illusory profits claimed in past years never existed – which would be expected, if material, to affect the ongoing value of the company – a disclosure that genuine earnings had been shifted from one quarter to another several years earlier would not affect the perceived value of the company as of the time of the disclosure.  The lack of market movement in 2005 says nothing about the materiality of

significant misstatements of earnings at the time they were made.  A significant overstatement or understatement of income calculated according to GAAP could be expected to affect the decision-making of reasonable investors, notwithstanding that some financial analysts would value other indicators more than short-term profits.

## CONCLUSIONS OF LAW

1.  The SEC has charged Stanard with violating the anti-fraud provisions of the Securities Exchange Act of 1934 ("Exchange Act") and the Securities Act of 1933 ("Securities Act"), as well as other non-fraud provisions.  For those violations, the SEC seeks a final judgment against Stanard (i) permanently enjoining him from future violations of those provisions; (ii) barring Stanard from serving as an officer or director of a public company; and (iii) ordering him to pay the SEC a civil money penalty.  Each of the violations is addressed separately below, followed by a discussion of the appropriate relief.

**I.     Anti-Fraud Violations**

2.  To prove its claims under the anti-fraud provisions of the Securities Act and Exchange Act – Securities Act Section 17(a), 15 U.S.C. § 77q(a); Exchange Act Section 10(b), 15 U.S.C. § 78j(b); and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5 – the SEC must establish by a preponderance of the evidence that Stanard, (1) "by the use of any means or instrumentality of interstate commerce," (2) made a (3) material (4) false statement or omission (5) in connection with (6) the purchase or sale of a security (Section 10(b) and Rule 10b-5), or in the "offer or sale" of a security (Section 17(a)), (7) either knowingly or recklessly.  See 15 U.S.C. §§ 78j(b) & 77q(a); 17 C.F.R. § 240.10b-5; see also Acito v. Imcera Group, Inc., 47 F.3d 47, 52 (2d Cir. 1995).

A.      Stanard Used an "Instrumentality of Interstate Commerce"

3.  A fraud has been committed "by the use of any means or instrumentality of interstate commerce" if the defendant used some means of interstate communication (such as a telephone call), in some phase of the transaction.  See Richter v. Achs, 962 F. Supp. 31, 33 (S.D.N.Y. 1997) (element satisfied where "the designated means [is] used in some phase of the transaction, which need not be the part in which the fraud occurs").  "In other words, if a single telephone is used to call the defendants to a meeting at which they engage in fraudulent activity, the jurisdictional element is satisfied."  Id.  Stanard relied on both telephone and the internet (including e-mail and electronic SEC filings) to communicate with others regarding the Inter-Ocean Transaction fraud.  For example, his telephone call from Bermuda to Ed Noonan, who was located in the United States (Noonan Aff. ¶ 38; Ex. 115; Stipulations 5-7), confirming the lack of risk in the transaction constituted use of an "instrumentality of interstate commerce."

B.      Stanard "Made" the False Statements at Issue

4.  A corporate officer who signs a corporate document is deemed to have "made" the statements therein for the purposes of the anti-fraud provisions of the federal securities laws. See Howard v. Everex Sys. Inc., 228 F.3d 1057, 1061 (9th Cir. 2000); In re Ind. Energy Holdings PLC Secs. Litig., 154 F. Supp.2d 741, 767 (S.D.N.Y. 2001), abrogated on other grounds, 241 F. Supp.2d 281 (S.D.N.Y. 2003).  As the Ninth Circuit has noted,

> [w]hen a corporate officer signs a document on behalf of the corporation, that signature will be rendered meaningless unless the officer believes that the statements in the document are true. . . . Key corporate officers should not be allowed to make important false financial statements knowingly or recklessly, yet still shield themselves from liability to investors simply by failing to be involved in the preparation of those statements.  Otherwise, the securities laws would be significantly weakened.

Howard, 228 F.3d at 1061-62 (citing AUSA Life Ins. Co. v. Dwyer (In re JWP Inc., Sec. Litig.), 928 F. Supp. 1239 (S.D.N.Y. 1996)).

5.  Even a public company CEO who does not sign a particular public filing may nonetheless be held liable under Sections 10(b) and 17(a) in an SEC enforcement action, where the CEO was sufficiently responsible for a false statement contained in it, and where the CEO caused the false statement to be made and knew or had reason to know that the false statement would be disseminated to investors.  SEC v. KPMG LLP, 412 F.Supp.2d 349, 375 (S.D.N.Y. 2006); In re Salomon Analyst AT&T Litigation, 350 F.Supp.2d 455, 473-74 (S.D.N.Y. 2004).

6.  Because Stanard signed RenRe's 2001 and 2002 Forms 10-K, he "made" the statements contained in them, including the financial statements that misrepresented RenRe's actual earnings for those fiscal years.  Stanard certified RenRe's Form 10-Q for the third quarter of 2002 and, thus, is deemed to have "made" the statements in that document as well.

7.  Stanard neither signed nor certified RenRe's January 30, 2003, and February 3, 2003 prospectus supplements (Exs. 242, 243), nor RenRe's June 19, 2002 Form S-8.  However, those filings incorporated by reference one or more of the false statements at issue.  As RenRe's CEO, Stanard had reason to know that RenRe's subsequent public filings disseminated to its investors and potential investors would reference the false Forms 10-K and Form 10-Q; Stanard is thus liable for the false statements contained by reference in those additional filings as well.

C.    The Statements Were Material

8.  A statement is material for purposes of Exchange Act and Securities Act liability if a substantial likelihood exists that a reasonable investor would consider the information important in making an investment decision.  Basic Inc. v. Levinson, 485 U.S. 224, 231-32 (1988); SEC v.

48

Mayhew, 121 F.3d 44, 51 (2d Cir. 1997).  The information need not be of a type that necessarily would cause an investor to change his investment decision.  Ganino v. Citizens Utils. Co., 228 F.3d 154, 162 (2d Cir. 2000); Folger Adam Co. v. PMI Indus., Inc., 938 F.2d 1529, 1533 (2d Cir. 1991).  Rather, a statement is material so long as the "investor would have viewed it as significantly altering the 'total mix' of information available."  Mayhew, 121 F.3d at 52. Material information includes reports of current and future earnings found in quarterly and annual public filings and press releases.  SEC v. Caserta, 75 F. Supp.2d 79, 93 (E.D.N.Y. 1999); In re Kidder Peabody Secs. Litig., 10 F. Supp.2d 398, 410 (S.D.N.Y. 1998).

9.  The SEC has satisfied the materiality element of its fraud claims against Stanard.  As described in the Findings of Fact, a reasonable RenRe investor would have considered RenRe's misstatements significant in making an investment decision.

D.    The RenRe Public Statements at Issue Were False

10.  Stanard does not dispute that RenRe's original financial statements in its Forms 10-K and Form 10-Q falsely understated RenRe's total 2001 net income by 14.7%, overstated its total 2002 net income by 7%, and overstated its third quarter 2002 net income by 37.7%.  These false statements were the direct result of RenRe's having accounted for the Inter-Ocean Transaction improperly as reinsurance rather than as a mere deposit of RenRe's funds with Inter-Ocean.

E.    The Statements Were "in Connection with" a Securities Transaction

11.  A statement or omission is "in connection with" the purchase or sale of a security for the purpose of Exchange Act Section 10(b) if it "somehow touches upon" or has "some nexus" with "any securities transaction."  SEC v. Rana Research, Inc., 8 F.3d 1358, 1362 (9th Cir. 1993).  The false statements at issue, which were made in RenRe's public filings with the SEC,

were available to investors and potential investors in RenRe's stock, which was actively traded at the time on the New York Stock Exchange.  Thus, the false statements at issue were "in connection with" the purchase or sale of securities within the meaning of Exchange Act Section 10(b).

F.   The Statements Were in Connection with a "Purchase or Sale"

12.  The Securities Act defines "sale" to include "every contract of sale or disposition of a security or interest in a security, for value"; and "offer" to include "every attempt or offer to dispose of . . . a security or interest in a security, for value."  15 U.S.C. § 77b(a)(3).  Thus, the false statements contained in RenRe's January and February prospectus supplements, and in its June 2002 Form S-8, were in the "offer or sale" of a security for Section 17(a) purposes.

G.   Stanard Acted with the Requisite Degree of Scienter

13.  Scienter is "a mental state embracing [an] intent to deceive, manipulate, or defraud."  Aaron v. SEC, 446 U.S. 680, 686 at n.5 (1980).  A defendant's scienter can be established "by facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness."  Stevelman v. Alias Research Inc., 174 F.3d 79, 84 (2d Cir. 1999); see also SEC v. U.S. Environ., Inc., 155 F.3d 107, 111 (2d Cir. 1998); SEC v. McNulty, 137 F.3d 732, 741 (2d Cir. 1998); Shields v. Citytrust Bancorp, Inc., 25 F.3d 1124, 1128 (2d Cir. 1994); In re Time Warner Inc. Securities Litigation, 9 F.3d 259, 268-69 (2d Cir. 1993).

14.  Recklessness is the standard under § 10(b) in part because

> [p]roof of a defendant's knowledge or intent will often be inferential, and cases thus of necessity cast in terms of recklessness.  To require in all types of 10b-5 cases that a factfinder must find a specific intent to deceive or defraud would for all intents and purposes disembowel the . . . cause of action under § 10(b).

Rolf v. Blyth, Eastman Dillon & Co., 570 F.2d 38, 47 (2d Cir. 1978).

15.  Reckless conduct represents "an extreme departure from the standards of ordinary care . . . to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it."  Id.  An egregious refusal to see the obvious, or to investigate the doubtful, may also give rise to an inference of recklessness.  Chill v. General Elec. Co., 101 F.3d 263, 269 (2d Cir. 1996); see also Lanza v. Drexel & Co., 479 F.2d 1277, 1306 at n. 98 (2d Cir. 1973).  Accordingly, a defendant cannot plead ignorance of the facts where there are warning signs or information that should have put him on notice of either misrepresented or undisclosed material facts.  See Chris-Craft Indus., Inc. v. Piper Aircraft Corp., 480 F.2d 341, 398 (2d Cir. 1973); Novak v. Kasaks, 216 F.3d 300, 308 (2d Cir. 2000) (scienter may be established by showing defendant's "knowledge of facts or access to information contradicting [his] public statements").

16.  Even if Stanard did not decide, in so many words, "I want to do something fraudulent," the SEC has demonstrated that Stanard was, at the least, highly reckless with respect to the Inter-Ocean transaction.  The SEC has demonstrated, by a substantial preponderance of the evidence, that Stanard wanted to engage in a transaction that would have a particular balance sheet effect, without economic reality; that he knew that the transaction was being structured in a way (i.e., the two-part deal) that would obscure its significance from the auditors; that he understood the basic meaning of FAS 113; and that, as a sophisticated underwriter, he had to have understood that there was no risk at all in this contract.  He thus knew the facts, and he knew the rule, and he knew that the facts did not square with the rule.  Accordingly, he acted with knowledge that RenRe's earnings would be falsely stated.

H.      Stanard Committed Securities Fraud

17.  For the foregoing reasons, the Court holds that Stanard is liable for violations of the

anti-fraud provisions of the federal securities laws, Securities Act Section 17(a) and Exchange

Act Section 10(b).

18.  For the same reasons, Stanard violated Exchange Act Rule 13a-14, 17 C.F.R. §

240.13a-14, by certifying that RenRe's 2002 Form 10-K and third quarter 2002 Form 10-Q

contained no material false statements or omissions, at a time when Stanard knew that those

reports contained material false statements and omissions concerning RenRe's financial

condition (due to RenRe's improper accounting for the Inter-Ocean Transaction).  See SEC v.

Indigenous Global Development Corp., No. 06 Civ. 05600, 2008 U.S. Dist. Lexis 50434, at

*43-44 (N.D. Cal. June 30, 2008).

**II.    Books and Records Violations**

A.      Rule 13b2-1 Promulgated Under the Exchange Act

19.  Rule 13b2-1, titled "Falsification of Accounting Records," provides that "[n]o person

shall, directly or indirectly, falsify or cause to be falsified, any book, record or account subject to

section 13(b)(2)(A) of the Securities Exchange Act."  17 C.F.R. § 240.13b2-1.

20.  Scienter is not an element of a cause of action under Rule 13b2-1.  See SEC v.

McNulty, 137 F.3d 732, 741 (2d Cir. 1998) ("no scienter requirement inserted in SEC Rule

13b2-1, 17 C.F.R. § 240.13b2-1, because § 13(b) of the 1934 Act contains no words indicating

that Congress intended to impose a scienter requirement" (internal citations omitted)).

21.  Nor is materiality an element of a Rule 13b2-1 claim.  See Foreign Corrupt Practices

Act of 1977, SEC Release No. 34-17500, 1981 WL 36385, at *5 (Jan. 29, 1981) ("[S]uggestions

have been made to qualify these provisions by super-imposing a 'materiality' test on the requirement that corporate records be accurate and on the scope of the internal controls provision . . . . Despite these suggestions, however, Congress determined not to incorporate such a limitation . . . . Internal accounting controls are not only concerned with misconduct that is material to [investors but] also with a great deal of misconduct which is not."); McNulty, 137 F.3d at 741 ("The Commission's interpretations of § 13 and of its own regulations thereunder are entitled to deference."); SEC v. 800America.com, Inc., No. 02 Civ. 9046, 2006 WL 3422670, at *11 (S.D.N.Y. Nov. 28, 2006) (not listing materiality as element of Rule 13b2-1 violation).

22.  Hence, to establish its Rule 13b2-1 claim against Stanard, the SEC need only establish, by a preponderance of the evidence, that Stanard created, or caused to be created, the false accounting records associated with the Inter-Ocean Transaction.

23.  Because Stanard was the CEO of RenRe and was an impetus behind the Inter-Ocean transaction fraud, and because the central purpose of that fraud was the improper accounting associated with the Inter-Ocean Transaction (which necessitated Merritt's creation of the improper and inaccurate 2001 and 2002 RenRe books and records), Stanard violated Rule 13b2-1.

B.    Exchange Act Rule 13b2-2

24.  The SEC also charges Stanard with violating Exchange Act Rule 13b2-2, 17 C.F.R. § 240.13b2-2, which states in pertinent part that "[n]o director or officer of an issuer shall, directly or indirectly: (1) [m]ake or cause to be made a materially false or misleading statement to an accountant in connection with . . . [a]ny audit, review or examination of the financial statements of the issuer required to be made pursuant to this subpart."  The SEC charges that Stanard made,

or caused Merritt to make, material false statements or omissions concerning the Inter-Ocean Transaction, in connection with Ernst & Young's review, audit, and examination of RenRe's financial statements and RenRe's preparation and filing of reports and other documents with the SEC.

25.  Rule 13b2-2 does not require a showing of scienter.  See 17 C.F.R. § 240.13b2-2; SEC v. Espuelas, No. 06 Civ. 2435, 2008 WL 4414516, at *22 (S.D.N.Y. Sept. 30, 2008).

26.  Because Stanard made material false statements and omissions to Ernst & Young in management representation letters he signed, and because Stanard's actions caused Merritt to make material false statements or omissions in April 2001 and late 2002 (when RenRe made a reinsurance claim under the Inter-Ocean Transaction reinsurance agreement), Stanard violated Exchange Act Rule 13b2-2.

C.    Exchange Act Section 13(b)(5)

27.  The SEC also charges Stanard with violating Exchange Act Section 13(b)(5), 15 U.S.C. § 78m(b)(5), which provides, in pertinent part, that no "person shall knowingly . . . falsify any book, record, or account [of any issuer who is required to file reports pursuant to section 15(d)]."  15 U.S.C. § 78m(b)(5).  The SEC charges that Stanard violated Section 13(b)(5) by knowingly failing to implement a system of internal accounting controls at RenRe, and knowingly falsifying, directly or indirectly, or causing to be falsified, books, records and accounts of RenRe that were subject to Exchange Act Section 13(b)(2)(A), 15 U.S.C. § 78m(b)(2)(A).

28.  Materiality is not an element of a Section 13(b)(5) claim.  See Foreign Corrupt Practices Act of 1977, SEC Release No. 34-17500, 1981 WL 36385, at *5 (Jan. 29, 1981); SEC

v. Thielbar, No. 06 Civ. 4253, 2007 WL 2903948, at *10 (D.S.D. Sept. 28, 2007) (materiality is

not an element of a Section 13(b)(5) claim) (citing SEC v. World-Wide Coin Invs., Ltd., 567 F.

Supp. 724, 748-50 (N.D. Ga. 1983)); SEC v. Cohen, No. 05 Civ. 371, 2007 WL 1192438, at *18

(E.D. Mo. Apr. 19, 2007) (holding that a Section 13(b)(5) claim does not require a showing of

materiality).

29.  Section 13(b)(5) does require a showing of scienter.  As the plain language of the

statute indicates, the standard is "knowing," not merely "reckless."  The SEC has met this

heightened burden, showing as outlined above that Stanard knew that Cash was involved in a

fraudulent scheme intended to fool RenRe's auditors.  Because the central purpose of that fraud

was the improper accounting associated with the Inter-Ocean Transaction (which necessitated

Merritt's creation of the improper and inaccurate 2001 and 2002 RenRe books and records), the

Court finds that Stanard violated Exchange Act Section 13(b)(5).

D.     Aiding and Abetting Liability

30.  Pursuant to Exchange Act Section 20(e), 15 U.S.C. § 78t(e), the SEC charges

Stanard with having aided and abetted RenRe's violations of Exchange Act Section 13(a), 15

U.S.C. § 78m(a), and Rules 12b-20, 13a-1 and 13a-13, 17 C.F.R. §§ 240.12b-20, 240.13a-1 and

240.13a-13.  The SEC alleges that RenRe violated those provisions by filing false financial

statements with the SEC as described above and that Stanard aided and abetted those violations

by orchestrating the sham Inter-Ocean Transaction as a means of improperly smoothing RenRe's

reported earnings, thereby distorting RenRe's filed financial reports.

31.  The SEC further charges Stanard with having aided and abetted RenRe's violations

of Exchange Act Section 13(b)(2), 15 U.S.C. § 78m(b)(2).  The SEC alleges that, as a result of

the improper accounting for the Inter-Ocean Transaction, RenRe violated that provision by failing to (1) make and keep books, records, and accounts, which, in reasonable detail, accurately and fairly reflected the transactions and dispositions of its assets; and (2) devise and maintain a system of internal accounting controls sufficient to provide reasonable assurances that (i) RenRe's transactions were recorded as necessary to permit preparation of financial statements in conformity with generally accepted accounting principles, and to maintain accountability for assets; and (ii) the recorded accountability for assets was compared with the existing assets at reasonable intervals and appropriate action was taken with respect to any differences.

32.   Exchange Act Section 20(e) provides that "any person that knowingly provides substantial assistance to another person in violation of a provision of [the Exchange Act], shall be deemed to be in violation of such provision to the same extent as the person to whom such assistance is provided."  15 U.S.C. § 78t(e).  Thus, to prove aiding and abetting liability, the SEC must prove (1) a securities law violation by the primary wrongdoer; (2) the aider and abettor's knowledge of the violation; and (3) that the aider and abettor substantially assisted in the violation.  See SEC v. Pimco Advisors Fund Mgmt. LLC, 341 F. Supp.2d 454, 467-68 (S.D.N.Y. 2004).

33.   The SEC has proved securities law violations by RenRe, the primary wrongdoer. The SEC need not establish scienter to prove either its Exchange Act Section 13(a) or Section 13(b)(2) claims.  See McNulty, 137 F.3d at 740-41;  SEC v. Todd, No. 03 Civ. 2230, 2007 WL 1574756, at *14 (S.D. Cal. May 30, 2007); SEC v. Wills, 472 F. Supp. 1250, 1268 (D.D.C. 1978).  To prove a violation of Exchange Act Rules 12b-20, 13a-1 and 13a-13, the SEC must establish that RenRe's filings at issue were materially false.  See 17 C.F.R. §§ 240.12b-20;  SEC

v. Koenig, No. 71 Civ. 5016, 1972 WL 329, at *6 (S.D.N.Y. June 20, 1972).  No dispute exists

that RenRe filed the false financial statements at issue.  Furthermore, for the reasons set forth

above, those false statements were material.  Thus, the trial evidence establishes that RenRe, the

primary wrongdoer, violated Exchange Act Rules 12b-20, 13a-1 and 13a-13.

34.  Exchange Act Section 13(b)(2) does not require a showing of materiality.  See

Foreign Corrupt Practices Act of 1977, SEC Release No. 34-17500, 1981 WL 36385, at *5 (Jan.

29, 1981); McNulty, 137 F.3d at 741 ("The Commission's interpretations of § 13 and of its own

regulations thereunder are entitled to deference."); SEC v. Patel, No. 07 Civ. 39, 2008 WL

781912, at *15 (D.N.H. Mar. 24, 2008).

35.  The trial evidence establishes that RenRe failed to keep accurate accounting records

related to the Inter-Ocean Transaction and that it failed to maintain a system of internal

accounting controls sufficient to do so.

36.  Having proved violations of the securities laws by the primary wrongdoer, the SEC

must also show the aider and abettor's knowledge of the violation.

37.  Courts have been clear in requiring a showing of "actual knowledge of the violation

by the aider and abettor."  SEC v. Cedric Kushner Promotions, Inc., 417 F. Supp. 2d 326, 334

(S.D.N.Y. 2006).  This Court has rejected the SEC's arguments for a recklessness standard under

section 20(e), which contradicts not only the plain language of the statute but also its legislative

history.  See SEC v. KPMG LLP, 412 F. Supp. 2d 349, 383 (S.D.N.Y. 2006) (quoting floor

debate:  "Although [the existing bill] authorizes the SEC to take action against aiders and

abettors who knowingly violate the securities laws, it effectively eliminates the ability of the

[SEC] to proceed against reckless professional assisters").

38.  The "actual knowledge" standard applies equally to the SEC's claims for aiding and abetting RenRe's alleged violation of section 13(a) of the Exchange Act and the related rules relating to the filing of periodic reports.  See Ponce v. SEC, 345 F.3d 722, 737 (9th Cir. 2003) (defendant must have had knowledge of the primary violation and of his role in furthering it to be liable for aiding and abetting company's section 13(a) violation).

39.  As found above, Stanard acted with knowledge that RenRe's accounting for the Inter-Ocean Transaction was incorrect, and its financial statement would accordingly be incorrect.  The Court therefore finds that Stanard is liable for aiding and abetting RenRe's violations of Exchange Act Sections 13(a) and 13(b)(2).

## III.    Relief

40.  For his several violations of the federal securities laws, the SEC requests that the Court enter a final judgment against Stanard (i) enjoining him from future violations of the federal securities laws; (ii) barring him from serving as an officer or director of a public company; and (iii) imposing a civil money penalty against him.

### A.    Permanent Injunction Against Future Violations

41.  Exchange Act Section 21(d) entitles the SEC to permanent injunctive relief upon a showing that (1) violations of the securities laws have occurred, and (2) a reasonable likelihood exists that violations will occur in the future.  15 U.S.C. §§ 77(t)(b) & 78u(d); SEC v. Commonwealth Chem. Secs., Inc., 574 F.2d 90, 99 (2d Cir. 1978);  SEC v. Manor Nursing Ctrs., Inc., 458 F.2d 1082, 1100 (2d Cir. 1972).

42.  To determine whether a permanent injunction is appropriate, courts look at the following factors: the fact that the defendant has been found liable for illegal conduct; the degree

58

of scienter involved; whether the infraction is an isolated occurrence; whether the defendant

continues to maintain that his past conduct was blameless; and whether, because of his

professional occupation, the defendant might be in a position where future violations could be

anticipated.  SEC v. Cavanagh, 155 F.3d 129, 135 (2d Cir. 1998).

43.  On balance, the Court finds it appropriate to impose against Stanard a permanent

injunction against future violations of the securities laws.

44.  Weighing in Stanard's favor is the fact that he has no previous history of SEC

violations and that the Inter-Ocean transaction was the only transaction, among hundreds

reviewed by both Boies Schiller and Ernst & Young, that was determined to have been

accounted for improperly.  (Ex. 94 at 1, 3.)

45.  The evidence, however, indicates that the Inter-Ocean Transaction was not the sole

improper finite reinsurance transaction that Stanard was contemplating for RenRe.  In a

September 2001 e-mail, for example, Cash recalled for Stanard at least one instance in which

RenRe used a bogus consulting agreement as a means of retrieving money it had paid to a

counterparty on another finite reinsurance transaction.  (Ex. 260.)

46.  Stanard is also an actuary and reinsurance executive.  He has made plain his desire to

return to the reinsurance industry in the future.  (Tr. 841-42.)  Stanard's occupation puts him in a

position from which future violations could be anticipated.

47.  Finally, Stanard has also continued to maintain that his past conduct was blameless.

While this stance is of course consistent with his denial of any personal involvement in the fraud,

Stanard's failure to accept responsibility and his lack of credibility at trial suggest the need to

enjoin him from future violations of the federal securities laws.

B.        Officer and Director Bar

48.  Section 20(e) of the Securities Act, 15 U.S.C. § 77t(e), and Section 21(d)(2) of the

Exchange Act, 15 U.S.C. § 78u(d)(2), permit the Court to bar from serving as an officer or

director of a public company any person who has violated Securities Act Section 17(a) or

Exchange Act Section 10(b), and whose conduct demonstrates "unfitness" to serve as an officer

or director.

49.  The Second Circuit has identified six non-exclusive factors that the Court may

consider when determining whether to impose an officer and director bar (and the duration of

such a bar): (i) the egregiousness of the underlying securities law violation; (ii) the defendant's

repeat offender status; (iii) the defendant's role or position when he engaged in the fraud; (iv) the

defendant's degree of scienter; (v) the defendant's economic stake in the violation; and (vi) the

likelihood that misconduct will recur.  SEC v. Patel, 61 F.3d 137, 141 (2d. Cir. 1995).

50.  The Court has substantial discretion in determining whether to impose an officer and

director bar and need not apply all the factors in every case.  Id.

51.  On balance, the Court finds that the factors weigh against an officer and director bar

for Stanard.  The Court finds particularly relevant Stanard's lack of previous securities law

violations and the fact that the injunctive relief already granted will provide a significant

deterrent, greatly reducing the likelihood that Stanard, who has had an otherwise unblemished

career, will engage in future securities violations as an officer or director.

52.  Additionally, Stanard's violations – while serious – are not, on the scale of things,

"egregious."  (Compare SEC v. Robinson, No. 00 Civ. 7452, 2002 WL 1552049, at *5 (S.D.N.Y.

July 16, 2002) (defendant's conduct was "egregious" for § 20(e) purposes when defendant lied

about his company's having a product to market, ties to established telecommunications companies, and an expectation of reaping billions of dollars in sales revenue, i.e., when his actions "constituted nothing but a polite form of theft.")).  While the false accounting gave a misleading impression of RenRe's profits over time, the incorrect accounting did not have the effect of creating false profits, hiding losses, or giving a misleading picture of RenRe's overall financial strength.

53.  Finally, the SEC has not shown that Stanard obtained any ill-gotten gains or unjust enrichment as a result of the fraudulent accounting.  There is no evidence that Stanard benefitted through bonuses, salary, or stock sales from the false accounting for the Inter-Ocean transaction. (See Ex. 39.)

    C.    Civil Money Penalty

54.  Section 21(d)(3) of the Exchange Act and Section 20(d) of the Securities Act authorize the Court to order civil money penalties for the violations at issue.  See 15 U.S.C. §§ 78u(d)(3) and 77t(d); SEC v. Palmisano, 135 F.3d 860, 865 (2d Cir. 1998).

55.  The Exchange Act and Securities Act provide three separate "tiers" of potential penalties, which increase depending upon the seriousness of the violation. 15 U.S.C. §§ 78u(d)(3) and 77t(d).  Tier I penalties, for non-scienter violations, may not exceed the greater of $5,000 per natural person for each violation or the gross amount of pecuniary gain to the defendant as a result of the violation.  Tier II penalties are available if the violation involved "fraud, deceit, manipulation, or deliberate or reckless disregard of a regulatory requirement," and may not exceed $50,000 per natural person for each violation or the gross amount of pecuniary gain to the defendant as a result of the violation.  Tier III penalties are available if the violation

involved "fraud, deceit, manipulation, or deliberate or reckless disregard of a regulatory

requirement" and the violation "resulted in substantial losses or created a significant risk of

substantial losses to other persons," and may not exceed $100,000 per natural person or the gross

amount of pecuniary gain to the defendant as a result of the violation.[9] Id.

56.  Stanard's violations involved fraud and the "deliberate or reckless disregard of a

regulatory requirement."  The SEC has not shown, however, that Stanard's violations resulted in

substantial losses or created a significant risk of substantial losses to other persons.  The Court

therefore finds that Stanard's violations fall under the category of Tier II.

57.  The Court has discretion in determining the appropriate amount of any penalty to

impose under these provisions.  The amount should be determined "in light of the facts and

circumstances" surrounding the violations. 15 U.S.C. §§ 77t(d), 78u(d)(3).  The factors to be

considered in evaluating such relief are familiar, and include: (1) the egregiousness of the

violations; (2) a defendant's scienter; (3) the repeated nature of the violations; (4) a defendant's

failure to admit wrongdoing; (5) whether a defendant's conduct created substantial losses or the

risk of substantial losses to others; (6) a defendant's lack of cooperation with authorities; and (7)

whether the penalty that would otherwise be appropriate should be reduced due to a defendant's

demonstrated current and future financial condition.  SEC v. Cavanagh, No. 98 Civ. 1818, 2004

WL 1594818, at *31, aff'd, 445 F.3d 105 (2d Cir. 2006).

58.  Most of these factors weigh in favor of a moderate financial penalty.  Stanard's

actions were knowing and he has failed to express remorse or recognition of the wrongfulness of

---

[9] For violations occurring after February 2, 2001, the maximum amounts of all civil penalties under the Securities Act of 1933 and the Securities Exchange Act of 1934 are adjusted for inflation.  17 C.F.R. § 201.1002.

his actions.  His violations must therefore be accounted serious.  At the same time, as already noted, the violations cannot be considered "egregious," and a substantial risk of loss to others has not been shown.  Moreover, the evidence in this case shows that Stanard gained nothing; his compensation was unaffected by the accounting misstatement at issue.  (See Ex. 39.)  While there were technically multiple violations of various provisions of the securities laws, all of them resulted from a single scheme.  Accordingly, the Court concludes that a total penalty of $100,000 is appropriately imposed for defendant's violations.  In view of defendant's substantial wealth, there is no reason to reduce the penalty that is otherwise appropriate.

## CONCLUSION

For the foregoing reasons, the Court:

(1) finds defendant Stanard liable for fraud violations under section 17(a) of the Securities Act of 1933 and section 10(b) of the Securities Exchange Act of 1934 and Rule 10b-5; for books and records violations under section 13(b)(5) of the Exchange Act and Rule 13b2-1; for making false or misleading statements to auditors under Rule 13b2-2; for providing false officer certifications in violation of Rule 13a-14; and for aiding and abetting violations of sections 13(a) and 13(b)(2) of the Exchange Act and Rules 12b-20, 13a-1 and 13a-13;

(2) permanently enjoins defendant Stanard from future securities violations;

(3) denies plaintiff's request for an order barring defendant Stanard from serving as an officer or director of a public company; and

(4) orders Stanard to pay $100,000 as a civil penalty.

The SEC is directed to submit an appropriate judgment on or before February 17, 2009.

SO ORDERED.

Dated: New York, New York
        January 27, 2009

GERARD E. LYNCH
United States District Judge